# JONES DAY

250 VESEY STREET • NEW YORK, NEW YORK 10281.1047

TELEPHONE: +1.212.326.3939 • FACSIMILE: +1.212.755.7306

Direct Number: (212) 326-3429
trgeremia@JonesDay.com

June 2, 2016

**BY ECF AND HAND**

The Honorable Loretta A. Preska
U.S. District Judge
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007-1312

    Re:    *In re Relativity Fashion, LLC,* No. 1:16-cv-04069-LAP (S.D.N.Y.)

Dear Judge Preska:

    We represent Relativity Media, LLC and more than 140 of its affiliates (collectively, "Relativity"), who are the reorganized debtors in this appeal from an Order and Injunction of the Bankruptcy Court (Wiles, J.). The appellant in this matter, Netflix, Inc., served us with its full set of papers on this "emergency" motion for a stay of the Bankruptcy Court's Order pending appeal only at 12:30 p.m. today. Relativity will submit an appropriate and complete response to Netflix's motion as ordered by the Court; and we respectfully submit that, in light of the five-day lapse between when the Bankruptcy Court issued its Order on May 27, 2016 and the date Netflix is making its motion, Relativity should likewise be afforded until June 7 to submit its opposition. We submit these brief remarks in advance of the conference with the Court this afternoon, at 3:15 p.m.

    Relativity is a reorganized "mini major" movie studio. The Bankruptcy Court confirmed Relativity's Plan of Reorganization and, in its decision accompanying the Order, ruled pursuant to Section 1142(b) of the Bankruptcy Code that the Order was necessary to consummate the Plan, and, in particular, that Netflix had asserted a bad-faith position under an assumed License Agreement with Relativity that was a collateral attack on the Plan and threatens to "collapse" the Plan by destroying the value of two films that, pursuant to the Plan, Relativity is scheduled to release later this year. The Bankruptcy Court found, for example: "I do not believe Netflix is asserting the alleged contractual rights in good faith. It is very clear that the license agreement here is better than the ones Netflix has negotiated more recently with other parties and that Netflix would like to get out of it. Netflix waited until very late in the process to spring this new issue on the debtors in the hopes that it could gain leverage to force a contract change or maybe even a contract cancellation." 5/27/16 Tr. at 36:19-37:1.

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DETROIT • DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES
MADRID • MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

The Bankruptcy Court's Order was issued in the morning of May 27, 2016, and was accompanied by a detailed ruling, following full briefing and three days of an evidentiary trial that ended on May 23, 2016. Netflix has now waited more than five days to make this "emergency" motion for a stay and to expedite its appeal. Netflix is also, in the meantime, in violation of certain provisions of the Bankruptcy Court's Order that went into immediate effect, even while Netflix seeks a "stay" of the Order that would, in effect, moot the appeal by giving Netflix an irreparable win, by allowing it to stream two of Relativity's films, *Masterminds* and *The Disappointments Room*, before those films have been theatrically released.

Netflix's belated motion for a stay should be denied. It has no likelihood of success on the merits, allowing Netflix to proceed as it proposed before the Bankruptcy Court issued its Order and injunction would enable Netflix, the losing party below, to obtain a permanent victory, and would further "collapse" the Plan and thus irreparably harm the Reorganized Debtors and other constituent parties. In this vein, the Bankruptcy Court rejected as incredible Netflix's position: "Netflix took the position in front of me that it did not know what the consequence for a theatrical distribution would be if Netflix streamed the movies. I found that the least credible testimony at the entire hearing in front of me. Netflix is in this business. It knows perfectly well what a Netflix distribution of these movies would accomplish, and in fact, and I specifically find Netflix is counting on that distribution to try to exact leverage against the debtors." 5/27/16 Tr. at 22:24-23:7. Conversely, Netflix would not be harmed one iota by litigating an appeal in the absence of a stay.

Some brief background makes this clear. Netflix was found by the Bankruptcy Court to not have been acting in good faith. Its witnesses were found not credible in seeking to change the express positions taken before the Bankruptcy Court in connection with the process for confirming Relativity's Plan. Furthermore, Netflix was found to have violated its express contractual agreement and duty to agree to routine date extension agreements in connection with financing that Relativity had obtained for the two films at issue whose theatrical release in 2016 was an integral part of the Debtors' Chapter 11 Plan, and which are projected to produce revenues in excess of $200 million—but only if released theatrically before they stream on Netflix's service. The Bankruptcy Court explained, "The debtors' witnesses, Ms. Benjamin, Ms. Stall, and Mr. Hohauser testified credibly that the standard practice in the industry is for the distributor to agree to assign payment to the lenders and also to include an outside date for payment to the lenders in order to ensure that the lenders receive money before the loans come due. These witnesses further testified credibly that it is a standard and customary practice for the distributors to waive defenses to such payments." 5/27/16 Tr. at 38:14-21.

On Friday, May 27, 2016, the Bankruptcy Court issued a detailed ruling on the record, speaking for over an hour and a half, and thereafter entered an Order, which was partially stayed

until Friday, June 3, 2016.  The Bankruptcy Court provided that it would review the transcript and issue any corrections.  Netflix immediately filed an appeal, on that same afternoon.  Now, Netflix has filed a late and misleading emergency motion.  And, by this emergency motion, Netflix seeks to permanently prevail on this dispute, not seek to maintain the status quo.  Netflix's motion misleadingly states that the Bankruptcy Court only issued its ruling on June 1, 2016.  In fact, the Order was issued shortly after the proceedings concluded on May 27 itself.  Moreover, Netflix's counsel and all the parties were present as the Bankruptcy Court read its decision into the record on May 27, stating then that it would correct later typos and the like.

More substantively, Netflix is seeking by its self-created emergency to obtain total victory, without giving this Court the opportunity to fully and fairly review the detailed record and findings of the Bankruptcy Court, issued after full briefing and a full evidentiary presentation.  What Netflix is seeking to do with this emergency stay is to obtain permanent relief, ignore its contractual obligations, and exhibit two of Relativity's films on Netflix's streaming service prior to their theatrical release, which would destroy their commercial value to Relativity and a slew of creditors who have secured interests in distributions pursuant to the Plan from theatrical release revenues earned by these two films.  The Bankruptcy Court specifically found that Netflix knew, as its own witness admitted, that at the time of the Confirmation Hearing that these films were projected to be theatrically released, and yet Netflix did not disclose, even while it otherwise objected to the Confirmation of the Debtors Reorganization Plan, its secret position that it purportedly had the right to stream these films before theatrical release.  The Bankruptcy Court specifically found that Netflix's witnesses did not testify credibly on these points: "I believe and find that Netflix has always understood that, as between it and Relativity, a prior theatrical release of movies was required before Netflix could distribute them.  The testimony by Ms. Gagan and Mr. Roy to the contrary was not credible, was contradicted by Netflix's prior papers, Mr. Roy's prior declaration, the exhibits Netflix offered at trial, including Netflix Exhibits 26 and 27, some of which contained other statements, including by Ms. Gagan herself, I believe, that the prior theatrical release is what Netflix bargained for and required and which was necessary before a movie could be distributed by Netflix."  5/27/16 Tr. at 45:1-11.

In 2010, Relativity and Netflix entered into what at the time was a groundbreaking agreement for Netflix, providing it for the first time with first run theatrical films to stream on its internet service during the "Pay TV" window, normally a mere few months after theatrical release, when most studios licensed their first run theatrical films to pay television distributors such as HBO, Showtime and Cinemax.  Previously, Netflix could only obtain those films after the Pay TV window, as long as eight years after theatrical release.

The License Agreement had a provision, Section 5.6, that required Netflix to enter into reasonable and customary agreements for the benefit of Relativity and its lenders in order to provide for the financing of Relativity films that would later, after theatrical release, be streamed

on the Netflix service.  The Bankruptcy Court heard unrebutted expert testimony about these agreements from an expert for Relativity, as well as testimony from the Relativity executive in charge of negotiating these financing agreements, and the bank officer from an agent for the lenders who signed the two agreements at issue, and was in charge of this type of financing for the bank.  Section 5.6 had a unique provision, underscoring that this particular provision is "essential to Relativity and its willingness to enter into this Agreement."  The testimony credited by the Bankruptcy Court was that theatrical release prior to streaming was the essence of the License Agreement, was specifically required by the License Agreement, was the industry norm and custom, and was the clear intent of the parties.  Furthermore, the testimony was clear and found credible that the ancillary financing documents are for the benefit of the lender and that distributors such as Netflix routinely sign such ancillary documents as they are required to do, and routinely sign extensions of dates for delivery or streaming or other distribution to accommodate delays in production or theatrical screening.  The Bankruptcy Court reasoned that, "So long as the agreements requested by the debtors and the lenders are consistent with the license agreement itself, Section 5.6 requires Netflix to cooperate. In fact, it requires all agreements reasonably requested to accommodate the debtors and lenders in that regard. Reference to all agreements includes amendments, cancellations and replacements of prior agreements just as much as it covers the initial agreements themselves." 5/27/16 Tr. at 41:10-17.

In fact, the cornerstone of the opposition that Netflix presented to the Bankruptcy Court in objecting, in February 2016, to confirmation of the Plan and to the assumption of its license agreement was that Relativity had failed to release the minimum number of films in theaters before being provided to Netflix, and casting doubts on Relativity's ability to release the minimum number of films in theaters before providing them to Netflix, including the two films at issue here.  Netflix's own witnesses testified—and the uncontroverted evidence was—that agreements to extend the dates for delivery of films and payment by Netflix was customary to accommodate revised theatrical release dates, due to delays.  Netflix did not disclose to the Bankruptcy Court in February that it would not sign any such routine documentation for the two films that were at issue on this motion, and that Netflix would instead, notwithstanding the request of Relativity and its lenders, insist on having to pay for the two subject films in June, 2016 so that it would seek to have the right to immediately stream the films.  The Bankruptcy Court ruled that, in light of this and other bad-faith conduct by Netflix, it was estopped from now changing its position and attempting to invoke its purported "rights" under the ancillary financing documents to stream these films prior to their theatrical release.

The uncontroverted testimony was that such premature streaming of the films would likely destroy Relativity's ability to obtain financing for the planned theatrical release, and that if any theatrical release were even possible after streaming the Films on the Netflix service it would only yield a small fraction of the projected domestic box office revenues, revenues that were essential to the Reorganization Plan.  The Bankruptcy Court found that Relativity's

witnesses credibly testified on these issues: "The debtors' witnesses in this proceeding have testified credibly that a release of *Masterminds* and *The Disappointments Room* on the Netflix system in the manner that Netflix now contends it can do, would destroy, as a practical matter, the debtors' ability to accomplish the theatrical release on which all of the projections depend, and destroy the collateral on which the lenders and other parties depend, and in fact, would destroy the theatrical release on which even Netflix's own obligations under the license agreement depend." 5/27/16 Tr. at 21:19-2.

For these and other reasons we will present in a more complete opposition in accordance with a schedule to be set by the Court, the Court should summarily deny the "stay" Netflix is seeking that will, in effect, hand it a victory on an issue where the Bankruptcy Court roundly rejected Netflix's positions and held that, if Netflix were allowed to proceed as it planned, would destroy the Plan. While Relativity consents to a reasonable schedule to expedite the submissions on this appeal, a stay is not warranted here and is wholly inappropriate.

Respectfully submitted,

Todd R. Geremia

cc: Van C. Durrer, II, Esq.
Tonia O. Klausner, Esq.
Walter Curchack, Esq.