# Case No. 1:16-cv-04069-LAP

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Honorable Loretta A. Preska |
| RELATIVITY FASHION, LLC., et al., | Appeal from a Final Order in Bankruptcy Case No. 15-11989 (MEW) |
| Debtors. | Chapter 11 (Jointly Administered) |
| NETFLIX, INC. | |
| Appellant, | |
| v. | ORAL ARGUMENT REQUESTED |
| RELATIVITY FASHION, LLC., et al., | |
| Appellees. | |

---

## APPELLANT NETFLIX INC.'S OPENING BRIEF

---

Stephen R. Mick (*admitted pro hac vice*)
L. Rachel Lerman (*pro hac vice pending*)
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, California 90067
Telephone: (310) 244-3880
Facsimile: (310) 284-3894
smick@btlaw.com
rlerman@btlaw.com

Scott H. McNutt *(pro hac vice to be sought)*
Shane J. Moses *(pro hac vice to be sought)*
McNUTT LAW GROUP LLP
219 9th Street
San Francisco, California 94103
Telephone: (415) 995-8475
Facsimile: (415) 995-8487
smcnutt@ml-sf.com
smoses@ml-sf.com

Tonia Ouellette Klausner
WILSON SONSINI GOODRICH & ROSATI PC
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
tklausner@wsgr.com

*Attorneys for Netflix, Inc.*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................2

INTRODUCTION ..................................................................................3

STATEMENT OF THE CASE ..............................................................7

SUMMARY OF ARGUMENT ............................................................21

ARGUMENT ........................................................................................23

    I.     THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN GRANTING RELATIVITY RELIEF AND EFFECTIVELY NULLIFYING THE DISPUTED TERMS OF THE NOA CONTRACTS. ...................................................................23

        A.     Statutory Background. ...........................................................23

        B.     The doctrines of res judicata, collateral estoppel, and judicial estoppel do not apply as a matter of law...................................25

        C.     Application of bar and estoppel defenses are questions for the arbitrator...................................................................26

        D.     None of the estoppel and bar defenses applies on the merits. ..28

            1.     Res judicata does not apply to bar a creditor's exercise of post-confirmation rights under an assumed contract......28

            2.     Issue preclusion does not apply because the present issue was not adjudicated during the bankruptcy proceeding. 31

        E.     Judicial estoppel does not apply. .............................................34

    II.    THE BANKRUPTCY COURT SHOULD HAVE DEFERRED TO THE PARTIES' BROAD ARBITRATION AGREEMENT. ............36

        A.     A bankruptcy court has no discretion to deny arbitration of a non-core matter when the parties have agreed to arbitrate such disputes...................................................................37

        B.     Even if the dispute were core, the Bankruptcy Court erred in refusing to compel arbitration. .............................................39

    III.   THE BANKRUPTCY COURT LACKED SUBJECT MATTER JURISDICTION TO RULE ON THE MERITS OF THE PARTIES' CONTRACT DISPUTE...................................................................40

IV.    EVEN ON THE MERITS, WHICH IT SHOULD NOT HAVE
       REACHED, THE BANKRUPTCY COURT GOT IT WRONG. ......42

              A.    The Court's reliance on evidence of custom in the
                    industry is contrary to California law..................44

              B.    Section 5.6 of the License Agreement does not
                    require Netflix to agree to modify the Start
                    Dates ..................................................................46

              C.    The Bankruptcy Court's Order is fundamentally
                    inconsistent with the Bankruptcy Code...............47

V.    AS AN INDEPENDENT MATTER, THIS COURT SHOULD
      STRIKE THE PORTIONS OF THE ORDER THAT ENJOIN
      SPEECH BECAUSE THEY ARE UNCONSTITUTIONAL ON
      THEIR FACE. ....................................................................48

CONCLUSION ....................................................................................51

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adelphia Recovery Trust v. Goldman, Sachs & Co.*,
748 F.3d 110 (2d Cir. 2014) ...............................................................34

*Alexander v. U.S.*,
509 U.S. 544 (1993)............................................................................47

*Arciniaga v. Gen. Motors Corp.*,
460 F.3d 231 (2d Cir. 2006) ...............................................................36

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)............................................................................36

*Baker v. General Motors Corp.*,
522 U.S. 222 (1998)............................................................................27

*Balderman v. U.S. Veterans Admin.*,
870 F.2d 57 (2d Cir. 1989) ................................................................31

*Bynum v. Connecticut Comm'n on Forf. Rights*,
410 F.2d 173 (2d Cir. 1969) ..............................................................48

*Collins & Aikman Products Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995) ..................................................................36

*Corbett v. MacDonald Moving Servs., Inc.*,
124 F.3d 82 (2d Cir. 1997) ...........................................................27, 28

*Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*,
226 F.3d 160 (2d Cir. 2000) ..........................................................36, 37

*DeRosa v. Nat'l Envelope Corp.*,
595 F.3d 99 (2d Cir. 2010) ................................................................34

*Diorinou v. Mezitis*,
237 F.3d 133 (2d Cir. 2001) .................................................................2

*Drug Purchase, Inc. v. Dubroff*,
    485 F. Supp. 887 (S.D.N.Y. 1980) ....................................................49

*Dynegy Danskammer, L.L.C. v. Peabody COALTRADE Int'l Ltd.*,
    905 F. Supp. 2d 526 (S.D.N.Y. 2012) ..............................................40

*Exec. Benefits Ins. Agency v. Arkinson (In re Bellingham Insurance Agency, Inc.)*,
    134 S. Ct. 2165 (2014)...............................................................41, 42

*G.M. Leasing Corp. v. United States*,
    429 U.S. 338 (1977)......................................................................49

*Greenberg v. Board of Governors of the Federal Reserve System*,
    968 F.2d 164 (2d Cir. 1992) ..........................................................28

*In re Adelphia Recovery Trust*,
    634 F.3d 678 (2d Cir. 2011) ..........................................................34

*In re Adler*,
    395 B.R. 827 (E.D.N.Y. 2008) ......................................................31

*In re Applic. of New York Times Co.*,
    878 F.2d 67 (2d Cir. 1989) ............................................................48

*In re Belton*,
    No. 15 CV 1934 VB, 2015 WL 6163083 (S.D.N.Y. Oct. 14, 2015)..................39

*In re Circle K Corp.*,
    190 B.R. 370 (B.A.P. 9th Cir. 1995), *aff'd*, 127 F.3d 904 (9th Cir. 1997) ........................................................................................23

*In re DBSD N. Am., Inc.*,
    427 B.R. 245 (S.D.N.Y. 2010) ........................................................2

*In re Escarent Entities, L.P.*,
    423 F. App'x 462 (5th Cir. 2011) .......................................15, 25, 30

*In re Fleming Cos., Inc.*,
    499 F.3d 300 (3d Cir. 2007) ..........................................................24

*In re Fleming Companies, Inc.*, 42 Bankr. Ct. Dec. (CRR) 171, 51
   Collier Bankr. Cas. 2d (MB) 1178, 2004 WL 385517
   (Bankr. D.Del. 2004), ........................................................................24

*In re Ionosphere Clubs, Inc.*,
   85 F.3d 992 (2d Cir. 1996) ...............................................................23

*In re Lawrence Grp., Inc.*,
   285 B.R. 784 (N.D.N.Y. 2002)...........................................................37

*In re McGrahan*,
   459 B.R. 869 (1st Cir. BAP 2011).....................................................30

*In re Mintze*,
   434 F.3d 222 (3d Cir. 2006) ..............................................................39

*In re National Gypsum Co.*,
   208 F.3d 498 (5th Cir. 2000) .............................................................24

*In re Orion Pictures Corp.*,
   4 F.3d 1095 (2d. Cir. 1993) ...............................................................37

*In re Ortiz*,
   665 F.3d 906 (7th Cir. 2011) .............................................................41

*In re Park Ave. Radiologists, P.C.*,
   450 B.R. 461 (Bankr. S.D.N.Y. 2011)..............................39, 40, 46, 47

*In re Pin Oaks Apartments*,
   7 B.R. 364, 6 Bankr. Ct. Dec. (CRR) 1396 (Bankr. S.D. Tex. 1980) ..........24, 26

*In re Residential Capital, LLC*,
   519 B.R. 593 (S.D.N.Y. 2014) ...................................................... 2, 37

*In re Superior Toy & Mfg. Co.*,
   78 F.3d 1169 (7th Cir.1996) ..............................................................23

*In re Texaco Inc.*,
   254 B.R. 536 (Bankr. S.D.N.Y. 2000)...............................................24

*In re Winimo Realty Corp.*,
   270 B.R. 108 (S.D.N.Y. 2001) ............................................................2

*Kopel v. Campanile (In re Kopel)*,
    232 B.R. 57 (Bankr. E.D.N.Y.1999) ...................................................24

*Lawlor v. National Screen Service Corp.*,
    349 U.S. 322 (1955)........................................................................28

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011) ...........................................................29

*Madsen v. Wmn's Health Ctr., Inc.*,
    512 U.S. 753 (1994)........................................................................47

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) ...........................................................29

*MBNA Am. Bank, N.A. v. Hill*,
    436 F.3d 104 (2d Cir. 2006) .............................................. 36, 38, 39

*Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*,
    336 F.3d 185 (2d Cir. 2003) .............................................................3

*Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*,
    460 U.S. 1 (1983).............................................................................36

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Belco Petroleum Corp.*,
    88 F.3d 129 (2d Cir.1996) ...............................................................27

*Nebraska Press v. Ass'n Stuart*,
    427 U.S. 539 (1976)........................................................................47

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)...................................................................23, 24

*NLRB v. United Technologies Corp.*,
    706 F.2d 1254 (2d Cir. 1983) .........................................................28

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)..........................................................................38

*Oldroyd v. Elmira Sav. Bank, FSB*,
    134 F.3d 72 (2d Cir. 1998) .............................................................35

*Matter of Pan Am. Sch. of Travel Inc.*,
  47 B.R. 242 (Bankr. S.D.N.Y. 1985)................................................................47

*Pettibone Corp. v. Easley*,
  935 F.2d 120 (7th Cir. 1991) .......................................................................39, 47

*Prime Management Co. v. Steinegger*,
  904 F.2d 811 (2d Cir. 1990) ..............................................................................28

*Matter of Providence Journal*,
  820 F.2d 1342 (1st Cir. 1986), *opin. modified on reh'g*,
  820 F.2d 1354 (1st Cir. 1987)............................................................................47

*R.A.V. v. St. Paul*,
  505 U.S. 377 (1992)............................................................................................47

*Residential Funding Co., LLC v. UBS Real Estate Sec., Inc.*,
  No. 14 CIV. 03039 GBD, 2015 WL 1062264 (S.D.N.Y. Mar. 6,
  2015) ...................................................................................................................40

*Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*,
  272 B.R. 74 (Bankr. S.D.N.Y. 2002)..................................................................47

*Riverside Nursing Home v. N. Metro. Residential Health Care
  Facility, Inc.*,
  977 F.2d 78 (2d Cir. 1992) .................................................................................49

*Rivet v. Regions Bank of Louisiana*,
  522 U.S. 470 (1998)............................................................................................27

*RKA Film Financing, Inc. v. Ryan Kavanaugh et al.*,
  New York Supreme Court Case No. 652592/2015 ...............................................3

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) .............................................................................28

*Simon v. Safelite Glass Corp.*,
  128 F.3d 68 (2d Cir. 1997) .................................................................................34

*Stern v. Marshall*,
  564 U.S. 462 (2011)....................................................................................*passim*

*Storey v. Cello Holdings, LLC*,
   347 F.3d 370 (2d Cir. 2003) ...............................................................29

*Taylor v. Sturgell*,
   553 U.S. 880 (2008)..........................................................................28

*Triumph Const. Corp. v. New York City Council of Carpenters Pension Fund*,
   29 F. Supp. 3d 373 (S.D.N.Y. 2014) ..................................................26

*U.S. Fire Ins. Co. v. Nat'l Gypsum Co.*,
   101 F.3d 813 (2d Cir. 1996) ...............................................................26

*United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.)*,
   346 B.R. 456 (Bankr. N.D.Ill. 2006) ..................................................24

*United States v. Quattrone*,
   402 F.3d 304 (2d Cir. 2005) ...............................................................47

*United States v. Salameh*,
   992 F.2d 445 (2d Cir. 1993) ...............................................................48

*Uzdavines v. Weeks Marine, Inc.*,
   418 F.3d 138 (2d Cir. 2005) .................................................................2

**State Cases**

*Jackson v. Porter Land & Water Co.*,
   151 Cal. 32 (1907) ..............................................................................33

*Meyer v. Sullivan*,
   40 Cal. App. 723 (1919) .....................................................................32

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
   69 Cal. 2d 33 (1968) ...........................................................................43

*Parsons v. Bristol Development Co.*,
   62 Cal.2d 861 (1965) ............................................................................3

*Peiser v. Mettler*,
   50 Cal. 2d 594 (1958) .........................................................................44

*Reeder v. Longo*,
    131 Cal. App. 3d 291 (1982) ..............................................................32

*Sabo v. Fasano*,
    154 Cal. App. 3d 502 (1984) ..............................................................32

*Steiner v. Thexton*,
    48 Cal. 4th 411 (2010) ........................................................................3

*Varni Bros. Corp. v. Wine World, Inc.*,
    35 Cal. App. 4th 880 (1995), *as modified on denial of reh'g* (July
    7, 1995) ........................................................................................43, 44

*Wesley N. Taylor Co. v. Russell*,
    194 Cal. App. 2d 816 (1961) ..............................................................32

## Federal Statutes

9 U.S.C. § 2 .............................................................................................10, 36

9 U.S.C. § 16 ...................................................................................................1

11 U.S.C. § 365 ......................................................................................*passim*

11 U.S.C. § 502 ..............................................................................................30

11 U.S.C. §1107 .............................................................................................23

11 U.S.C. § 1141 ......................................................................................40, 47

11 U.S.C. § 1142 ........................................................................................1, 50

28 U.S.C. § 157 .....................................................................................1, 38, 42

28 U.S.C. § 158 ................................................................................................1

28 U.S.C. § 1334 ........................................................................................1, 37

## State Statutes

Cal. Civ. Code § 1655 .....................................................................................43

## Bankruptcy Rules

Rule 8003 .........................................................................................................1

Rule 8014 ............................................................................................ 2

Rule 8015 ............................................................................................2

**Constitutional Provisions**

First Amendment of the U.S. Constitution ...........................................23

**Other Authorities**

Restatement (Second) of Judgments § 24................................................28

# JURISDICTIONAL STATEMENT
## (Bankruptcy Rule 8014(a)(4))[1]

On May 27, 2016, the Bankruptcy Court issued a final order ("Order") denying the motion of appellant Netflix, Inc. ("Netflix") to compel arbitration of its post-confirmation state law contract dispute with former debtor Relativity Media ("Relativity"), and granting, in substantial part, Relativity's motion, purportedly filed under 11 U.S.C. §1142(b), to compel Netflix to relinquish its rights under contracts that Relativity had assumed in its chapter 11 bankruptcy proceeding.

The Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") had jurisdiction over Netflix's motion to compel arbitration under 28 U.S.C. §1334(b).  This Court has jurisdiction under 28 U.S.C. §158(a) and 9 U.S.C. §16(a)(1)(C) to hear this appeal from the order denying that motion. Netflix contests the Bankruptcy Court's jurisdiction to adjudicate and issue a final order on Relativity's motion.  This Court has jurisdiction to review the Bankruptcy Court's order and determine jurisdictional issues under 28 U.S.C. §158(a)(1).

Netflix's appeal was timely noticed on May 27, 2016 and amended June 6, 2016.  Bankr. R. 8002(a)(1), 8003.

---

[1] Netflix, Inc. files this appeal brief pursuant to Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 8000 *et seq.* (as amended in 2014).  This brief complies with Bankruptcy Rule 8015(a)(7)(B)(i) because it is no longer than 14,000 words.  *See* Certificate of Compliance at the end of the brief.

## STATEMENT OF ISSUES
### (Bankruptcy Rule 8014(a)(5))

1.     **Whether the Bankruptcy Court erred in ruling that Netflix is barred or estopped from asserting its rights under the contracts that the Relativity assumed in chapter 11 bankruptcy.**

Application of claim and issue preclusion is reviewed de novo.  *Diorinou v. Mezitis,* 237 F.3d 133, 138 (2d Cir. 2001).  Invocation of judicial estoppel is likewise "a pure question of law," reviewed de novo.  *Uzdavines v. Weeks Marine, Inc*., 418 F.3d 138, 142 (2d Cir. 2005).

2.     **Whether the Bankruptcy Court erred in refusing to compel arbitration of the parties' state law contract dispute.**

A bankruptcy court's decision declining to compel arbitration is reviewed de novo.  *In re Winimo Realty Corp*., 270 B.R. 108, 117 (S.D.N.Y. 2001).

3.     **Whether the Bankruptcy Court lacked jurisdiction to adjudicate the parties' state law contract dispute.**

Jurisdiction is reviewed de novo, *In re DBSD N. Am., Inc*., 427 B.R. 245, 250 (S.D.N.Y. 2010), as is a bankruptcy court's characterization of a proceeding as core or non-core, *Winimo*, 270 B.R. at 117.  This Court reviews de novo a bankruptcy court's proposed findings of fact and conclusions of law with respect to "a proceeding that is not a core proceeding."  *In re Residential Capital, LLC*, 519 B.R. 593, 599 (S.D.N.Y. 2014) (citing 28 U.S.C. §157(c)(1)).

4.     **Whether the Bankruptcy Court's decision on the merits of the parties' state law contract dispute was wrong as a matter of law.**

California courts review de novo a lower court's interpretation of a contract. *Steiner v. Thexton*, 48 Cal. 4th 411, 425 (2010) (citing P*arsons v. Bristol Development Co*., 62 Cal.2d 861, 865-66 (1965)).[2]

**5.      Whether the Bankruptcy Court's orders restraining Netflix's future speech are void under the First Amendment.**

First Amendment issues are reviewed de novo.  *Melzer v. Bd. of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 198 (2d Cir. 2003).

## INTRODUCTION

In 2010, Relativity entered into an 8-year output agreement with Netflix, pursuant to which Relativity promised to produce and deliver to Netflix a minimum number of theatrical quality motion pictures each year.  By 2015, Relativity was sinking fast.  It had accrued more than a billion dollars in debt (Dkt. #14); it was by its expert's own admission using money borrowed for future movie releases to pay current expenses (AA0714); and it was unable to produce, deliver or release the movies it had promised to Netflix and others.  In July 2015, one of its major lenders sued Relativity's CEO and a group of other insiders, accusing them of running a Ponzi scheme.[3]  Relativity filed for bankruptcy protection soon after.

In the bankruptcy proceeding, Relativity initially proposed to sell its business.  There were no takers.  Relativity then sold off a related television subsidiary, and proposed to reorganize its motion picture business under chapter

---

[2] All the contracts at issue include a California choice-of-law provision.
[3] *See* Amended Complaint filed in *RKA Film Financing, Inc. v. Ryan Kavanaugh et al*., New York Supreme Court Case No. 652592/2015, ex. A to Netflix's Request for Judicial Notice ("RJN"), filed with this brief.

11.  At the outset, Relativity told the Bankruptcy Court that—in addition to wiping out half a billion in debt owed to creditors—it would need $100 million in new capital to go forward.

Over the course of the bankruptcy proceeding, Relativity represented to the Bankruptcy Court it had secured the money it needed, but these representations turned out to be false.

In the end, Relativity convinced the Bankruptcy Court to let it emerge from chapter 11 on the hope and promise that it would somehow find all of the new capital it needed, despite its track record of deception and failure.  Not surprisingly, Relativity continues to flounder.  In just the past two months, it has lost the rights to one of the films on its "projected" release schedule, failed to deliver another, and has no prospect of releasing a third film on the promised schedule.  And the lenders' Ponzi scheme lawsuit against the Relativity insiders continues on in New York state court.  (*See* fn. 1, *supra*.)

Against this backdrop, Relativity's effort to escape the obligations of its contracts with Netflix is not at all surprising.  What is surprising is the Bankruptcy Court's failure to see through Relativity's deceptive gambit.

In the chapter 11 proceeding, Relativity was permitted to assume or reject its contracts with Netflix.[4]  The statutory process for assuming contracts is carefully

---

[4] In 2010, Relativity assigned the License Agreement to Relativity Distribution Domestic, LLC ("RML").  RML and its subsidiaries (Armored Car Productions, LLC, and DR Productions, LLC) are the only reorganized debtors that are parties to the contracts at issue here, and thus the only entities, besides Relativity, with a direct stake in the Order on appeal sufficient to confer standing.  For the sake of simplicity, we refer to the company and contracting parties as Relativity.

structured by Congress to protect the interests of third-party creditors (such as
Netflix) who have contract rights with the debtor.  Thus, it is well-established that
assumption of a contract requires the debtor to hew to the terms of the contract.  11
U.S.C. ("Code") §365.   Likewise, if the debtor rejects a contract, the third-party
creditor is entitled to a claim for default damages in the unsecured creditor's pool.
*Id*.  What the debtor absolutely *cannot* do is pick and choose the provisions in a
contract that it wants to honor.  A bankruptcy court "violate[s] its obligation to
ensure that [the debtor] assume[] the contract in toto" when it permits a debtor to
impose an "un-agreed-to modification."  *In re Escarent Entities, L.P.*, 423 F.
App'x 462, 467 (5th Cir. 2011).  That is exactly what happened here.

    Relativity could have rejected the agreements it had with Netflix for the
films *Masterminds* and *Disappointments Room* (the "Subject Films").  That would
have relieved Relativity of the burdens associated with Netflix's rights or its own
obligations under those contracts.  But it also would have deprived Relativity of
the Netflix payments that it hoped to leverage in the future, and given Netflix a
claim in the bankruptcy estate.  So Relativity chose to assume the Netflix contracts.

    The terms of those contracts were clear and well-understood. Completion
Guarantors ("UniFi"), the third party engaged to guarantee delivery of the Subject
Films to Netflix, filed papers in the bankruptcy proceeding specifically pointing
out the Relativity obligations associated with the "outside date" clauses in the
contracts (*i.e.*, the provision the Bankruptcy Court seemed to think was known
only to Netflix).  Throughout the process, even Relativity's papers acknowledge
that the terms of the contracts regarding the Subject Films are clear on their face.

5

(AA0047.)  Faced post-confirmation with a contractual obligation imposing an economic cost it realized it did not wish to bear, Relativity asked the Bankruptcy Court to abrogate a fundamental tenet of bankruptcy law and allow it to forcibly modify the terms of an assumed contract, and to do so *post-confirmation*.

Over the objection of Netflix—which consistently argued that the entire contract dispute needed to be arbitrated pursuant to the parties' broad arbitration agreement—the Bankruptcy Court held evidentiary hearings, denied Netflix's motion to compel arbitration, overruled Netflix's other jurisdictional objections, and then proceeded to do something extraordinary.  Realizing it lacked jurisdiction to force Netflix to sign an amendment that would modify the terms of an assumed contract (as Relativity requested), the Bankruptcy Court *sua sponte* rejected the contracts on the Subject Films by judicial fiat.

Although the Bankruptcy Court recited numerous findings laying the foundation for a legally unsustainable forced modification, it stopped short of actually granting that relief in its Order.  Instead, it nullified the contracts related to the Subject Films by issuing injunctive relief against all of the contractual provisions at issue—and thus deprived Netflix of the benefits of those contract provisions, as though they had been rejected in the bankruptcy process, without a single protection that would have been available to Netflix under the Code.

This result cannot stand.  The obligation to assume or reject the contracts – and to evaluate the burdens and benefits thereof—rested entirely on Relativity. Relativity made its choice fully aware of the obligation it now seeks to avoid, and the protections in the Bankruptcy Code and applicable law preclude the

Bankruptcy Court from stripping Netflix of its rights under the contracts in an *ex post facto* order. The Bankruptcy Court's Order allows Relativity to obtain through a post-confirmation motion contractual modifications that the Bankruptcy Court lacked authority to grant during the bankruptcy process. Sustaining this Order would rip a gaping hole in the statutory bankruptcy process of assumption and rejection, and subject third parties to years of future uncertainty over whether their contract rights with the allegedly reorganized debtor are real, or will be nullified in the future because Relativity and the Bankruptcy Court find them too economically onerous.

This Court should reverse the Bankruptcy Court's Order, compel Relativity to engage in arbitration in California as it expressly agreed to do in the NOA Contracts it assumed, and vacate the portions of the Order that separately violate the First Amendment rights of Netflix and others.

## STATEMENT OF THE CASE

**A.    The Parties**

Appellant Netflix is a global provider of films and television series to consumers on a subscription basis and is headquartered in Los Gatos, California. (AA0007.)

Appellee Relativity is a privately held media company located in Beverly Hills, California. (*See* http://relativitymedia.com (last viewed June 20, 2016).) Among other things, the company acquires, develops, produces, and

distributes films.  (*Id.*)  In July 2015, Relativity and affiliated companies filed for chapter 11 bankruptcy protection in the Bankruptcy Court.

**B.     The Parties' Pre-Petition Contracts**

Long before Relativity filed for bankruptcy, the parties entered into the three contracts at issue here.

**1.     The License Agreement**

On June 1, 2010, Netflix and Relativity entered into an output-type license agreement (the "License Agreement") with respect to motion pictures produced or distributed by Relativity.  (AA0007.)  The License Agreement calls for Relativity to provide Netflix a certain number of first run, theatrically released films ("Titles") on an annual basis between 2010 and 2018, and grants Netflix a license to make these films available to its customers through its subscription video-on-demand service ("Service"), should it choose to do so.  (*Id.*)

The term "Titles" is defined in the License Agreement to "mean any and all … first run, theatrically released feature films that are financed, produced, and/or distributed, in whole or in part, by Relativity … in the Territory and whose first theatrical release in the Territory occurs during the Output Term and which are designated by Relativity for license to Netflix hereunder."  (AA0007.)

"Output Term" is defined to include the entire term of the agreement (from the effective date through 2018).  As long as Relativity provides the minimum number of Titles, Relativity does not have to designate all of its theatrically released films to Netflix.  (AA0031, 0011, §4.2.)

Under the License Agreement, Netflix's rights in each film vest when it accepts delivery of the film.  (AA0016, §6.3.)  Netflix's first payment of the license fee for each Title is due on an initial "Start Date," which is defined as the date on which Netflix is entitled to release the Title on its Service. (AA0014-15, §5.4; AA0029-33.)

The License Agreement also contains a provision requiring Netflix to execute documents reasonably requested by Relativity's *lenders* when they are "of a nature which are customarily entered into in connection with comparable credit facilities."  (*Id*. §5.6.)  However, this provision also includes language, on which Netflix insisted during negotiations (AA0825-26), limiting the scope of documents that Netflix can be required to sign.  This language states that Netflix "shall not [be required to sign documents that] result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this Agreement …" (AA0015, §5.6.)

In July 2014, Relativity designated the films *Masterminds* and *Disappointments Room* as Titles under the License Agreement.  (AA0075-76.)

## 2.    The Notice of Assignment Contracts

Soon after Relativity designated the Subject Films as Titles, Netflix and Relativity, along with Relativity's production lender, OneWest Bank (now CIT Bank), UniFi, and the individual Relativity-affiliated production companies that produced each of the Subject Films, entered into two Notice of Assignment agreements (the "NOA Contracts") expressly amending the License Agreement. (AA0050, 0078, ¶D.)

9

These NOA Contracts were heavily negotiated and serve multiple purposes.

First, the NOA Contracts direct Netflix to pay the Minimum Guaranteed amount (the license fee under the License Agreement) directly to the lending bank, rather than to Relativity, based on Relativity's assignment of the distribution license fees to the bank.  (AA0051, 0079, §2.)

Next, the NOA Contracts amend the License Agreement by establishing fixed outside dates on which payment would be due for the Subject Films: June 17, 2016 for *Masterminds* and June 30, 2016 for *Disappointments Room.*  (AA0050, 0078, ¶D.[5])  CIT Bank requested these terms to ensure that the license fees would be paid before the loans matured, regardless of unexpected events such as delays to planned theatrical release of the Subject Films.  *Id.*

In exchange for agreeing to pay CIT Bank by the Payment Dates, Netflix requested and obtained a provision stating that Netflix may release the Subject Films on its Service on the same fixed outside dates, even if these dates are earlier than the dates provided for in the License Agreement.  (*Id.*)  This provision assures

---

[5] The NOA for *Masterminds* provides that "the Minimum Guaranteed Payment is due and payable in full on the later of (1) Delivery (as defined below) and (2) the earlier of (I) one hundred-twenty (120) days after the earlier of (a) release of the Film for Home Video … or (b) the date of first Non-Premium VOD exploitation of the Film or (II) twelve (12) months after the initial theatrical release of the Film …; provided, however, that *if the date set forth in (2) above has not occurred on or before June 17, 2016, then (y) such date shall be deemed to occur on June 17, 2016*, and (z) the first Start Date for the first Availability Period for the Film shall be the earlier of (A) the date set forth in (y) above and (B) the date prescribed in the Distribution Agreement."  (AA0050, ¶ D, emphasis added.)  The NOA for *Disappointments Room* is identical except that it specifies June 30, 2016 as the latest possible Start Date.  (AA0078, ¶D.)

Netflix of a fixed end date by which it will pay and release the film, or will no longer be obligated to pay for it.  (*Id.*)

In short, provided that delivery of the Subject Films is effected pursuant to the NOA Contracts, Netflix must pay CIT Bank on the fixed outside date even if the Subject Films do not satisfy Relativity's obligations under the License Agreement.  Netflix nevertheless retains the right to object to nonconforming films as to Relativity and sue for breach.

Finally, the NOA Contracts include a provision calling for any and all disputes to be arbitrated under the auspices of the Independent Film & Television Alliance ("IFTA"). The arbitration provision broadly covers:

> All controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in ***any way upon, arising under, relating to, or arising in connection with*** the Film or the Distribution Rights, this Agreement, satisfaction of the Conditions Precedent including Delivery, or any resulting transaction, including, but not limited to, their respective obligations hereunder, payment of the Minimum Guaranteed Payment and any other Distribution Agreement Proceeds, a disagreement about the meaning, interpretation, application performance, breach, termination, enforceability, or validity of this Agreement, and whether based on statute, tort, contract, common law or otherwise ....

(AA0056, 0084, §6, emphasis added.)  Under the IFTA rules, the arbitrator decides arbitrability.  (IFTA Rules 8.1. and 8.3; available at http://www.ifta-online.org/rules-international-arbitration (last viewed June 20, 2016).)

C.      **The Chapter 11 Bankruptcy Proceeding**

1.      **Relativity files for chapter 11 bankruptcy relief.**

In July 2015, Relativity and certain affiliates filed chapter 11 petitions in the Bankruptcy Court.  The bankruptcy cases were jointly administered.

2.      **Netflix objects to Relativity's assumption of the License Agreement.**

As part of its proposed plan, Relativity decided to assume the License Agreement and NOA Contracts with Netflix (instead of rejecting them and eliminating those obligations).  (Dkt.# 1239.)

Netflix objected to assumption of the License Agreement—and to the proposed plan itself—on the grounds that Relativity had failed to distribute the yearly minimum of movies in 2015 as required by the contract, and was thus in default of the License Agreement.  Netflix argued that Relativity could neither cure that default nor provide Netflix with "adequate assurances" that it would be able to meet its future obligations, as Code § 365 requires.  (AA0114.)

Indeed, Relativity's proposed film schedule revealed its plan to release only seven films each in 2016 and 2017—less than half the minimum number of Titles required by the License Agreement.  (AA0150, 0250.)  Even though Relativity could not comply with the Minimum Title requirements in the License Agreement, the Bankruptcy Court overruled Netflix's objection.  (Dkt.# 1573, p. 22, ¶5.)[6]

---

[6] During the hearing on the objection, Netflix agreed to withdraw the objection as to feasibility of the plan, based on the Bankruptcy Court's decision requiring Relativity to make further showings as to financing and management.  (Dkt.# 1592, pp. 80-81, 87-88.)

Netflix's objection and supporting argument at the confirmation hearing were limited to the question of whether Relativity would be able to meet the minimum yearly delivery requirements in the License Agreement. (AA0114.) Netflix contended that Relativity had failed to meet the yearly minimums in the past, and could not and would not do so in the future, and that assumption of the License Agreement should thus not be allowed.  (AA0115-16.) The question of whether Netflix could, if it chose, accept nonconforming films, was never at issue.

The Bankruptcy Court overruled Netflix's objection based on its conclusion that provisions in the License Agreement limited the remedies available for the Relativity's failure to meet the yearly minimums.  (AA0154:10-18; Dkt.# 1573, p. 19, ¶KK, p. 22, ¶5.)

### 3.    Relativity signs an agreed order acknowledging that the NOA Contracts are binding on all parties.

The completion guarantor, UniFi, objected, *inter alia*, to Relativity's assumption of the NOA Contracts, explaining that Relativity's failure to deliver by the Delivery Dates set forth in those contracts could trigger a claim against UniFi:

> [Relativity] apparently intends to assume, and then perform all of its distribution agreements, for all territories and Netflix; however, the Plan does not cure the prospective defaults on the outside dates; and ***does not propose to amend or extend those outside dates***; as such the September 30 release of *Masterminds* may cause wholesale breaches of the various distribution agreements.

(AA0111, n.3, emphasis added.)

UniFi also filed a motion for annulment or relief from the automatic stay to "clear the way to complete delivery to the distributors[.]"  (Dkt.# 1645, p. 5.)  An

agreed order signed by UniFi and Relativity reflects their understanding that, if the Relativity failed to meet the delivery dates set forth in the NOA Contracts, "[Relativity], UniFi, CIT and others may be adversely effected [sic] and suffer losses." (AA0257-58.)  The agreed order explicitly requires delivery of the Subject Films to Netflix by the Delivery Dates in the NOA Contracts.  (*Id.*)

> **4.** **Relativity proposes various theatrical release dates, but never suggests the dates are inconsistent with the Start Dates in the NOA Contracts.**

Over the course of the confirmation process, Relativity submitted a series of theatrical release schedules for films to be released post-confirmation, including the Subject Films.  None of the schedules contain any reference to the date on which the Subject Films would be available to Netflix, whether under the terms of the License Agreement or the NOA Contracts.

In December 2015, Relativity submitted a proposed release schedule in connection with summary financial projections attached to its disclosure statement in support of the Plan.  (Dkt.# 1143, p. 250.)  In January 2016, just days before the confirmation hearing, Relativity submitted a second declaration with updated projections and a revised release schedule.  (AA0143-51.)  The theatrical release dates proposed were March 2016—*i.e.*, just one month later—for *Disappointments Room*, and September 2016 for *Masterminds*.  (*Id.*)  After the Plan was confirmed, Relativity submitted yet another iteration of its proposed release schedule, this time with a proposed release of *Disappointments Room* in December 2016.  (AA0238, 0250.)

14

     **5.**      **The Plan is confirmed in February and substantially consummated by mid-April 2016.**

At the outset of the bankruptcy proceeding, Relativity advised the Bankruptcy Court that, in addition to wiping out half a billion in debt owed to creditors, they would need $100 million in new capital to go forward.  (Dkt.# 1143, pp. 166, 191.)

Despite several public statements by Relativity representing that it had secured the needed $100 million in new capital from, among others, the money never materialized.

In late January 2016, Relativity told the Bankruptcy Court that it had $20 million in new capital (Dkt.# 1505, Ex. A., p. 13.), and an agreement with actor Kevin Spacey in which he would become chairman of the company post-bankruptcy.  (Dkt.# 1503, ¶¶5-6.)  But it did not have $20 million in new capital (AA0241-43, AA0253.), and Mr. Spacey declined the invitation to join the company. (Dkt.# 1642, Ex. A.)

In the end, Relativity convinced the Bankruptcy Court to let it emerge from chapter 11 based on a hollow assertion that it would somehow come up with the necessary capital.

In February 2016, the Bankruptcy Court confirmed Relativity's Fourth Amended Plan of Reorganization (the "Plan").  (AA0156; Dkt.# 1573.)  On April 14, 2016, Relativity filed a notice of confirmation and Plan effectiveness, stating, *inter alia*, that, "[t]he Effective Date of the Plan occurred on April 14, 2016, and the Plan was substantially consummated."  (Dkt.# 1766, p. 3.)

Lacking revenue or new capital, Relativity predictably continues to flounder. In just the last two months, it has lost the rights to one of the films on its "projected" release schedule, failed to deliver another, and has no prospect of releasing a third film as scheduled.  And the lenders' Ponzi scheme lawsuit against the Relativity insiders continues in the New York state court.  (RJN Ex. A.)

### 6. Netflix accepts the nonconforming Subject Films.

The Subject Films were delivered to Netflix in April 2016 in accordance with the UniFi agreed order and the NOA Contracts.  (AA0895.)  Relativity had not yet released the Subject Films in theaters, but Netflix formally accepted them pursuant to the terms of the NOA Contracts, and was prepared to pay CIT Bank in on the fixed outside dates specified in the NOA Contracts.  (*Id*.)  Netflix's right to release the Subject Films on its service vested when Netflix served a Notice of Acceptance for each Film.  (*Id*. at 895-96; AA0016, §6.3.)

### a. Relativity demands that Netflix agree to new Start Dates for the Subject Films.

Relativity never addressed the Start Dates dates for the Subject Films during the confirmation process, so Netflix was taken by surprise when it received a letter from Relativity shortly after the Subject Films were delivered, demanding that Netflix execute amendments to the assumed NOA Contracts.  Specifically, Relativity wanted to change the Start Dates, and postpone Netflix's right to release the Subject Films on its Service.  (Dkt.# 1860, pp. 30-31.)  Relativity threatened to pursue various remedies, including emergency motions in the Bankruptcy Court and/or withdrawal of the Films, if Netflix did not agree.  (*Id*.)

Unwilling to cede to Relativity's unexpected demand and its skewed interpretation of the assumed contracts, Netflix filed and served a Notice and Demand for Arbitration pursuant to ¶ 6 of the NOA Contracts, seeking declaratory relief as to the parties' rights under the contracts. Within hours of receiving the Notice and Demand, Relativity filed its own motion in the Bankruptcy Court asking that court to *compel* Netflix to execute the amendments Relativity desired. (AA0265.)  Netflix subsequently filed a motion with the Bankruptcy Court to compel arbitration of the disputes raised by the Relativity motion.  (AA0408.)

**D.  The Bankruptcy Court denies Netflix's request for arbitration and grants Relativity relief instead.**

The Bankruptcy Court held evidentiary hearings on both motions and, on May 27, 2016, read its findings into the record and issued an Order denying the arbitration motion and granting Relativity's motion, albeit in a different form than Relativity had requested.  (AA1036, 1021.)

The Bankruptcy Court denied Netflix's motion to compel arbitration based on its conclusions that (1) the arbitration provision somehow did not cover the parties' dispute regarding the meaning of the assumed contracts, and (2) the parties' state law contract dispute was a core proceeding for the Bankruptcy Court to resolve based on its jurisdiction over the chapter 11 proceeding and the confirmed Plan.  (AA1062.)

Even though Netflix had raised no affirmative claim (apart from its request for a declaration of the parties' rights in arbitration), the Bankruptcy Court decided

that Netflix was subject to the *defenses* of res judicata and estoppel and barred Netflix from asserting its contractual rights.  (AA1066.)

With respect to res judicata, the Bankruptcy Court decided it was Netflix's duty (rather than Relativity's duty) to alert the Court during the chapter 11 proceeding that the assumed NOA Contracts might prove economically burdensome to Relativity.

With respect to judicial estoppel, the Court ruled that Netflix's interpretation of the assumed contracts contradicted its position in the bankruptcy proceeding-- specifically, Netflix's assertion that Relativity had promised to distribute a minimum number of theatrically released films each year.  (AA1047-48 ["There was no suggestion at any time that the theatrical release was not necessary to Netflix or that it was not a precondition to Netflix's right and obligations."].)  The Court discounted Netflix's explanation that theatrical release was not a precondition to Netflix's ability to release the films on its service, but simply a promise by Relativity to release the films theatrically.  Even if Relativity failed to deliver films meeting that description, Netflix maintained its contractual right to accept the films anyhow, and waive Relativity's non-compliance.  (AA1064.)

The Bankruptcy Court also ruled, contrary to California law, that Relativity's reading of the contracts was supported by extrinsic evidence of custom in the industry, even though such evidence is admissible only to aid in interpretation of an ambiguous term, and is not admissible to vary the express terms of the contracts.  (AA1067 ["It appears quite clear to me from the evidence

that, as a matter of custom[,] [Relativity] and CIT are entitled to new Notices of Assignments that will incorporate reasonable new outside dates."].)

In the end, the Bankruptcy Court issued an Order that stopped short of compelling Netflix to agree to modify the terms of the assumed contracts, but granted Relativity multiple forms of injunctive relief that effectively erase, or nullify, the Start Date terms on which Netflix was relying and add new terms to the assumed contracts.

The Bankruptcy Court advised Relativity it could seek an order compelling Netflix to agree to modify the NOA Contracts in other fora. (AA1023, ¶5.) It added that Netflix would not be required to make its guaranteed payments under the NOA Contracts until "a court of competent jurisdiction has resolved any disputes among the parties as to the dates" they should be made, effectively striking the Payment Dates set forth in the NOA Contracts. (*Id*.)

The Bankruptcy Court also prohibited Netflix from releasing the Subject Films (or any other films) on its Service, "unless and until they are first released theatrically" (A1023, ¶6), thereby adopting reorganized Relativity's interpretation of the assumed contracts.

Next, the Bankruptcy Court issued two mandatory injunctions:

• It ordered Netflix to dismiss the arbitration proceeding. (*Id*., ¶7.)[7]

• It required Netflix to "confirm and acknowledge that payments due from Netflix with respect to the distribution of the Subject Films have been assigned as

---

[7] In fact, no arbitration proceeding was pending because the arbitral tribunal had requested additional documents before proceeding with arbitration.

collateral for the repayment of the Replacement Production Notes issued pursuant to the Plan and will be paid by Netflix [to CIT Bank] in accordance with such assignments," even though there was no pending dispute as to this portion of the NOA Contracts.  (AA1022-23, ¶4.)

Finally, the Bankruptcy Court issued two prohibitory injunctions constraining the future speech of Netflix and others:

• It "estopped, barred and enjoined" "Netflix and all persons in active concert or participation with Netflix … from distributing or contending that they have the rights to distribute the films Masterminds and The Disappointment Room … on any dates prior to the dates specified in the Distribution Agreement … without regard to the terms of the [NOA Contracts]."  (AA1022, ¶3.)

• It ruled that "Netflix shall not take any further actions to collaterally attack the confirmation order."  (AA1023, ¶8.)

Netflix requested a stay in the Bankruptcy Court on May 27, 2016, but the Bankruptcy Court denied Netflix's request except with respect to paragraph 4, requiring Netflix to "confirm and acknowledge" it would pay CIT Bank, which it stayed for one week, to June 3, 2016.  (*Id.,* ¶9.)

Netflix appealed the Order on May 27, 2016.  (AA1936.)

**E.    This Court denies Netflix a stay but agrees to expedite the appeal.**

On June 2, 2016, Netflix filed an Emergency Motion in this Court to Stay the Bankruptcy Court's order pending appeal and/or strike the orders restraining speech, and to expedite the appeal.  This Court heard argument and denied the motion for stay, but instructed the parties to work out an expedited briefing

schedule for appeal.  The Court approved the parties' proposed briefing schedule the following week.  (AA1123.)

## SUMMARY OF ARGUMENT

1.  Bar and estoppel are defenses.  They do not, as a matter of law, apply to prevent Netflix from asserting its contractual rights in opposition to Relativity's motion to compel Netflix to relinquish them.  To the extent these defenses apply to Netflix's efforts to obtain declaratory relief in arbitration, it is up to the arbitrator, not the Bankruptcy Court, to consider whether to apply them.

a.  Res judicata does not apply to after-arising claims like the ones at issue here, which concern rights that arose only after confirmation of the Plan, and which are not mentioned in the Plan.  Netflix had no obligation to alert the Bankruptcy Court to its future rights, which were apparent on the face of the assumed contracts; it was Relativity's duty to reject the contracts if it had reason to believe it could not meet its obligations or that the contracts would be burdensome.

b.  Issue preclusion does not apply, either.  The Bankruptcy Court stated that the contract dispute had already been adjudicated, but that statement improperly conflates two separate issues: (1) Relativity's promise to deliver films of a certain character, and (2) Netflix's contractual right to accept or reject the films even if they are not of that character.  In ruling that Relativity's obligation to make and deliver certain types of films limits what Netflix can receive and distribute, the Bankruptcy Court ignored bedrock principles of contract law concerning a buyer's rights to accept nonconforming goods.  The parties' discussion of the License Agreement during the bankruptcy proceedings was

limited exclusively to the question of Relativity's obligations.  Nothing was said about the fixed outside dates or Netflix's rights, as the Bankruptcy Court itself conceded, so the present question was not adjudicated and issue preclusion does not apply.

        c.     Judicial estoppel does not apply because there is no risk of inconsistent results.  Netflix stands by its original position that Relativity would be unable to meet their obligations, a position the Court did not adopt.  Presently, Netflix asserts its own rights to accept the films despite Relativity's failure to meet its obligations.

        2.     The Bankruptcy Court lacked discretion to refuse to compel arbitration of the parties' non-core contract dispute under the broadly-worded arbitration agreement signed by the parties.  Even if the case could be construed as core, the Court was required to compel arbitration in the absence of a "serious conflict" between the Federal Arbitration Act (the "FAA") and post-confirmation arbitration of the parties' contractual rights.

        3.     Relativity did not overcome the legal hurdles necessary to establish the Bankruptcy Court's diminished post-confirmation jurisdiction.  Further, under *Stern v. Marshall*, 564 U.S. 462 (2011), a bankruptcy court lacks authority to make factual and legal determinations in a state law action independent of the federal bankruptcy law, when the issues were not resolved in ruling on a proof of claim.

        4.     The Court's decision on the merits of the parties' state law contract dispute is also wrong as a matter of law.  The Court based its decision primarily on evidence of "custom," which is not admissible to vary the express terms of a

contract under California contract law.  The Court also misread the License Agreement to permit Relativity to modify material terms at its sole discretion.

5.      As an independent matter, the Bankruptcy Court's orders restraining future speech are void under the First Amendment of the U.S. Constitution.

## ARGUMENT

**I.      THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN GRANTING RELATIVITY RELIEF AND EFFECTIVELY NULLIFYING THE DISPUTED TERMS OF THE NOA CONTRACTS.**

### A.      Statutory Background.

Under Code § 365, a debtor in bankruptcy is allowed, with permission of the bankruptcy court, to assume or reject an executory contract, *i.e.*, a contract "on which performance remains due to some extent on both sides."  *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6 (1984) (quotation marks omitted); *see* Code §365 (setting forth rights and powers of trustee); *see also id*. §1107(a) (giving substantially identical rights and powers to debtor-in-possession).

If a chapter 11 debtor cannot fulfill its obligations under an executory contract, or views the contracts as burdensome to reorganization, it may reject the contract.  When a contract is rejected, the Code treats it as breached as of the petition date, and affords the nondebtor party a claim in bankruptcy to compensate it for the debtor's breach.  Code §§365(g), 502(g); *see Bildisco*, 465 U.S. at 531.

If a debtor assumes such a contract, it assumes it in full.  *See In re Ionosphere Clubs, Inc*., 85 F.3d 992, 999 (2d Cir. 1996).  In enacting Code § 365, Congress directed bankruptcy courts "'to insure that the contracting parties receive

the full benefit of their bargain'" when a debtor decides to assume a contract it is free to reject.  *Id.* (quoting *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir.1996) (citing S.Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845; H.R.Rep. No. 595, 95th Cong., 2d Sess. 348 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05)). *See also In re Circle K Corp.*, 190 B.R. 370, 376 (B.A.P. 9th Cir. 1995), *aff'd*, 127 F.3d 904 (9th Cir. 1997) (stating that the purpose behind Code § 365 is to "balance the state law contract right of the creditor to receive the benefit of his bargain with the federal law equitable right of the debtor to have an opportunity to reorganize.").

A debtor who elects to assume a contract thus "cannot simply retain the favorable and excise the burdensome provisions of [the] agreement."  *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 63–64 (Bankr. E.D.N.Y.1999).  The contract must be assumed in full, or "*cum onere* [with all of its burdens]." *Bildisco*, 465 U.S. at 531; *see also, e.g., In re Texaco Inc.*, 254 B.R. 536, 550 n.1 (Bankr. S.D.N.Y. 2000) (a debtor must accept "both the obligations and the benefits of the executory contract.") (citing *In re National Gypsum Co.*, 208 F.3d 498 (5th Cir. 2000)); *In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) ("[t]he [debtor] ... may not blow hot and cold. … If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.")).  In short, the *cum onere* rule "prevents the estate from avoiding obligations that are an integral part of an assumed agreement."  *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.)*, 346 B.R. 456, 468 n.11 (Bankr. N.D.Ill. 2006) (citation omitted).

Accordingly, neither the debtor nor the bankruptcy court may strike or modify the express terms of an assumed contract without the non-debtor party's freely-given consent.  "Section 365 provides that a debtor's assumption and assignment cannot modify an agreement's express terms; it does not require the other party to the contract to agree to changes, even if the overall impact lowers [the debtor's] costs." *In re Fleming Companies, Inc.*, 42 Bankr. Ct. Dec. (CRR) 171, 51 Collier Bankr. Cas. 2d (MB) 1178, 2004 WL 385517 at *3 (Bankr. D. Del. 2004), *aff'd*, 499 F.3d 300 (3d Cir. 2007) (citation omitted); *see also In re Pin Oaks Apartments*, 7 B.R. 364, 367, 6 Bankr. Ct. Dec. (CRR) 1396 (Bankr. S.D. Tex. 1980) ("If Congress intended to give [the Bankruptcy] Court or the trustee the power to abrogate any contractual rights between a debtor and non-debtor contracting party other than anti-assignment and "ipso facto" clauses, it would have expressly done so.").

A bankruptcy court "violate[s] its obligation to ensure that [the debtor] assume[] the contract in toto" when it  permits a debtor to impose an "un-agreed-to modification." *Escarent Entities,* 423 F. App'x at 467.  Unfortunately, that is what happened here.

**B.    The doctrines of res judicata, collateral estoppel, and judicial estoppel do not apply as a matter of law.**

As a structural matter, it was error for the Bankruptcy Court to apply these affirmative defenses to prevent Netflix from asserting its contractual rights, which arose post-confirmation, in opposition to reorganized Relativity's motion to compel Netflix to agree to modify the contracts.  These defenses are not tools to

prevent a party from asserting its rights under a contract or from opposing another party's affirmative claim interpreting terms of the contract.  They are tools that shield a defendant who is the subject of a legal claim.  Netflix has not tried to prosecute a claim in the bankruptcy court; it has not challenged the confirmation order; it has not contended that any of the Plan provisions are improper; and it has not sought to block any other party's rights under the Plan.  If anything, Netflix should be protected from Relativity's attempt to modify Netflix's rights under the contracts Relativity had assumed *cum onere*.

Instead of barring reorganized Relativity from gaining an advantage it could not have gained in the bankruptcy proceeding, however, the Bankruptcy Court characterized Relativity's motion as one seeking to "enforce" the Plan.  (AA1069.) This characterization of Relativity's motion is without support in the record.  As the Bankruptcy Court itself acknowledged, "there was no prior testimony at confirmation as to any specific new outside date that would be requested from Netflix," nor could it recall "seeing any such provision in the plan documents or in the notes that were issued to CIT [Bank] and other parties."  (AA1066.) Reorganized Relativity thus did not move to enforce any aspect of the Plan; it sought relief from burdensome aspects of the assumed contracts.

### C.   Application of bar and estoppel defenses are questions for the arbitrator.

To the extent bar and estoppel defenses apply to Netflix's efforts to obtain declaratory relief in arbitration, it is up to the arbitrator, not the Bankruptcy Court, to consider whether to apply them.  The Bankruptcy Court believed that it should

apply these defenses because it was the one who presided over the bankruptcy proceeding and issued the final judgment (AA1051.) ["I am the only one who knows exactly what I previously decided and why"]), but the Court was wrong as a matter of law.  It is well-established that "substantive defenses such as res judicata, waiver, estoppel, and laches are properly reserved for the arbitrator" when, as here, the parties' contract provides for arbitration.  *Triumph Const. Corp. v. New York City Council of Carpenters Pension Fund*, 29 F. Supp. 3d 373, 390-91 (S.D.N.Y. 2014); *see id*. at 392 ("[t]here is no principled categorical distinction to be drawn between different affirmative defenses going to the substance of the dispute: all must be left for the arbitrator to decide."); *see also U.S. Fire Ins. Co. v. Nat'l Gypsum Co*., 101 F.3d 813, 816 (2d Cir. 1996) ("issue preclusion, like other defenses to arbitrability, is arbitrable, and, because issue preclusion can be arbitrated, it must be arbitrated."); *Nat'l Union Fire Ins. Co. of Pittsburgh*, *Pa. v. Belco Petroleum Corp*., 88 F.3d 129, 135-36 (2d Cir.1996) ("a claim of preclusion is a legal defense.... As such, it is itself a component of the dispute on the merits.... It is as much related to the merits as such affirmative defenses as a time limit in the arbitration agreement or laches, which are assigned to an arbitrator").

Finally, the Bankruptcy Court was not entitled to assume jurisdiction simply because it chose to rule on preclusion and estoppel defenses.  *See Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 478 (1998) ("a defense, such as the res judicata or claim preclusive effect of a prior federal judgment, cannot be a basis for federal jurisdiction.").

**D.    None of the estoppel and bar defenses applies on the merits.**

**1.    Res judicata does not apply to bar a creditor's exercise of post-confirmation rights under an assumed contract.**

Res judicata (or claim preclusion) bars litigation of claims (*i.e.*, causes of action) that were or could have been raised in a prior action.  *E.g.*, *Baker v. General Motors Corp.,* 522 U.S. 222, 233, n. 5 (1998) ("a valid final adjudication of a claim precludes a second action on that claim or any part of it").  Res judicata bars prosecution of an action if "1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, *and* 4) the causes of action were the same."  *Corbett v. MacDonald Moving Servs., Inc*., 124 F.3d 82, 87–88 (2d Cir. 1997) (emphasis added).  In bankruptcy cases, courts also consider whether an "independent judgment in a separate proceeding would impair, destroy, challenge, or invalidate, the enforceability or effectiveness of the reorganization plan."  *Id.*  This prong does not operate independently, but in conjunction with the other four elements, *id*., *all* of which must be established.  *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("the party asserting preclusion must carry the burden of establishing *all* necessary elements.") (emphasis added).

Res judicata does not apply, *period*, if the second litigation involves "different transactions, and especially *subsequent* transactions[.]"  *S.E.C. v. First Jersey Sec., Inc*., 101 F.3d 1450, 1464 (2d Cir. 1996) (emphasis added) (citing *Lawlor v. National Screen Service Corp*., 349 U.S. 322, 328 (1955) (res judicata did not bar claim for anticompetitive conduct occurring subsequent to first suit); *Greenberg v. Board of Governors of the Federal Reserve System*, 968 F.2d 164,

168–70 (2d Cir. 1992) (same regarding different financial transactions); *Prime Management Co. v. Steinegger*, 904 F.2d 811,  816 (2d Cir. 1990) (same regarding subsequent breaches of contract); *NLRB v. United Technologies Corp*., 706 F.2d 1254,  1260 (2d Cir. 1983) (same regarding subsequent labor conflicts over same type of employee activity at different times and places, involving different employees)).[8]

A corollary to this principle precludes the application of res judicata when the court in the first action could not have awarded the relief requested in the new one.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (citations omitted).

Here, the Bankruptcy Court was disturbed because no one, including Relativity itself, had alerted it to the prospect that Netflix's future rights under the assumed contracts might prove economically onerous to Relativity.  (AA1041-47.) To protect Relativity, the Bankruptcy Court tried to bar Netflix from exercising its unambiguously stated rights under the assumed NOA Contracts.  But res judicata is not only structurally and jurisdictionally inapposite, as discussed above, it is inapplicable because the questions regarding Netflix's rights had not yet arisen as of the date of the Bankruptcy Court's Order confirming the Plan.  Netflix's rights did not come into effect, let alone vest, until the Subject Films were delivered to

---

[8] *See also* Restatement (Second) of Judgments § 24 comment d (when a contract is to be performed over a period of time and one party has sued for a breach but has not repudiated the contract, res judicata will preclude the party's subsequent suit for any claim of breach that [] occurred prior to the first breach-of-contract suit, but will not preclude a subsequent suit for a breach that had not occurred when the first suit was brought).

Netflix and Netflix accepted them.  Both of these events transpired *after* the Plan was confirmed and substantially consummated.

Because the Bankruptcy Court could not have awarded declaratory or any other type of relief to a hypothetical, unripe dispute concerning the scope of Netflix's yet to be realized rights, res judicata does not apply.  *Marvel*, 310 F.3d at 287; *Storey v. Cello Holdings*, *LLC*, 347 F.3d 370, 383 (2d Cir. 2003) ("Claims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by res judicata.").

Furthermore, it is self-evident that a creditor "hardly need[s] to file a claim in bankruptcy court to obtain an asset it already own[s]." *Lockheed Martin Corp. v. Retail Holdings, N.V*., 639 F.3d 63, 71 (2d Cir. 2011).  Netflix had no obligation to alert the Bankruptcy Court to its express rights under the assumed contracts. Netflix did warn the Court that Relativity would likely be unable to meet its contractual obligations, but the Court elected to believe Relativity's assertions that it could.  The Bankruptcy Court's decision to construe Netflix's "silence" as to as yet unripe rights as waiver of those rights is inimical to the doctrine of res judicata and contrary to bankruptcy law.  Because the Plan was silent about Netflix's rights, they survive as a matter of law.  A plan's silence as to a third party's rights "cannot be deemed … as binding [that party] and prohibiting it from exercising those rights." *In re McGrahan*, 459 B.R. 869, 875 (1st Cir. BAP 2011); *see also id*. (explaining that a chapter 13 plan is not binding "as to issues not sufficiently

30

evidenced in a plan to provide adequate protection to the creditor") (citation and quotations omitted).

Had there been any doubt in Relativity's mind regarding its ability to honor the terms of the contracts it assumed, it was up to Relativity to reject the contracts during the chapter 11 proceeding.   Had it done so, Netflix would have been entitled to claim default damages against Relativity, and to recover for that claim in the unsecured creditors pool.  Code §§ 365(g), 502(g).  Having assumed contracts it had reason to know could prove onerous, Relativity is now obliged to honor them.  The Bankruptcy Court had no authority to relieve Relativity of this obligation during, much less after, confirmation of the Plan.  A bankruptcy court "violate[s] its obligation to ensure that [the debtor] assume[] the contract in toto" when it  permits a debtor to impose an "un-agreed-to modification." *Escarent Entities*, 423 F. App'x at 467.

### 2. Issue preclusion does not apply because the present issue was not adjudicated during the bankruptcy proceeding.

Collateral estoppel (or issue preclusion) is a defense that operates to preclude a party "from relitigating an issue that was 'raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action.'"   *In re Adler*, 395 B.R. 827, 835 (E.D.N.Y. 2008) (quoting *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 62 (2d Cir. 1989)).  While the Bankruptcy Court did not refer explicitly to this form of preclusion, its reasoning suggests it considered and applied it.

Specifically, the Bankruptcy Court stated at several junctures that the issue in dispute had already been adjudicated, because the parties had agreed during the bankruptcy proceeding that Relativity had promised to provide Netflix with films that had been theatrically released.  (AA1047-49, 1058, 1063-65.) These statements reflect the Bankruptcy Court's conflation of two separate issues: (1) *Relativity's* promise to deliver films of a certain character, and (2) *Netflix's* contractual right to accept the films as delivered, even if they are not of the promised character, *i.e.*, are nonconforming.  The parties' discussion of the License Agreement during the bankruptcy proceedings was limited exclusively to the first question.  Nothing was said about the Start Dates or Netflix's rights, which had yet to vest.  The Bankruptcy Court itself conceded that "there was no prior testimony at confirmation as to any specific new outside date that would be requested from Netflix," nor was "any such provision in the plan documents or in the notes that were issued to CIT [Bank] and other parties."  (AA1066.)

In ruling that an obligation on the part of Relativity to make and deliver certain types of films limits what Netflix can receive and distribute (AA1063-65), the Bankruptcy Court ignored the bedrock principle of contract law that a contractual description of the goods to be delivered can always be waived by buyer, who is entitled to accept nonconforming goods at its sole discretion.  It is well settled under California law, which is the law selected by the parties, (AA0023-24, § 10.1; AA0058-59 and 86-87, § 9), that a "contracting party may waive provisions placed in a contract solely for his benefit."  *Reeder v. Longo*, 131 Cal. App. 3d 291, 296 (1982); *see also Sabo v. Fasano*, 154 Cal. App. 3d 502, 505

(1984) ("It is well settled a contracting party may waive conditions placed in a contract solely for that party's benefit."); *Meyer v. Sullivan*, 40 Cal. App. 723, 731 (1919) (holding that buyers who had purchased wheat while it was aboard ship could waive the provision obliging the sellers to transfer the wheat from the dock to the deck of the steamship, because the provision was for buyers' benefit).

This kind of issue arises frequently in numerous commercial contexts, including sales of real estate and goods. For example, real-estate purchasers often enter into agreements that are conditioned on the purchaser securing a loan. Because the condition is included in the contract solely to protect the purchaser, the purchaser's right to buy the property is not conditioned on securing a loan; rather, the purchaser could decide unilaterally to waive the provision and purchase the property without securing a loan. *Wesley N. Taylor Co. v. Russell*, 194 Cal. App. 2d 816, 828-29 (1961). By contrast, a seller cannot escape his obligations to sell the property on the ground the buyer decided not to obtain a loan. *Id*.

The same principle applies when a buyer receives goods that do not conform to contractual requirements. As the California Supreme Court explained:

> As to the purchaser, he is bound to accept the property, provided it conforms to the terms of the contract, or, if not according to the contract, he may reject or refuse to accept it. Although the property may not be of the quality or description contracted for, he may nevertheless, if he so elect, waive the defect, and acceptance of the property offered constitutes such a waiver."

*Jackson v. Porter Land & Water Co*., 151 Cal. 32, 39 (1907).

This venerable principle of contract law applies here. Relativity agreed under the assumed contracts to provide films of proven theatrical quality.

(AA0010-11, §4.1.1.)  This promise was for the benefit of Netflix; it was not a condition precedent to Netflix's right to release the films on its service, as the Bankruptcy Court seemed to believe.

In sum, Netflix's objection to assumption of the License Agreement was directed at showing that Relativity could not deliver the goods as promised. Netflix was not suggesting that its own rights should be compromised as a result. Only after Relativity sought post-confirmation to preclude Netflix from exercising its rights when they vested did a dispute arise concerning the scope of those rights, which was always plain on the face of the NOA Contracts.[9]

### E.   Judicial estoppel does not apply.

"'Typically, judicial estoppel will apply if: 1) a party's later position is clearly inconsistent with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party

---

[9] "Conditions precedent are not favored in the law and the provisions of a contract will not be construed as conditions precedent in the absence of language plainly requiring such construction."  *Pacific Allied v. Century Steel Products*, 162 Cal.App.2d 70, 79-80 (1958).  Accordingly, the parties expressly stated in their agreements when a party's rights or obligations operated as conditions precedent. In the NOA Contracts, for example, the parties state that Netflix's obligation to pay the Minimum Guarantee Payments "is conditioned only on satisfaction" of specifically defined "Conditions Precedent" (AA0052 and 80, §2(g)), and that Netflix's payment of the Minimum Guarantee Payment "is a condition precedent to the grant to [Netflix] of any of the Distribution Rights" (*id*. at (f)).  In the License Agreement, the parties used the term "provided that" to set conditions on a party's rights or obligations.  (*E.g*., AA0019-20, §7.5.2 (conditioning party's ability to settle certain disputes on first obtaining written consent from indemnified party); AA0025-26, §10.8 (conditioning party's right to assign agreement to wholly owned subsidiary on three express conditions).)

seeking estoppel.'" *In re Adelphia Recovery Trust*, 634 F.3d 678, 695-96 (2d Cir. 2011) (citing *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010)). Courts in this Circuit, however, "'limit judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain.'" *Id*. at 696 (citing *DeRosa*, 595 F.3d at 103).  This "means that judicial estoppel may only apply where the earlier tribunal accepted the accuracy of the litigant's statements." *Id*. (citing *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997)).

Likewise, the case on which the Bankruptcy Court relied, *Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110 (2d Cir. 2014) confirms "that … relief is granted only when the risk of inconsistent results with its impact on judicial integrity is certain." *Id*. at 117 (citation omitted).  Thus it is not essential to show unfair advantage to the opposing party.  *Id*.

Judicial estoppel does not apply here because there is no risk of inconsistent results.  The Bankruptcy Court did not adopt Netflix's position that Relativity would not be able to meet their obligations under the License Agreement.  To the contrary, the Court squarely rejected that position when it overruled Netflix's objection to assumption of the contract.

Furthermore, Netflix's position in the present dispute is not at odds with its previous position, as the Bankruptcy Court mistakenly believed.  (AA1058.) Netflix did not contend during the confirmation proceeding that its own rights were conditioned on Relativity's meeting its obligation to deliver films that were already theatrically released.  It did not make assertions about its own rights at all; it simply objected to the assumption of contracts that Relativity would likely prove

35

unable to perform.  In the current litigation, by contrast, Netflix asserts its rights following Relativity's demonstrated failure to meet those obligations.

## II.  THE BANKRUPTCY COURT SHOULD HAVE DEFERRED TO THE PARTIES' BROAD ARBITRATION AGREEMENT.

The arbitration provision of the NOA Contracts could not be broader.  It expressly applies to: "[a]ll controversies, claims, disputes, or counterclaims between the parties hereto concerning, based in any way upon, arising under, relating to, or arising in connection with the Film or the Distribution Rights, [or] this [NOA]…." (AA0056, 0084, §6.) The parties' dispute regarding whether Netflix can release the Subject Films in accordance with the Start Date provisions in the NOA Contracts, or whether the License Agreement precludes it from doing so, is well within the scope of this arbitration clause.

Despite this clear language, the Bankruptcy Court concluded that the arbitration provision does not apply because the arbitration agreement is not contained in the parties' License Agreement.  (AA1062.)  This is irrelevant.  The parties agreed that any dispute relating to the films would be subject to final and binding arbitration.  That agreement encompasses all disputes, regardless of when, where, or how they arise.  *E.g., Oldroyd v. Elmira Sav. Bank*, *FSB*, 134 F.3d 72, 76 (2d Cir.1998) (the court must "'construe arbitration clauses as broadly as possible [citation] and "'resolv[e] any doubts concerning the scope of arbitrable issues ... in favor of arbitration'") (quoting *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983)).

**A.** **A bankruptcy court has no discretion to deny arbitration of a non-core matter when the parties have agreed to arbitrate such disputes.**

Written agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (quoting 9 U.S.C. §2); *see Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) ("it is difficult to overstate the strong federal policy in favor of arbitration[,] .… a policy we have often and emphatically applied.") (citation and quotations omitted). Courts *must* "compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Collins & Aikman Products Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (quotations and citation omitted).

Whether a bankruptcy court may deny arbitration based on a weighing of arbitration and bankruptcy policy depends on whether the proceeding at issue is core or non-core under the Bankruptcy Code. "Bankruptcy courts generally do not have discretion to refuse to compel arbitration of "non-core" bankruptcy matters, or matters that are simply "related to" bankruptcy cases." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (quoting *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir. 2000). "As to these matters, the presumption in favor of arbitration usually trumps the lesser interest of bankruptcy courts in adjudicating non-core proceedings." *Id.* (citations omitted).

The Bankruptcy Court here characterized the parties' contract dispute as "core" primarily because it could have an effect on the well-being of reorganized Relativity.  (AA1052, 1062.) That is not the test.  A contract dispute does not become "core" merely because it will affect the amount of money available to a reorganized debtor or his present creditors.  The Second Circuit squarely rejected the argument that a dispute is core simply because a large sum of money is at stake, even when it affects the bankruptcy estate (which no longer exists in this case): "such reasoning would turn any contract dispute into a core proceeding" because one would always expect the result to have some effect on the estate.  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1097-98, 1102 (2d. Cir. 1993); *see also In re Residential Capital, LLC*, 519 B.R. 593, 601 (S.D.N.Y. 2014) (rejecting argument that "the matter is core because the funds [sought] are closely linked to the administration of its liquidation proceeding"); *In re Lawrence Grp., Inc.*, 285 B.R. 784, 787-88 (N.D.N.Y. 2002) (rejecting argument that a proceeding was core simply because "the resolution of this matter directly affects the core bankruptcy function of equitably distributing the estate's assets.").

Instead, determination of core and non-core is based on the Code's division of bankruptcy proceedings into three jurisdictional categories: (1) those "'arising under'" Title 11, (2) those "'arising in'" Title 11 cases, and (3) those "'related to'" Title 11 cases.  *Stern*, 564 U.S. at 473 (quoting 28 U.S.C. § 157); *see also* 28 U.S.C. § 1334.  Only the first two categories are "core" proceedings.  *Stern*, 564 U.S. at 476-478.  The third category is comprised of cases "related to" Title 11,

which are by definition non-core.  As the Supreme Court has explained, "[t]he terms 'non-core' and 'related' are synonymous."  *Id.* at 477.[10]

The parties' state law contract dispute certainly does not fall into either of the first two categories.  It does not invoke rights created by bankruptcy law, or rights that would have no existence outside of bankruptcy law.  *Hill*, 436 F.3d at 108–09.  The dispute involves interpretation of pre-petition contracts that were assumed in bankruptcy—just the sort of dispute that can be asserted in a non-bankruptcy forum without regard to bankruptcy law or practice.  Whether Relativity has a right to insist that Netflix amend its contracts involuntarily pursuant to a contract provision is purely an issue of California contract law.  It is thus ***non-core***, even if it can be characterized as "related to" the proceeding.[11]

Because bankruptcy courts have no discretion to refuse to send non-core disputes to arbitration when the parties have agreed to arbitrate, the Court erred in denying Netflix's motion to compel arbitration.  *Hill*, 436 F.3d at 108.

### B.   Even if the dispute were core, the Bankruptcy Court erred in refusing to compel arbitration.

Even when a dispute is core, a bankruptcy court may not refuse to compel arbitration "unless it finds that the proceedings are based on provisions of the

---

[10] *See also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) (plurality opinion) (as a constitutional matter, "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages," which is beyond the jurisdiction of the bankruptcy court).

[11] As we discuss in the next section, this dispute is not even "related to" the bankruptcy proceeding.

Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code. *Hill*, 436 F.3d at 108 (citation omitted). In the absence of such a showing, courts regularly hold that bankruptcy courts lack discretion to deny a request to enforce the parties' arbitration agreement even in core proceedings. *See id.*; *see also, e.g., In re Belton*, No. 15 CV 1934 VB, 2015 WL 6163083, at *7 (S.D.N.Y. Oct. 14, 2015) (reversing denial of a motion to compel arbitration because there was no "inherent conflict"); *In re Mintze*, 434 F.3d 222, 233 (3d Cir. 2006) (holding bankruptcy court lacked the authority and the discretion to deny enforcement of the arbitration provision in a matter presumed to be core).

No showing has been made here to satisfy a finding that arbitration of the claim would "necessarily jeopardize" the objectives of the Bankruptcy Code or that the dispute involves provisions of the Bankruptcy Code that "inherently conflict" with the Arbitration Act. Indeed, the parties' dispute is not based on the Code at all. To the extent Code § 365 is at issue, it is undisputed that when a debtor assumes a contact, he assumes it in full.

## III.   THE BANKRUPTCY COURT LACKED SUBJECT MATTER JURISDICTION TO RULE ON THE MERITS OF THE PARTIES' CONTRACT DISPUTE.

Well-settled case law establishes that a bankruptcy court's post-confirmation jurisdiction is limited. "Once a plan is confirmed, it is assumed the reorganized debtor is becoming self-sufficient, and no longer needs umbrella protection from the bankruptcy court." *In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 468 (Bankr. S.D.N.Y. 2011) (citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th

Cir. 1991)).  Additionally, there is no estate, because property reverts to the reorganized debtor.  *Id.* (citing, *inter alia*, Code § 1141(b); additional citations omitted).  Accordingly, reorganized parties wishing to proceed in the bankruptcy court for any reason face a steep jurisdictional hurdle.

Furthermore, under *Stern*, a bankruptcy court does not have authority to make factual and legal determinations in a "state law action independent of the federal bankruptcy law" when the issues were "not resolved in the process of ruling" on a proof of claim.  *Stern*, 564 U.S. at 487, 503.

Applying *Stern*, courts in this Circuit have consistently held that a bankruptcy court may constitutionally enter a final order in a claim against a third party only: "(1) if the claim involves a public right; (2) if the process of adjudicating the creditor's proof of claim would resolve a counterclaim; or (3) if the parties consent to final adjudication by the bankruptcy court."  *Dynegy Danskammer, L.L.C. v. Peabody COALTRADE Int'l Ltd.*, 905 F. Supp. 2d 526, 530 (S.D.N.Y. 2012); *Residential Funding Co., LLC v. UBS Real Estate Sec., Inc.*, No. 14 CIV. 03039 GBD, 2015 WL 1062264, at *3 (S.D.N.Y. Mar. 6, 2015).

None of these conditions exists here.  It is undisputed that factors (1) and (3) do not apply:  this matter involves no "public right" and Netflix has expressly and repeatedly stated it does not consent to the Bankruptcy Court's jurisdiction over this contract dispute.  (Dkt.## 1892, 1905, 1930; AA0436-42.)

Factor (2) does not apply either, because the Bankruptcy Court's adjudication of Netflix's proof of claim did not and could not resolve the present contract dispute.  A creditor's filing of a proof of claim does not give the

bankruptcy court constitutional authority to resolve state law claims that involve factual and legal determinations that were "not resolved in the process of ruling on [the] creditor's proof of claim." *Stern*, 564 U.S. at 499; *In re Ortiz*, 665 F.3d 906, 913 (7th Cir. 2011). The Bankruptcy Court was never asked to make any substantive decision on Netflix's creditor claim in the bankruptcy proceeding, and there is no pending creditor's claim by Netflix that requires adjudication. The issues being litigated now are part of a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy." *Stern*, 564 U.S. at 487.

The Bankruptcy Court was thus constitutionally limited to submitting "proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment." *Exec. Benefits Ins. Agency v. Arkinson (In re Bellingham Insurance Agency, Inc.)*, 134 S. Ct. 2165, 2172 (2014) (citing *Stern*, 564 U.S. at 475-477, 502; Code § 157(c)(1)).

## IV.   EVEN ON THE MERITS, WHICH IT SHOULD NOT HAVE REACHED, THE BANKRUPTCY COURT GOT IT WRONG.

As set forth in the Statement of the Case, *supra*, the NOA Contract for *Masterminds* provides that,

> Under the terms of the Distribution Agreement that apply to a Film that has been designated as a "Base Rate Title", as amended hereby, … the Minimum Guaranteed Payment is due and payable in full on the later of (1) Delivery … and (2) the earlier of (I) one hundred-twenty (120) days after the earlier of (a) release of the Film for Home Video within the Territory or (b) the date of first Non-Premium VOD exploitation of the Film or (II) twelve (12) months after the initial theatrical release of the Film in the Territory; provided, however, that *if the date set forth in (2)*

>*above has not occurred on or before June 17, 2016, then (y) such*
>*date shall be deemed to occur on June 17, 2016, and (z) the first*
>*Start Date for the first Availability Period for the Film shall be*
>*the earlier of (A) the date set forth in (y) above and (B) the date*
>*prescribed in the Distribution Agreement.*

(AA0050, ¶ D, emphasis added.)  The NOA Contract for *Disappointments Rooms*

is identical except that it specifies June 30, 2016 as the fixed outside Start Date.

(AA0078, ¶ D.)

These Start Date provisions are unambiguous on their face: the Start Date

for *Masterminds* can be no later than June 17, 2016, and the Start Date for

*Disappointments Room* can be no later than June 30, 2016.  By definition, the Start

Dates are the dates on which Netflix is entitled to release the Subject Films on its

Service.  (*Id.*)

As discussed above, Relativity promised to provide Netflix with movies

consistent with the terms of the assumed contracts; indeed, Relativity asserted

throughout the bankruptcy proceeding that it would provide compliant, qualifying

movies.  (AA0049, 0077, ¶ B.) It is undisputed, however, that the Subject Films

delivered to Netflix at the end of April need not have been theatrically released,

although Relativity has represented to all, and contractually promised its lenders,

that it will theatrically release these films before the end of the year.  Netflix

nevertheless agreed to accept the films as delivered by Relativity.  Upon

acceptance, Netflix's rights in the Subject Films vested, permitting it to release the

Films on its service on the agreed upon Start Date.  (AA0016, ¶ 6.3.)

The Bankruptcy Court had no authority under the Code to strip Netflix of

that vested right.  Had Relativity rejected the contract during the bankruptcy

proceeding, Code §§ 365 (g), (n) and 502(g) would have protected Netflix's rights by giving it, *inter alia*, a claim in the debtors' estate.  Post-confirmation, the Bankruptcy Court's attempt to force Netflix to give up its rights by an involuntary amendment, without compensation, was error, pure and simple.

### A. The Court's reliance on evidence of custom in the industry is contrary to California law.

The Bankruptcy Court based its decision primarily on extrinsic evidence of "custom," which would not have been admissible under state contract law.  Under California law, "extrinsic evidence is not admissible to add to, detract from, or vary the terms of a written contract."  *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co*., 69 Cal. 2d 33, 39 (1968).  Extrinsic evidence can be considered *only* when it is relevant to prove a meaning to which the specific terms of the contract are "reasonably susceptible."  *Id.* at 40.  In other words, extrinsic evidence is allowed when it helps to "determin[e] what the parties meant by the words they used."  *Id*. at 38.

Like extrinsic evidence in general, evidence regarding industry custom and practice may be used only in limited circumstances to help interpret, not to vary contractual terms.  "Usage or custom may be looked to, both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract."  *Varni Bros. Corp. v. Wine World, Inc*., 35 Cal. App. 4th 880, 889 (1995), *as modified on denial of reh'g* (July 7, 1995) (citing, *inter alia*, Cal. Civ. Code § 1655, additional citation and quotations omitted.)  In other words, "usage can be invoked only to interpret, not create contractual terms."  *Id*. (citation

and alterations omitted.)  "It is clear that where a written contract states a term clearly and unambiguously," however, evidence of usage or custom "that would vary or contradict the term is not admissible."  *Id.* (citing, *inter alia*, *Peiser v. Mettler*, 50 Cal. 2d 594, 610 (1958)).

Here, the Bankruptcy Court relied heavily on extrinsic evidence, including the testimony of Relativity's expert, Ronald Hohauser, regarding "industry custom."  (AA0401.)  Although Hohauser correctly stated that the express terms of the NOA Contracts give Netflix the right to release the films on the Start Date, he opined that these rights are "completely contrary to the 'standard release model', a well-established industry custom."  (AA0406, ¶ 10.)

The Court should have granted Netflix's motion in limine objecting to Hohauser's testimony as irrelevant and inadmissible, because it is not in any way tied to an allegedly ambiguous term in the parties' agreements.  (Dkt.# 1906; AA0676.) A statement that the terms of a contract are "completely contrary" to custom in the industry is not admissible under California law because such testimony patently serves to vary the terms of the contract, not to explain its language.  Parties are free to depart from custom in their agreements.  A party who is later dissatisfied with the agreement he entered cannot be heard to complain it is different than other contracts.

The Bankruptcy Court thus erred as a matter of law in admitting Hohauser's testimony and relying on it to rewrite the parties' contract.

**B.     Section 5.6 of the License Agreement does not require Netflix to agree to modify the Start Dates**

The Bankruptcy Court cited to section 5.6 of the License Agreement for the notion that Relativity could force Netflix to agree to modify the terms of the NOA Contracts, although in the end, it declined to grant this relief in so many words.  As set forth in the Statement of the Case, *supra*, section 5.6 requires Netflix to execute documents reasonably requested by Relativity's *lenders* when they are "of a nature which are customarily entered into in connection with comparable credit facilities." (AA0015,  §5.6.)  However, the final text of this section demonstrates that it could not be used to require Netflix to execute amendments that would modify Netflix's substantive contractual rights, including the Start Dates.

The License Agreement was originally drafted by Netflix's Vice President of Legal and Business Affairs, Bryony Gagan.  (AA0819.)  The draft that Ms. Gagan originally prepared did not include section 5.6.  (AA0006.) In its revisions, Relativity added a broad section 5.6 that would have required Netflix to sign "customary" documents without any expressed limitations.  (AA0822-23, 0002.) Ms. Gagan explained this language was unacceptable because she did not want a Relativity to be able to demand that Netflix give up contractual rights "just on the basis of custom."  (AA0823.) She therefore revised the provision to ensure it could not be used to require Netflix to adjust its own rights.  (AA0004; AA0825-26.) As a result, the final agreement includes the statement that section 5.6 "shall not result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this Agreement[.]"  (AA022-26, 0015, §5.6.)

46

In the final version, Section 5.6 has a single purpose and effect: it binds Netflix to a limited form acknowledgement with the lending bank directing Netflix to pay the bank without offset.  Beyond that, Section 5.6 explicitly states that no other term or obligation of Netflix is or can be modified by this provision.  The Bankruptcy Court erred in finding that Section 5.6 should be construed as creating an open-ended obligation on Netflix's part to modify the contracts in any way that Relativity desires.  In the end, however, the Bankruptcy Court did not rely on section 5.6 at all, and declined to compel Netflix to agree to modify the terms of the NOA Contracts.  (AA1066-68.)

### C. The Bankruptcy Court's Order is fundamentally inconsistent with the Bankruptcy Code.

The Bankruptcy Court acted well beyond its jurisdiction, and well beyond the structural limitations of what a bankruptcy court may do to alter the contractual rights of third parties.  By nullifying terms of an assumed contract, post-confirmation, the Court's Order effectively modifies the terms of an assumed contract without the other party's consent, and gives Relativity a second opportunity to reject the contract, without compensation.  This result abrogates the statutory rights of third parties, violating the careful balance of interests reflected in Code § 365, and depriving Netflix of its property interest in the distribution rights without compensation for the breach or the right to protect its license under Code § 365(n).  If left uncorrected, the Order would mean that the post-confirmation contract rights of third parties are forever in doubt and perpetually subject to the bankruptcy court deciding that economic consequences to the

allegedly reorganized debtor warrant more or further manipulation by the Court, without the protections afforded by the Code.

That is precisely why the jurisdiction of bankruptcy courts "shrinks" substantially post-confirmation. *Park Ave. Radiologists*, 450 B.R. at 468. "Once a plan is confirmed, it is assumed the reorganized debtor is becoming self-sufficient, and no longer needs umbrella protection from the bankruptcy court. Additionally, there is no estate, as property reverts to the reorganized debtor." *Id.* (citing *Pettibone Corp. v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991); 11 U.S.C. § 1141(b); *Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 97–98 (Bankr. S.D.N.Y. 2002)); *see also Matter of Pan Am. Sch. of Travel Inc.*, 47 B.R. 242, 244 (Bankr. S.D.N.Y. 1985) ("A debtor is not to be insulated from its post-confirmation liabilities merely because it was successful in reorganizing its affairs and composing its debts.").

## V.  AS AN INDEPENDENT MATTER, THIS COURT SHOULD STRIKE THE PORTIONS OF THE ORDER THAT ENJOIN SPEECH BECAUSE THEY ARE UNCONSTITUTIONAL ON THEIR FACE.

"A 'prior restraint' on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression." *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (Sotomayor, J.) (citing *Alexander v. U.S.*, 509 U.S. 544, 550 (1993)). "It has long been established that such restraints constitute 'the most serious and the least tolerable infringement' on our freedoms of speech and press." *Id.* at 309 (quoting *Nebraska Press v. Ass'n Stuart*, 427 U.S. 539 559 (1976)). No branch of

government may attempt to "regulate [speech] based on hostility—or favoritism—towards the underlying message expressed."  *Madsen v. Wmn's Health Ctr., Inc.*, 512 U.S. 753, 763-66 (1994) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 386 (1992)).

"Prior restraints on pure speech … are presumptively unconstitutional." *Matter of Providence Journal*, 820 F.2d 1342, 1353 (1st Cir. 1986), *opin. modified on reh'g*, 820 F.2d 1354 (1st Cir. 1987).

Without regard to whether its interpretation of the contracts and Netflix's statutory rights was correct, the Bankruptcy Court abandoned any pretense of due process or adherence to law when it entered a final order that unconstitutionally infringes Netflix's First Amendment right to speak about a matter in dispute, its right to petition the courts for redress, and its right not to speak, without any showing of prejudice to Relativity or attempt to tailor relief accordingly.  *United States v. Salameh*, 992 F.2d 445, 446-47 (2d Cir. 1993); *In re Applic. of New York Times Co.*, 878 F.2d 67, 68 (2d Cir. 1989).

The Order violates the law by (1) enjoining Netflix "and all persons in active concert or participation with Netflix" from "contending that they have the rights to distribute the films *Masterminds* and [] *Disappointment Room* … on any dates prior to the dates specified in the License Agreement … without regard to the terms of the [NOAs]"; (2) prohibiting Netflix from "collaterally attacking" the confirmation order, which is a prior restraint on Netflix's ability to file claims in

other forums (*id.* ¶ 8)[12]; and (3) seeking to force Netflix to "confirm" the position of other parties—*i.e.*, an order compelling Netflix to speak (*id.* ¶ 4).[13]

The Bankruptcy Court cited Code §1142(b) in support of its authority to compel Netflix to act or keep silent, as it did in paragraphs 3, 4, and 8 of the Order. (AA1060 ["section 1142(b) requires Netflix's cooperation to the extent necessary to implement the plan."].)  But section 1142(b) is not so broad; it simply allows a bankruptcy court to compel recalcitrant parties to sign agreements and instruments *that are specifically identified in the plan.  See, e.g., Riverside Nursing Home v. N. Metro. Residential Health Care Facility, Inc.*, 977 F.2d 78, 80 (2d Cir. 1992). Because the Plan here makes no mention of the NOA Contracts for the Subject Films, much less of the hypothetical amendments that Relativity now wishes to force on Netflix, section 1142(b) does not apply.  To read more into it would unconstitutionally expand the bankruptcy court's jurisdiction.  *See Drug Purchase, Inc. v. Dubroff*, 485 F. Supp. 887, 891 (S.D.N.Y. 1980) (statutes must not be read in a way that calls their constitutionality into question) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 358 (1977)).

---

[12] Paragraph 8 effectively restrains the right to petition for relief in the courts, a right so "fundamental" it is "not to be interfered with except for the most pressing reasons."  *Bynum v. Connecticut Comm'n on Forf. Rights*, 410 F.2d 173, 177 (2d Cir. 1969).

[13] Paragraph 4 requires Netflix to "confirm and acknowledge that payments due from Netflix with respect to the distribution of the Subject Films have been assigned as collateral for the repayment of the Replacement Production Notes issued pursuant to the Plan and will be paid by Netflix in accordance with such assignments."

Accordingly, paragraphs 3, 4, and 8 of the Order must be stricken regardless of how this Court rules on the remaining issues.

## CONCLUSION

For the foregoing reasons, Netflix respectfully requests that this Court reverse the Bankruptcy Court's Order granting reorganized Relativity relief and refusing to enforce the parties' arbitration agreement.  It should also strike the Order's unconstitutional restraints on speech.


Dated: June 20, 2016


                                                        *s/Stephen R. Mick*
                                                        Stephen R. Mick
                                                        (admitted *pro hac vice*)
                                                        BARNES & THORNBURG LLP
                                                        2029 Century Park East
                                                        Suite 300
                                                        Los Angeles, CA  90067
                                                        Telephone:          (310) 284-3871
                                                        Facsimile:          (310) 284-3894
                                                        smick@btlaw.com

                                                        *One of the Attorneys for Netflix, Inc.*

**CERTIFICATE OF COMPLIANCE (Bankr. Rule 8015 (a)(7)(C))**

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B)(i) because it contains 13,560 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D).

Dated: June 20, 2016

*s/Stephen R. Mick*
Stephen R. Mick
(admitted *pro hac vice*)
BARNES & THORNBURG LLP
2029 Century Park East
Suite 300
Los Angeles, CA  90067
Telephone:          (310) 284-3871
Facsimile:          (310) 284-3894
smick@btlaw.com

*One of the Attorneys for Netflix, Inc.*