**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | No. 1:16-cv-04069-LAP |
| RELATIVITY FASHION, LLC, *et al.*,[1] | |
| Debtors. | Honorable Lorretta A. Preska |
| NETFLIX, INC. | Appeal from a Final Order in a Bankruptcy Case |
| Appellant, | No. 15-11989 (MEW) |
| v. | Chapter 11 (Jointly Administered) |
| RELATIVITY FASHION, LLC, *et al.*, | |
| Appellees. | |

---

## APPELLEES' BRIEF

---

| | |
|---|---|
| Van C. Durrer II | Richard L. Wynne |
| SKADDEN, ARPS, SLATE, | Todd R. Geremia |
| MEAGHER & FLOM | JONES DAY |
| 4 Times Square | 250 Vesey Street |
| New York, New York  10036 | New York, New York  10281-1047 |
| (212) 735-3000 | (212) 326-3939 |
| | |
| | Bennett L. Spiegel |
| | Monika S. Wiener (*pro hac pending*) |
| | JONES DAY |
| | 555 South Flower Street, 50th Floor |
| | Los Angeles, California 90071 |
| *Counsel for Plan Proponent-Appellee,* | *Counsel for Appellees-Reorganized* |
| *Ryan Kavanaugh* | *Debtors, Relativity Fashion, LLC et al.* |

---

[1]  The Reorganized Debtors in these Chapter 11 cases are as set forth on page (i).

The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, are: Relativity Fashion, LLC (4571); Relativity Holdings LLC (7052); Relativity Media, LLC (0844); Relativity REAL, LLC (1653); RML Distribution Domestic, LLC (6528); RML Distribution International, LLC (6749); RMLDD Financing, LLC (9114); 21 & Over Productions, LLC (7796); 3 Days to Kill Productions, LLC (5747); A Perfect Getaway P.R., LLC (9252); A Perfect Getaway, LLC (3939); Armored Car Productions, LLC (2750); Best of Me Productions, LLC (1490); Black Or White Films, LLC (6718); Blackbird Productions, LLC (8037); Brant Point Productions, LLC (9994); Brick Mansions Acquisitions, LLC (3910); Brilliant Films, LLC (0448); Brothers Productions, LLC (9930); Brothers Servicing, LLC (5849); Catfish Productions, LLC (7728); Cine Productions, LLC (8359); CinePost, LLC (8440); Cisco Beach Media, LLC (8621); Cliff Road Media, LLC (7065); Den of Thieves Films, LLC (3046); Don Jon Acquisitions, LLC (7951); DR Productions, LLC (7803); Einstein Rentals, LLC (5861); English Breakfast Media, LLC (2240); Furnace Films, LLC (3558); Gotti Acquisitions, LLC (6562); Great Point Productions, LLC (5813); Guido Contini Films, LLC (1031); Hooper Farm Music, LLC (3773); Hooper Farm Publishing, LLC (3762); Hummock Pond Properties, LLC (9862); Hunter Killer La Productions, LLC (1939); Hunter Killer Productions, LLC (3130); In The Hat Productions, LLC (3140); J & J Project, LLC (1832); JGAG Acquisitions, LLC (9221); Left Behind Acquisitions, LLC (1367); Long Pond Media, LLC (7197); Madaket Publishing, LLC (9356); Madaket Road Music, LLC (9352); Madvine RM, LLC (0646); Malavita Productions, LLC (8636); MB Productions, LLC (4477); Merchant of Shanghai Productions, LLC (7002); Miacomet Media LLC (7371); Miracle Shot Productions, LLC (0015); Most Wonderful Time Productions, LLC (0426); Movie Productions, LLC (9860); One Life Acquisitions, LLC (9061); Orange Street Media, LLC (3089); Out Of This World Productions, LLC (2322); Paranoia Acquisitions, LLC (8747); Phantom Acquisitions, LLC (6381); Pocomo Productions, LLC (1069); Relative Motion Music, LLC (8016); Relative Velocity Music, LLC (7169); Relativity Development, LLC (5296); Relativity Film Finance II, LLC (9082); Relativity Film Finance III, LLC (8893); Relativity Film Finance, LLC (2127); Relativity Films, LLC (5464); Relativity Foreign, LLC (8993); Relativity India Holdings, LLC (8921); Relativity Jackson, LLC (6116); Relativity Media Distribution, LLC (0264); Relativity Media Films, LLC (1574); Relativity Music Group, LLC (9540); Relativity Production LLC (7891); Relativity Rogue, LLC (3333); Relativity Senator, LLC (9044); Relativity Sky Land Asia Holdings, LLC (9582); Relativity TV, LLC (0227); Reveler Productions, LLC (2191); RML Acquisitions I, LLC (9406); RML Acquisitions II, LLC (9810); RML Acquisitions III, LLC (9116); RML Acquisitions IV, LLC (4997); RML Acquisitions IX,LLC (4410); RML Acquisitions V, LLC (9532); RML Acquisitions VI, LLC (9640); RML Acquisitions VII, LLC (7747); RML Acquisitions VIII, LLC (7459); RML Acquisitions X, LLC (1009); RML Acquisitions XI, LLC (2651); RML Acquisitions XII, LLC (4226); RML Acquisitions XIII, LLC (9614); RML Acquisitions XIV, LLC (1910); RML Acquisitions XV, LLC (5518); RML Bronze Films, LLC (8636); RML Damascus Films, LLC (6024); RML Desert Films, LLC (4564); RML Documentaries, LLC (7991); RML DR Films, LLC (0022); RML Echo Films, LLC (4656); RML Escobar Films LLC (0123); RML Film Development, LLC (3567); RML Films PR, LLC (1662); RML Hector Films, LLC (6054); RML Hillsong Films, LLC (3539); RML IFWT Films, LLC (1255); RML International Assets, LLC (1910); RML Jackson, LLC (1081); RML Kidnap Films, LLC (2708); RML Lazarus Films, LLC (0107); RML Nina Films, LLC (0495); RML November Films, LLC (9701); RML Oculus Films, LLC (2596); RML Our Father Films, LLC (6485); RML Romeo and Juliet Films, LLC (9509); RML Scripture Films, LLC (7845); RML Solace Films, LLC (5125); RML Somnia Films, LLC (7195); RML Timeless Productions, LLC (1996); RML Turkeys Films, LLC (8898); RML Very Good Girls Films, LLC (3685); RML WIB Films, LLC (0102); Rogue Digital, LLC (5578); Rogue Garnes, LLC (4812); Roguelife LLC (3442); Safe Haven Productions, LLC (6550); Sanctum Films, LLC (7736); Santa Claus Productions, LLC (7398); Smith Point Productions, LLC (9118); Snow White Productions, LLC (3175); Spy Next Door, LLC (3043); Story Development, LLC (0677); Straight Wharf Productions, LLC (5858); Strangers II, LLC (6152); Stretch Armstrong Productions, LLC (0213); Studio Merchandise, LLC (5738); Summer Forever Productions, LLC (9211); The Crow Productions, LLC (6707); Totally Interns, LLC (9980); Tribes of Palos Verdes Production, LLC (6638); Tuckemuck Music, LLC (8713); Tuckemuck Publishing, LLC (3960); Wright Girls Films, LLC (9639); Yuma, Inc. (1669); Zero Point Enterprises, LLC (9558). The location of the Reorganized Debtors' corporate headquarters is: 9242 Beverly Blvd., Suite 300, Beverly Hills, CA 90210.

i

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Bankruptcy Procedure 8012 and Federal Rule of Civil Procedure 7.1, the Appellees-Reorganized Debtors other than Relativity Holdings LLC state that their ultimate corporate parent is Relativity Holdings LLC and that no publicly held corporation owns 10% or more of an interest in them. No publicly held corporation holds 10% or more of an interest in Relativity Holdings LLC.

## TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................................1

INTRODUCTION ...........................................................................................2

STATEMENT OF THE CASE...........................................................................4

    A.    Relativity and Its Plan of Reorganization ..................................5

    B.    Netflix's Objections to the Plan and Assumption of the License Agreement ....................................................................6

    C.    The Bankruptcy Court's Order Confirming the Plan .............12

    D.    Netflix's Change of Position After Confirmation ..................13

    E.    The Bankruptcy Court's Order and Injunction Granting Relativity Relief Against Netflix ............................................17

    F.    This Court Denies Netflix's Stay Motion Due to an "Exceedingly Low" Likelihood of Reversal on Appeal ..........21

STANDARD OF REVIEW ..............................................................................21

SUMMARY OF ISSUES AND ARGUMENT .....................................................22

ARGUMENT ...............................................................................................24

    I.    THE BANKRUPTCY COURT HAD JURISDICTION ...................24

        A.    This Is a Core Proceeding .......................................................25

        B.    The Bankruptcy Court Properly Rejected Netflix's Belated *Stern* Objection ........................................................30

    II.    THE BANKRUPTCY COURT PROPERLY DENIED NETFLIX'S MOTION TO COMPEL ARBITRATION...................32

    III.    THE BANKRUPTCY COURT'S ORDER SHOULD BE AFFIRMED ON THE MERITS .......................................................38

        A.    The Bankruptcy Court Did Not Clearly Err in Finding That Netflix Is Judicially Estopped From Asserting Its New Position ...........................................................................39

        B.    The Bankruptcy Court Did Not Clearly Err in Finding That The Doctrine of *Res Judicata* Also Precludes Netflix's Position ...................................................................46

iii

**TABLE OF CONTENTS**
(continued)

                                                                    **Page**

    C.    The Order and Injunction May Also Be Affirmed Under
the License Agreement ............................................................52

IV.    THE ORDER AND INJUNCTION DO NOT IMPAIR
NETFLIX'S FIRST AMENDMENT RIGHTS ................................55

CONCLUSION .......................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adelphia Business Solutions, Inc. v. Abnos,*
  482 F.3d 602 (2d Cir. 2007) ...............................................................55

*Adelphia Recovery Trust v. Goldman, Sachs & Co.,*
  748 F.3d 110 (2d Cir. 2014) .............................................40, 41, 44, 45

*Am. Civil Liberties Union v. Clapper,*
  785 F.3d 787 (2d Cir. 2015) ...............................................................58

*Bullard v. Blue Hills Bank,*
  135 S. Ct. 1686 (2015)........................................................................47

*Coffaro v. Crespo,*
  721 F. Supp. 2d 141 (E.D.N.Y. 2010) ................................................46

*Cohen v. Cowles Media Co.,*
  501 U.S. 663 (1991)............................................................................57

*Commissioner of Internal Revenue v. Sunnen,*
  333 U.S. 591 (1948)............................................................................47

*Corbett v. MacDonald Moving Servs., Inc.,*
  124 F.3d 82 (2d Cir. 1997) ...........................................................47, 48

*Del. Trust Co. v. Wilmington Trust, N.A.,*
  534 B.R. 500 (S.D.N.Y. 2015) ...........................................................28

*Ermolieff v. R.K.O. Radio Pictures,*
  122 P.2d 3 (Cal. 1942) ........................................................................53

*Federated Dep't Stores, Inc. v. Moitie,*
  452 U.S. 394 (1981)............................................................................46

*In re 300 Washington St. LLC*,
    528 B.R. 534 (Bankr. E.D.N.Y. 2015) .............................................................40

*In re AMR Corp.*,
    508 B.R. 296 (Bankr. S.D.N.Y. 2014).............................................................39

*In re Bonnanzio*,
    91 F.3d 296 (2d Cir. 1996) ..............................................................................22

*In re Craig's Stores of Tex., Inc.*,
    266 F.3d 388 (5th Cir. 2001) ...........................................................................25

*In re Harlow Props., Inc.*,
    56 B.R. 794 (B.A.P. 9th Cir. 1985) ..................................................................26

*In re Ionosphere Clubs, Inc.*,
    922 F.2d 984 (2d Cir. 1990) ............................................................................33

*In re Iridium Operating LLC*,
    285 B.R. 822 (S.D.N.Y. 2002) .........................................................................33

*In re J&B Haldeman Holdings, LLC*,
    517 B.R. 910 (Bankr. W.D. Wis. 2014) ..........................................................26

*In re Kollel Mateh Efraim, LLC*,
    456 B.R. 185 (S.D.N.Y. 2011) ............................................................22, 37, 38

*In re Layo*,
    460 F.3d 289 (2d Cir. 2006) ..............................................................48, 50, 51

*In re Men's Sportswear, Inc.*,
    834 F.2d 1134 (2d Cir. 1987) ..........................................................................30

*In re Orion Pictures Corp.*,
    4 F.3d 1097 (2d. Cir. 1993) .............................................................................29

*In re Osyka Corp.*,
    426 B.R. 653 (Bankr. S.D. Tex. 2010) ............................................................45

*In re Petrie Retail, Inc.*,
 304 F.3d 223 (2d Cir. 2002) ...........................................................26, 27, 28, 57

*In re Polar Molecular Corp.*,
 195 B.R. 548 (Bankr. D. Mass. 1996) ...............................................................26

*In re Refco, Inc. Sec. Litig.*,
 628 F. Supp. 2d 432 (S.D.N.Y. 2008) ...............................................................25

*In re Resorts Int'l, Inc.*,
 372 F.3d 154 (3d Cir. 2004) ...............................................................................25

*In re Residential Capital, LLC*,
 519 B.R. 606 (S.D.N.Y. 2014) ....................................................................passim

*In re Riverside Nursing Home*,
 137 B.R. 134 (Bankr. S.D.N.Y.), *aff'd*, 977 F.2d 78 (2d Cir. 1992)..................57

*In re U. S. Brass Corp.*,
 301 F.3d 296 (5th Cir. 2002) ..............................................................................26

*In re U.S. Lines*,
 197 F.3d 631 (2d Cir. 1999) .......................................................................passim

*MNBA Am. Bank, N.A. v. Hill*,
 436 F.3d 104 (2d Cir. 2006) ...........................................................23, 25, 33, 35

*New Hampshire v. Maine*,
 532 U.S. 742 (2001)....................................................................................18, 40

*Parklane Hosiery Co., Inc. v. Shore*,
 439 U.S. 322 (1979).............................................................................................46

*Republic of Ecuador v. Chevron Corp.*,
 638 F.3d 384 (2d Cir. 2011) ...............................................................................40

*Roby v. Corp of Lloyd's*,
 996 F.2d 1353 (2d Cir. 1993) ..............................................................................33

*Stern v. Marshall,*
    564 U.S. 462 (2011)..................................................................25, 30

*Sure-Snap Corp. v. State Street Bank & Trust Co.,*
    948 F.2d 869 (2d Cir. 1991) .......................................................47, 48

*United States v. Brennan,*
    650 F.3d 65 (2d Cir. 2011) ...............................................................58

*United States v. Quattrone,*
    402 F.3d 304 (2d Cir. 2005) .............................................................57

*Wellness Int'l Network, Ltd. v. Sharif,*
    617 F. App'x 589 (7th Cir. 2015) ....................................................31

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ................................................................passim

## STATUTES

11 U.S.C. § 365................................................................................39

11 U.S.C. § 1129(a)(11).................................................................11

11 U.S.C. § 1142(b) ................................................................passim

28 U.S.C. § 157....................................................................1, 24, 28

28 U.S.C. § 158(a)(1).........................................................................1

28 U.S.C. § 1334 ........................................................................1, 24

Cal. Civ. Code § 1636...................................................................52

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 158(a)(1).  The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157 and 1334.  Jurisdictional issues are further discussed in Part I of the Argument.

## INTRODUCTION

In a thorough decision issued after a three-day evidentiary hearing, the Bankruptcy Court made detailed findings, extensive credibility determinations, and adhered to well-established Second Circuit law in ruling that Netflix should be barred from taking a bad-faith position that threatened to "collapse" the Reorganized Debtors' Plan of Reorganization.  Upon affording the appropriate appellate deference to these findings and discretionary determinations, the Bankruptcy Court's order should be summarily affirmed.

This dispute centers on two films that Relativity is scheduled to theatrically release this year:   *Masterminds*, starring Kristen Wiig, Jason Sudeikis, Owen Wilson, and Zach Galifianakis; and *The Disappointments Room*, starring Kate Beckinsale (the "Films").  After Relativity's Plan had been confirmed, Netflix took the position that, under its License Agreement with Relativity and a separate "Notice of Assignment" relating to financing for these films, it was permitted to stream these films on its internet-based service *before* their theatrical releases. Unrebutted testimony at trial showed that such a move by Netflix, in violation of express contractual provisions in the License Agreement and contradicting Netflix's own previous representations to the Bankruptcy Court, would decimate these films' value to Relativity.

The Bankruptcy Court determined that Netflix was judicially estopped and, separately, precluded by *res judicata* from taking this ruinous position.  As the Bankruptcy Court found, Netflix had taken a contrary position in previously objecting to the feasibility of Relativity's Plan of Reorganization and to Relativity's assumption of the License Agreement, insisting that it was a "material requirement" under the License Agreement that only *theatrically released* movies may be streamed by Netflix.  Indeed, in connection with the very two films at issue here—*Masterminds* and *The Disappointments Room*—Netflix represented to the Bankruptcy Court that there was doubt as to whether these films would be theatrically released in time for Relativity to meet its obligations to Netflix under the License Agreement.

As the Bankruptcy Court found, Netflix should have raised during the confirmation process its purported "right" to stream these films before Relativity theatrically releases them.  The Plan was predicated on the revenues to be realized from first-run theatrical releases of *Masterminds*, *The Disappointments Room*, and other films on Relativity's post-bankruptcy slate.  The Bankruptcy Court explained that issue was "key" to its feasibility findings supporting its confirmation of the Plan.  Although aware of this, "Netflix never once contended that its own contracts stood in the way of the debtors doing what they proposed" and, further, Netflix expressly represented to the Court that the License Agreement *requires* a prior

3

theatrical release of a film before it may be streamed on Netflix's service.   The Bankruptcy Court correctly concluded that Netflix's antics threatened the integrity of the judicial process, and therefore correctly barred and, separately, estopped Netflix from taking this new position.

Netflix's arguments as to jurisdiction and whether an arbitral panel should have decided this dispute are meritless for similar reasons.   Because the planned distribution sequence for the Films was "key to the debtors' financial viability and to the feasibility of the plan," the Bankruptcy Court plainly had core jurisdiction to enter an order pursuant to 11 U.S.C. § 1142(b), under which a Bankruptcy Court has authority to "direct . . . any [] necessary party . . . to perform any other act . . . that is necessary for consummation of the plan."   The Bankruptcy Court also properly weighed the factors bearing on its discretionary determination to reject Netflix's argument that the issues should be decided by an arbitral panel—an issue that Netflix expressly conceded at the trial.

For these and other reasons addressed below, the Bankruptcy Court's Order and Injunction should be affirmed.

## STATEMENT OF THE CASE

The background pertinent to this appeal is set out below.[2]  The attached Appendix also shows how Netflix's brief repeatedly mischaracterizes the record.

### A.    Relativity and Its Plan of Reorganization

Relativity is one of the largest "mini major" movie studios in the world.  The company is based in Beverly Hills and was founded in 2004.  Its full-scale film studio acquires, develops, produces, and distributes films.  (RA557-58).  The company has distributed, produced, or arranged financing for more than 200 films, generating more than $17 billion in box-office revenues and earning 60 Oscar nominations.  (RA558).

Relativity and more than 140 of its affiliates filed voluntary petitions for relief under the Bankruptcy Code on July 30, 2015.  (Dkt. 1).  Relativity and its many stakeholders painstakingly negotiated the details of a Plan of Reorganization for the company to restructure approximately $1 billion in pre-petition debt, to ensure the company's continued viability post-bankruptcy, as well as continuing its relationships with thousands of contract counterparties, ranging from actors, producers, directors, writers, guilds, unions, and many movie industry specialty craft companies.  The Bankruptcy Court held a hearing on the debtors' motion to

---

[2] References to "AA___" in this brief are to Appellant's Appendix.  References to "RA___" are to Relativity's Supplemental Appendix.

confirm their Amended Plan of Reorganization on February 1 and 2, 2016 (Dkt. 1499) (as amended, supplemented, or modified, the "Plan"), and, after a detailed evidentiary presentation, including in response to extensive questioning of the Debtors' witnesses from the Bankruptcy Court itself, confirmed the Plan (Dkt. 1573).

### B.   Netflix's Objections to the Plan and Assumption of the License Agreement

While dozens of objections to confirmation were initially filed, all but one was resolved through negotiations and plan amendments or clarifications.   Only Netflix objected to the Plan at the confirmation hearing.  (RA027-28).   Netflix asserted that the Plan was not feasible, and also objected to the assumption of its June 2010 License Agreement for Internet Transmission with Relativity (the "License Agreement").   (RA049-58, RA322-330).   Pursuant to the License Agreement, Relativity licenses to Netflix, for a contractually prescribed fee, first run, theatrically released feature films that are financed, produced, distributed, or acquired by Relativity; and, at a prescribed period after theatrical release and for a prescribed availability period, Netflix then has the right to exhibit those films on its streaming service.  (AA0007-44).

A critical issue at the confirmation hearing, specifically raised by Netflix, was whether Relativity would be able to exit bankruptcy in accordance with its Plan by releasing a series of films on its slate in the manner and according to the

schedule proposed in the Plan.  (AA0114-42).  Under the Plan, two of the films on that slate, *Masterminds* and *The Disappointments Room*, are scheduled for theatrical release in September 2016 and December 2016, respectively.  (AA0250).

As the Bankruptcy Court found, Relativity's "ability and right to exploit the films in the manner set forth in the projections was key to the Debtors' financial viability and to the feasibility of the plan, and therefore to the plan itself." (AA1042).  The Court itself "asked [] for specific explanations of how the revenue projections worked and whether they were reasonable."  (AA1042).  The Plan and testimony at the confirmation hearing made clear that, under the Plan, there was to be "a theatrical release of the movies, and then at a later date, a distribution of the movies by Netflix, under the terms of the Netflix license agreement."  (AA1042). "The idea that theatrical release would occur first was a key part of the plan and of the proposed financial arrangements and projections."  (AA1042).

In particular, at the specific request of the Bankruptcy Court, Relativity's witnesses offered unrebutted testimony that the revenues to be derived from these films all hinge on their initial theatrical release.  (RA223, RA229-30).   The Bankruptcy Court found this testimony at the confirmation hearing also established that "later distribution through Netflix, after the theatrical release of the movies, was an important component of the financing plan."  (AA1043).

That planned distribution sequence—theatrical release *followed by* distribution on Netflix and other distributors—was "key, not only to the Debtors' financial projections, but also to the rights that the Plan granted to other parties." (AA1043). A major secured creditor of Relativity, CIT Bank, N.A., as agent for a group of lenders, had provided production financing in connection with the Films, and after certain paydowns $28 million remained outstanding on its loans. (AA0623). The Plan dealt with CIT's secured loans by issuing new replacement notes to CIT that extended the maturity date for the loans and altered the contractually required theatrical release dates for the two films in accordance with the theatrical release schedule in the Plan. (AA0631-34). The CIT replacement notes gave CIT as additional collateral and an important revenue source: a 10% interest in the domestic box office revenue for the Films. (AA0634-36).

Another creditor of Relativity, RKA Film Financing, LLC, had provided loans in connection with five films and over $80 million remained outstanding under those loans on the petition date, secured by, among other films, *Masterminds* and *The Disappointments Room*. (AA705-06). The Plan gave RKA replacement notes that also provided it with a collateral interest in revenues from the theatrical release of the Films. (AA706-707). Thus, as the Bankruptcy Court found, "it was [] obvious that RKA's treatment under the plan was dependent on the theatrical release of these films on the planned schedule[]." (AA1043). Relativity's

unsecured creditors, represented by a court-appointed committee, also relied on the films to be released theatrically prior to their distribution on Netflix's service. (AA0947-48).   As the Bankruptcy Court found:  "All of these parties were depending specifically on the release of the films in the projected way and in the projected sequence, to provide them with the recoveries they expected under the plan and with the collateral rights that they were granted under the plan." (AA1044).

As explained in trial testimony by a finance advisor to Relativity (Ronald Hohauser), if Netflix first streamed Relativity's films prior to their theatrical releases, the films would result in minimal box office revenue, because people would not have to go to the theater to see a film that has been made available first on Netflix's streaming service.  (AA0701-02).   That lack of box office cache would also severely and negatively impact revenue from other downstream sources such as DVD and pay television.  (AA0695-704).   Specifically, Mr. Hohauser testified that the value of the films to Relativity would be decimated if they were streamed on Netflix's service before theatrical release.  (AA0698).  Further, if the films were released on Netflix's streaming service first, it might be difficult for Relativity even to secure necessary financing to market the films and screens on which to exhibit the films.  (AA0700-03).

As noted, Netflix objected to Relativity's assumption, pursuant to the Plan, of the License Agreement.  (RA049-58, RA322-330).  The License Agreement is, as the Bankruptcy Court found, highly favorable to Relativity.  (AA1059).  As the testimony showed at trial, it was negotiated when other content providers were reluctant to license first-run theatrically released films to Netflix, because films were first released theatrically, then provided to pay-TV services such as HBO, Showtime, and Cinemax, and only years later would be made available to distributors such as Netflix.  (AA0462-AA0463; AA0665).  At the time of the contract, Netflix was still new to the business of streaming films on its service; and Netflix itself described its agreement with Relativity as "the first time that studio quality theatrical feature films will be streamed via subscription by Netflix instead of being broadcast by the traditional pay providers."  (RA555).

Netflix's objection to the assumption of the License Agreement centered on its assertion that Relativity had not met a "Yearly Minimum" requirement of films licensed to Netflix in 2015 and would not be able to meet that requirement for 2016, either.  (AA0128).  As the Bankruptcy Court noted, Netflix expressly represented to the Court that, under the License Agreement, "there is a material requirement that the films provided must be first run theatrically released films." (AA0743, RA547).  Netflix went so far as to assert that "*[t]he only question*" as to whether Relativity could provide "adequate assurance" of future performance

under the License Agreement was "whether Relativity will even be able to release the films projected on its Film Release Schedule," which included the Films, and thereby "*qualify them for distribution* under the License Agreement[]."  (AA0137) (emphasis added).

With respect to *Masterminds* and *The Disappointments Room*, in particular, Netflix asserted they would not likely qualify for streaming on Netflix's service in 2016 for the specific reason, according to Netflix, that "it remains unclear whether these films will actually be released on the proposed schedule."  (AA0128). According to Netflix, without a theatrical release these films could not count towards the minimum "Titles" available to Netflix to stream.  (AA0128).  The sole witness Netflix offered in support of its objection—Robert Roy, who also testified at trial in the instant matter—submitted a sworn declaration in which he similarly testified that there were "substantial doubts" as to whether Relativity could meet the Yearly Minimum for 2016 because "it remains unclear" whether *Masterminds*, *The Disappointments Room*, and two other films "will actually be released on the proposed schedule."  (AA0274, AA0766; RA548).

Netflix was also the sole party to object to the Plan's feasibility, a finding that a bankruptcy court is required to make pursuant to 11 U.S.C. § 1129(a)(11) before a Plan may be confirmed.  Netflix's objection was predicated on its

assertions that Relativity could not demonstrate that the revenues it projected under the Plan were viable.  (RA056-57).

At no point during the confirmation process did Netflix ever assert that it purportedly had the right to stream the Films prior to their scheduled theatrical releases in September and December 2016.  Netflix also did not challenge any of the projections in the Plan that were predicated on an initial theatrical release of *Masterminds*, *The Disappointments Room*, and other films prior to streaming on Netflix's service.  Indeed, Netflix did not ask a single question of the witnesses offered by Relativity in support of confirmation of the Plan and who were expressly questioned by Judge Wiles himself concerning the projections in the Plan for exploiting *Masterminds*, *The Disappointments Room*, and other films scheduled for theatrical release under the Plan.

### C.    The Bankruptcy Court's Order Confirming the Plan

The Bankruptcy Court confirmed the Plan by Order entered February 8, 2016.  (Dkt. 1573).  The Court thereafter entered an Order confirming that certain showings required by the Confirmation Order had been made.  The Plan went effective on April 14, 2016, with an immaterial amendment to the release schedule and with no further objection by Netflix.

The Court overruled Netflix's objection in confirming the Plan.  But the Court did not reject Netflix's repeated representations that only films that had been

first theatrically released could be streamed by Netflix under the License Agreement.  To the contrary, Judge Wiles expressly adopted Netflix's position on this issue:

> I accepted Netflix's position that theatrical release was required.  I also accepted its position that the benefits under the Netflix contract that would be triggered by that theatrical release were important to feasibility, and I required proof by the Debtors that these things could be accomplished.

(AA1058).  The Court held that the Yearly Minimum under the License Agreement was not a fixed requirement for Relativity to provide Netflix with a certain number of films.  Rather, Relativity is subject to a penalty under the License Agreement only if Relativity actually has the specified minimum of theatrically released films in a given year and, through bad faith, does not provide them to Netflix.  Because that was not the case, the Court overruled Netflix's objection.  (AA0275).

## D.    Netflix's Change of Position After Confirmation

Netflix filed a Notice of Appeal from the Confirmation Order (Dkt. 1594), but voluntarily dismissed that appeal just before its brief was due.  After the Plan went effective, however, Netflix revealed an alternative scheme to try to thwart Relativity's rights under the License Agreement.

Before the Effective Date of the Plan, Netflix had been provided routine documentation, prepared by CIT, in the form of proposed amendments to a "Notice of Assignment" for each film (the "NOAs"), to adjust the "Outside Dates" for

13

payment to CIT set forth in these NOAs, to conform to the schedule for theatrical release of the Films in accordance with the Plan. (AA0624-25). As the Bankruptcy Court expressly found, Relativity's witnesses "testified credibly" that the purpose of an NOA, in accordance with "standard practice in the industry," is for a distributor such as Netflix to agree to assign payment of a license fee to the licensor's (i.e., Relativity's) lender and also include an outside date for payment by the distributor to the lender to ensure the lender receives this payment before its loan comes due. (AA1060). Relativity's witnesses further testified that it is customary to extend the Outside Date in an NOA, through an amendment, when financing terms are revised in order to accommodate a revised theatrical release schedule (a "Date Extension Amendment"). (AA0406).

In fact, not only is it customary to enter into such agreements, but the License Agreement *requires* Netflix to agree to such extensions. (AA0015). As it also did in the Bankruptcy Court, Netflix does not quote the provision in full in its appellate brief, but Section 5.6 of the License Agreement provides in pertinent part that Netflix "shall . . . enter into all agreements reasonably requested by Relativity" or any pertinent lender that are "customarily entered into in connection with comparable credit facilities" and do not result in any additional material obligations on Netflix under the License Agreement. (AA0015). Netflix even

14

acknowledged in the License Agreement that this provision is "essential to Relativity":

> Netflix shall, promptly upon the request of Relativity, enter into all agreements reasonably requested by Relativity or any financial institution or other party (each a "Lender") which extends or is willing to extend credit to Relativity against the License Fees payable to Relativity hereunder but in no event shall Netflix be required to enter into such agreements that cover unpaid License Fees for more than twenty five (25) Titles at any one time hereunder; provided such agreements are of a nature which are customarily entered into in connection with comparable credit facilities and shall not result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this Agreement other than the waiver, for the benefit of any such Lender, of any and all defenses (other than delivery of the Title Source Material in accordance with the terms, including delivery and timing provisions, hereof), if any, that Netflix may be entitled to assert against, or any and all rights, if any, which Netflix may have to offset against or otherwise withhold from amounts due and owing to Relativity hereunder. **Netflix acknowledges that this provision and Netflix's performance of its obligations under this Section 5.6 is essential to Relativity and its willingness to enter into this Agreement.**

(AA015) (emphasis added).

The Date Extension Amendments that CIT and Relativity asked Netflix to execute for the Films are customary and do not impose any additional obligations on Netflix under the License Agreement, material or otherwise. (AA0474). In fact, Netflix's own course of performance under the License Agreement shows that the NOAs are, indeed, customary. For example, Netflix entered into an amended

15

NOA on March 13, 2013, for the film *Immortals*, in a similar manner to the Date Extension Amendments at issue here.  (RA369-74).

This time, however, after Relativity's plan went effective, Netflix refused to enter into the Date Extension Amendments for the Films.  Despite initial assurances from Netflix that it would execute these routine amendments, *see* AA0358-59 and AA0360-64, Netflix abruptly changed its position and insisted that it should have the right to stream these Films on its system before their theatrical releases.  Netflix claimed, as the Bankruptcy Court noted, that it was not required to cooperate with Relativity's and CIT's request because the amendments would be inconsistent with the *NOAs themselves*, which according to Netflix gave it a "right" to stream these films in mid-June 2016.  (AA1039, 1061).

Netflix's position, as the Bankruptcy Court found, was not credible:

> I believe and find that Netflix has always understood that, as between it and Relativity, a prior theatrical release of movies was required before Netflix could distribute them. The testimony by Ms. Gagan and Mr. Roy to the contrary was not credible and was contradicted by Netflix's prior papers, Mr. Roy's prior declaration, and the exhibits Netflix offered at trial, including Netflix exhibits 26 and 27, some of which contained other statements, including by Ms. Gagan herself, I believe, that the prior theatrical release is what Netflix bargained for and required and which was necessary before a movie could be distributed by Netflix.

(AA1065).

16

This was in bad faith, the Bankruptcy Court found, because Netflix's conduct showed it had tried to obtain leverage to modify or terminate the License Agreement that was not favorable to Netflix:

> In fact, I do not believe Netflix is asserting the alleged contractual rights in good faith.  It is very clear that the license agreement here is better than the ones Netflix has negotiated more recently with other parties and that Netflix would like to get out of it.  Netflix waited until very late in the process to spring this new issue on the Debtors in the hopes it could gain leverage to force a contract change or maybe even a contract cancellation.

(AA1059).

### E. The Bankruptcy Court's Order and Injunction Granting Relativity Relief Against Netflix

After trying unsuccessfully to get Netflix's cooperation to extend the Outside Dates in the NOAs to accommodate the revised theatrical release schedule for the Films, Relativity made a motion to enforce its Plan on May 6, 2016, pursuant to 11 U.S.C. § 1142(b) (the "Plan Enforcement Motion").   The Bankruptcy Court heard an initial oral argument with respect to the motion on May 10, 2016 and thereafter at Netflix's request scheduled a full evidentiary hearing which took place on May 19-20 and 23, 2016.

The Bankruptcy Court issued its decision and order on May 27, 2016.  The Court's decision is discussed in more detail in the Argument section, below.  First, the Court held and found that it has jurisdiction over Relativity's request for relief

and that Netflix does not have a right to arbitrate whether it may stream the Films prior to their theatrical releases.  The Court noted that Netflix had conceded that the Bankruptcy Court should decide whether Netflix is barred by judicial estoppel.  (AA1050).  Moreover, the issues relevant to Relativity's dispute with Netflix involved not just those two parties, but as the Court found "affect all creditors" and relate to "the entire confirmation process."  (AA1051).  The Bankruptcy Court further ruled that "[I]t is my responsibility to ensure that the plan I have confirmed is carried out."  (AA1052).  That, the Court ruled, is a "core responsibility that Congress has entrusted to me under the statute," 11 U.S.C. § 1142(b).  (AA1052).  And, after exercising its discretion to balance the several factors set out by the Second Circuit in *In re U.S. Lines*, 197 F.3d 631 (2d Cir. 1999), the Bankruptcy Court found that the issue before it on Relativity's motion was "key to the confirmation of the plan" and that Netflix's position "is, in reality, a collateral attack on the factual findings and distributions of property that were essential to this plan."  (AA1052).

On the merits, the Bankruptcy Court ruled, on the basis of detailed findings, that Netflix is judicially estopped and, separately, barred by *res judicata* from taking the position that it has a right to stream the Films prior to their theatrical releases.  (AA1117).  The Bankruptcy Court ruled that its Confirmation Order was a final judgment on the merits as to all of the Plan's provisions and all related

property or non-property-based claims that could have been litigated during the confirmation process.  (AA1054).  And the Court's rulings in connection with confirming the Plan and overruling Netflix's objections encompassed the same issues that were before the Court on Relativity's Plan Enforcement Motion. (AA1055).

As to judicial estoppel, the Bankruptcy Court found, balancing the factors outlined by the Supreme Court in *New Hampshire v. Maine*, 532 U.S. 742 (2001), that Netflix's prior positions during the confirmation process "were utterly inconsistent with the position it now takes. . . .  The idea that Netflix could release [the films] first is utterly inconsistent with the findings that I was asked to make and that I did make . . . ."  (AA1057-58).  The Bankruptcy Court also rejected Netflix's notion that the Court had not "adopted" Netflix's prior position. (AA1058-59).  And Netflix's attempt to take a contrary position in connection with this dispute, the Court noted, "is exactly what judicial estoppel was meant to prevent."  (AA1059).  Finally, the Bankruptcy Court found that judicial estoppel was appropriate to apply here because allowing Netflix to change its position would give it an "unfair advantage."  (AA1059).  In particular, and as noted above, the Bankruptcy Court found that Netflix had changed its position in a bad-faith attempt to try to extract leverage over Relativity to cancel or modify the License Agreement.  (AA1059).

The Bankruptcy Court separately rejected on its merits Netflix's position on the contractual interpretation issues at issue on Relativity's motion, as discussed below.  (AA1066).  And, while the Bankruptcy Court barred Netflix from contending that it has the right to distribute films on its streaming service prior to their theatrical release, the Court did not compel Netflix to execute the Date Extension Amendments.  (AA1066).  The Court noted that Netflix "refused to take issue" with unchallenged testimony by Relativity's witnesses concerning how the new Outside Dates in the Date Extension Amendments were chosen, and, at the Bankruptcy Court's urging, CIT and Relativity expressed a willingness to slightly modify those Outside Dates in accordance with the loans' new maturity dates. (AA1066-67).  The Court asked whether Netflix had any issue with those modified dates, but "Netflix just refused to engage on the point, rather than offering any reason to think those dates were anything but customary and reasonable." (AA1067).  The Court found:  "It is quite clear to me that Netflix's refusal to agree to particular dates is tactical, not principled."  (AA1067).

However, having rejected on several alternative grounds Netflix's newly asserted position that it may stream the films prior to their theatrical releases, the Bankruptcy Court did not issue a specific ruling compelling Netflix to enter into the Date Extension Amendments, leaving that for litigation in another forum if necessary.  (AA1066-67).  The Court did, however, require Netflix to confirm, for

the benefit of the production lenders (for which CIT is the agent), that payments due to Relativity from Netflix with respect to the distribution of the Films have been assigned as collateral for the repayment of the CIT replacement notes issued pursuant to the Plan.  (AA1022-23).   Netflix was also ordered to dismiss an arbitration proceeding it had commenced related to the two films, and was ordered not to take any further actions to collaterally attack the Confirmation Order. (AA1023).

### F.   This Court Denies Netflix's Stay Motion Due to an "Exceedingly Low" Likelihood of Reversal on Appeal

Netflix filed its Notice of Appeal on May 27, 2016, the same day that the Bankruptcy Court issued its decision and also the Order and Injunction.  (AA1024). But Netflix then waited nearly a week, until June 2, before moving on an "expedited" basis for a stay in this Court.  After hearing full oral argument on Netflix's application that same day, this Court denied Netflix's stay motion.  This Court ruled that there is an "exceedingly low" likelihood that Netflix will obtain a reversal of the Bankruptcy Court's Order and Injunction:

> With respect to the request for the stay, that request is denied. I find that the likelihood of success on the merits is low.  In so finding, I rely, in large part, on page 15, line 14, through page 17, line 14 of the May 27 transcript and, in the same transcript, page 28, line 9, through page 37, line 25.  Rather than reading all of that into the transcript, I find that it is correct and that the likelihood of success in reversing that finding is exceedingly low.  Accordingly, the stay is denied.

(RA592).

## STANDARD OF REVIEW

Netflix tries to create the impression that all of the issues on appeal are pure issues of law, to be reviewed *de novo*. That is not correct. The Bankruptcy Court ruled on Relativity's motion after a three-day evidentiary trial, where disputed issues of fact were addressed by detailed testimony from five witnesses and more than forty-six exhibits were admitted into the record. The Bankruptcy Court made extensive findings and credibility determinations on the basis of that record and other prior proceedings in these Chapter 11 cases. While issues of law are reviewed *de novo*, the Bankruptcy Court's findings that are the underpinnings for its Order and Injunction are reviewed for "clear error." *In re Bonnanzio*, 91 F.3d 296, 300 (2d Cir. 1996). Moreover, in recognition of the Bankruptcy Court's "expertise and superior position to make determinations of credibility," this Court has observed that findings cannot be deemed clearly erroneous merely because they "strike the court as more than just maybe or probably wrong." *E.g.*, *In re Kollel Mateh Efraim, LLC*, 456 B.R. 185, 191 (S.D.N.Y. 2011) (internal quotation marks omitted). Instead, to meet the high threshold of clear-error review, the Bankruptcy Court's findings "must strike the court as wrong with the force of a five-week-old unrefrigerated dead fish." *Id.* (internal quotation marks omitted).

22

## SUMMARY OF ISSUES AND ARGUMENT

I.      The Bankruptcy Court correctly determined it had core jurisdiction here.  The adjudication of Relativity's motion to enforce the Plan "arose under" the Bankruptcy Code—and therefore was a statutorily core dispute—because it directly involved the Bankruptcy Court's core responsibility under § 1142(b) of the Bankruptcy Code to enforce the confirmed Plan.   As the Bankruptcy Court recognized, the planned sequence of distribution of the Films in accordance with the License Agreement here "was a foundation of the plan and without it Relativity could not have shown feasibility."   Because Netflix's inconsistent and unreasonable position here had the potential to undermine the core bankruptcy functions of Plan confirmation, the Bankruptcy Court correctly concluded that this dispute is a core matter.

II.     The Bankruptcy Court properly denied Netflix's motion to compel arbitration.   A bankruptcy court has the discretion to override an arbitration agreement in a core proceeding if "arbitration of the claim would 'necessarily jeopardize' the objectives of the Bankruptcy Code."  *MNBA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006).  As the Court found, the License Agreement's requirement that the theatrical release of a film occurs prior to Netflix's streaming "is key to the confirmation plan, as it was in the *U.S. Lines* case.  The entire thing collapses otherwise."  (AA1052).   Because the enforcement of the arbitration

agreement here would jeopardize its ability to "ensure that the plan [it] confirmed is carried out," the Bankruptcy Court correctly exercised its discretion to adjudicate this dispute that was manufactured by Netflix and not send it to arbitration.

III.    The Bankruptcy Court properly granted Relativity relief on its motion to enforce the Plan.   The Bankruptcy Court's finding that Netflix's position regarding its rights under the License Agreement contradicted express representations that Netflix made to the Court during confirmation proceedings—representations on which the Court relied in confirming the Plan—was well-supported.   Netflix was therefore appropriately barred by judicial estoppel and *res judicata* from changing its position in this manner.   In any event, the Bankruptcy Court correctly determined that Netflix's position is inconsistent with the License Agreement.

IV.    The Court should reject Netflix's argument that the Order and Injunction violates its First Amendment rights.   Netflix has waived this argument by failing to raise it in the Bankruptcy Court, and, in any event, there is no First Amendment issue because in pertinent part the Order and Injunction properly memorializes the Bankruptcy Court's *res judicata*, estoppel, and bad faith rulings and simply confirms that Netflix is not to engage in any further collateral attacks on the Confirmation Order.

24

## ARGUMENT

## I.   THE BANKRUPTCY COURT HAD JURISDICTION

Netflix challenges the Bankruptcy Court's authority to enter a final order on two separate grounds.  First, Netflix contends the Bankruptcy Court erred in its determination that this is a "core" bankruptcy proceeding under 28 U.S.C. §§ 157 and 1334.   Second, Netflix argues that, to the extent this matter is a core proceeding, the Court did not have the power to finally adjudicate it under *Stern v. Marshall*, 564 U.S. 462 (2011).  Both of these challenges are meritless.[3]

### A.   This Is a Core Proceeding

As Netflix acknowledges, a proceeding is core under the Bankruptcy Code to the extent that it either "arises under" the Bankruptcy Code, or "arises in" a bankruptcy case.  App. Br. at 38 (citing *Stern*, 564 U.S. at 473).  Core proceedings "arising under" the Bankruptcy Code are those "that clearly invoke substantive rights created by federal bankruptcy law," while proceedings "aris[ing] in" a

---

[3] Netflix also contends the Bankruptcy Court lacked subject matter jurisdiction because this is a post-confirmation dispute.  App. Br. at 40-41.  However, the Bankruptcy Court's jurisdiction does not evaporate after confirmation of a plan of reorganization, as Netflix would have it. Rather, the Court may properly adjudicate a matter where (i) the plan specifically provides for the retention of post-confirmation jurisdiction and (ii) the matter in dispute has a "close nexus" to the plan of reorganization.  The requisite "close nexus" exists where a matter "affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan."  *In re Refco, Inc. Sec. Litig.*, 628 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2008) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 165-169 (3d Cir. 2004)); *see also In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390-391 (5th Cir. 2001) (same).  Here, there is no dispute that the Plan provided for the retention of post-confirmation jurisdiction by the Bankruptcy Court, and the Bankruptcy Court found that resolution of this dispute not only affected, but was integral to, implementation of the Plan.  (AA1051-52).

bankruptcy case are those that would have no existence outside the bankruptcy context.  *Hill*, 436 F.3d at 108-09.

Contrary to Netflix's assertions (App. Br. at 39), Relativity's motion (a) invokes the Reorganized Debtors' right to enforce the terms of their confirmed Plan under § 1142(b) of the Code, and therefore (b) has no existence outside the context of the Plan and the underlying chapter 11 bankruptcy case in which it was confirmed.  Indeed, in determining this matter to be core, the Bankruptcy Court expressly noted that its responsibility to enforce a confirmed plan under § 1142(b) "is a core responsibility that Congress has entrusted to me under the statute." (AA1052).  The Bankruptcy Court's ruling in this regard is amply supported by case law,[4] and Netflix has cited no contrary authorities.

To get around this overwhelming judicial consensus, Netflix attempts to characterize Relativity's Plan Enforcement Motion as presenting nothing more than a "state law contract dispute." App. Br. at 39.  But, even if true, that does not

---

[4] *See In re U. S. Brass Corp.*, 301 F.3d 296, 304-06 (5th Cir. 2002) (proceedings under § 1142(b) of the Code should be "viewed as 'arising in' a case under title 11" because the court's authority to enforce a plan under § 1142(b) "can be exercised only in the context of a bankruptcy case"); *accord In re J&B Haldeman Holdings, LLC*, 517 B.R. 910, 918 (Bankr. W.D. Wis. 2014) ("[A] proceeding to enforce a term of the confirmed plan 'arises in' a case under title 11."); *In re Polar Molecular Corp.*, 195 B.R. 548, 556 (Bankr. D. Mass. 1996) (issues raised by a chapter 11 trustee, who sought an order compelling the debtor to remit certain post confirmation income for distribution to creditors as required by the debtor's reorganization plan, "arise under § 1142 of the Code and . . . [therefore] fall well within the jurisdictional grant of § 1334"); *In re Harlow Props., Inc.*, 56 B.R. 794, 797 (B.A.P. 9th Cir. 1985) ("A motion for an order [pursuant to § 1142(b)] requiring the debtor or other necessary party to execute the provisions of a confirmed plan is a proceeding arising under Title 11.").

render the dispute non-core.  To the contrary, where, as here, the resolution of a

contract dispute directly impacts a core bankruptcy function, the matter is properly

deemed a core proceeding.  In *In re Petrie Retail, Inc.*, 304 F.3d 223 (2d Cir. 2002),

for example, the Second Circuit held that certain contractual interpretation issues

raised by a plan enforcement motion were core, at least as to the "enforcement of

the rights established by the orders of the bankruptcy court and the resolution of

issues raised in the reorganization."  *Id.* at 231.  In that case, the successor to the

debtor had purchased a lease free and clear of certain liabilities pursuant to a

bankruptcy court order approving the sale, which was consummated as part of the

debtor's confirmed plan.  *Id.* at 226.  Several months after the sale closed and the

plan of reorganization was confirmed, the lessor initiated a contract action against

the purchaser outside the bankruptcy court.  *Id.* at 227.  Pursuant to § 1142(b) of

the Code, the purchaser filed a motion in the bankruptcy court seeking an "order in

aid of consummation" that would "enjoin [the lessor] from proceeding with a

contract action contingent upon the interpretation of the lease provisions at issue in

the administration of [the lessor's] claims in bankruptcy court."  *Id*. at 227, 229.

The bankruptcy court granted the purchaser's motion and enjoined the lessor from

"'commencing, continuing or prosecuting any action contingent upon the

interpretation of the provisions of the leases at issue before this Court.'"  *Id*. at 227.

In affirming, the Second Circuit upheld the bankruptcy court's determination that the matter was core, noting that the inquiry "hinges on the nature of the proceeding," and that "[p]roceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function." *Id*. at 229 (internal citations omitted).  The Second Circuit went on to hold that the contract dispute was not independent of the reorganization because "the impact of the plan consummation motion on other core bankruptcy functions renders it core." *Id*.  In particular, the Second Circuit held that the contract dispute directly affected the core bankruptcy functions of (i) approving sales of estate property, *see* 28 U.S.C. § 157(b)(2)(N), (ii) adjudicating "matters concerning the administration of the estate," *id*. § 157(b)(2)(A), and (iii) determining the "allowance or disallowance of claims against the estate," *id*. § 157(b)(2)(B).

Here, as in *Petrie*, the issues before the Bankruptcy Court concerning the operation of the Plan and the parties' rights under the License Agreement directly affect core bankruptcy functions.  Chief among those are (i) plan confirmation, *see Del. Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 517 (S.D.N.Y. 2015) (intercreditor dispute as to how to allocate debtor's cash collateral payments among its creditors was core because it would likely affect "whether to confirm a proposed plan of reorganization"); and (ii) asset allocation among creditors, *see In*

*re U. S. Lines, Inc.*, 197 F.3d at 638 (liquidating trustee's postconfirmation declaratory relief claims seeking interpretation of debtors' prepetition insurance contracts was core where it impacted the "core administrative function of asset allocation among creditors").

Indeed, the Bankruptcy Court expressly found this dispute was core in part due its close connection to the issues addressed by the Bankruptcy Court at confirmation, including recoveries to creditors as provided for in the Plan.  As the Bankruptcy Court explained, the theatrical release of the films was not only "key to the proposed treatment of CIT's secured claims . . . RKA's treatment under the plan . . . [and] affected the UCC recoveries . . . but everyone in the case . . . depended on the release of the films in the projected way."  (AA1043-44).  In other words, this dispute has the potential not only to impact the core bankruptcy functions of plan confirmation and allocation of assets to creditors in accordance with the Plan, but to completely eviscerate these functions.   Under these circumstances, resolution of the dispute concerning Netflix's putative rights under the License Agreement is plainly a core matter.

Netflix does not show that these findings were in clear error.  Rather, Netflix mischaracterizes the Bankruptcy Court's decision as ruling that this matter is core "primarily because it could have an effect on the well-being of reorganized Relativity" and, specifically, the amount of money available to its creditors.  App.

Br. at 38.  As explained above, however, this was manifestly *not* the basis for Relativity's motion or the Bankruptcy Court's finding that the matter was core.  As such, the cases cited by Netflix to the effect that breach of contract claims seeking to augment the estate for the benefit of creditors are non-core, including *In re Orion Pictures Corp.*, 4 F.3d 1097, 1102 (2d. Cir. 1993), are wholly inapposite.[5]

In sum, Netflix fails to provide any basis, nor is there any basis in the record, for disturbing the Bankruptcy Court's well-supported findings in its determination that this dispute is a core matter subject to final adjudication by the Bankruptcy Court.

## B.    The Bankruptcy Court Properly Rejected Netflix's Belated *Stern* Objection

At 2:12 a.m. on May 27, 2016—more than eight days after the submission of pretrial briefing, three days after the trial, and less than ten hours before the Bankruptcy Court was scheduled to and did issue its ruling—Netflix filed an objection contending that under *Stern v. Marshall*, 564 U.S. 462 (2011), the Bankruptcy Court lacked authority to issue a final decision in this matter.

---

[5] In any event, *Orion* is distinguishable.  In *Orion*, there was no confirmed plan (and thus no prior order to enforce), and the contract counterparty had not filed a claim against the bankruptcy estate, a fact the court highlighted.  4 F.3d at 1102 ("Thus we hold that this breach-of-contract action by a debtor against a party to a pre-petition contract, *who has filed no claim with the bankruptcy court*, is non-core." (emphasis added)).  By contrast, Netflix did file a claim under the same contract at issue here, and the Bankruptcy Court has already ruled on various issues regarding interpretation of the License Agreement in confirming the Plan.

(AA1104).   Netflix's *Stern* objection should be rejected on appeal for the same reasons provided by the Bankruptcy Court, and others.

First, Netflix's full participation in both the confirmation proceedings, as well as the three-day trial, without so much as mentioning *Stern* or any related constitutional concerns, is sufficient to establish Netflix's consent to final adjudication of this matter by the Bankruptcy Court.  *E.g.*, *In re Men's Sportswear, Inc.*, 834 F.2d 1134, 1137-38 (2d Cir. 1987) (party's failure to timely object to a bankruptcy court's assumption of core jurisdiction "constitutes consent to the final adjudication of this controversy before the bankruptcy court"); *see also Wellness Int'l Network, Ltd. v. Sharif*, 617 F. App'x 589, 590-91 (7th Cir. 2015) (party "forfeited his *Stern* argument" when he "waited too long to raise his *Stern* objection because he did not mention the issue until his reply brief").

In addition, the Bankruptcy Court had constitutional authority to fully adjudicate this matter.  As the Bankruptcy Court carefully explained, *Stern* is inapplicable to these proceedings for three separate reasons.  First, "[t]he confirmation order was entered in a core bankruptcy proceeding."  (AA1068).  Second, "Section 1142(b) of the Bankruptcy Code gives me the power to direct Netflix to cooperate to the extent necessary to implement the plan.  My approval of the plan, and the protections that confirmation provides to all creditors, would be meaningless if I could not enforce Section 1142(b) and compel Netflix's

cooperation in granting to other parties the rights that the plan grants to them."
(AA1068-69).  And, third, "the issues raised here are not just an incidental
counterclaim by a debtor," which was the issue addressed in *Stern*.  (AA1069).
"These are issues raised by the debtor to enforce the findings that I made in the
confirmation of the plan and to enforce the distributions of property that are set
forth in the plan."  (AA1068-69).

On appeal, Netflix fails to address *any* of these specific grounds.  Instead,
Netflix tries to change the subject.  Netflix argues that its filing of proofs of claim
against various Debtors does not affect the analysis because "[a] creditor's filing of
a proof of claim does not give the bankruptcy court constitutional authority to
resolve state law claims that involve factual and legal determinations that were not
resolved in the process of ruling on the creditor's proof of claim." App. Br. at 41-
42.  This not only fails to address the Bankruptcy Court's findings in support of its
analysis, but ignores that Netflix's proof of claim raised the *same issues* that the
Bankruptcy Court was called upon to adjudicate in connection with Plan
confirmation—*i.e.*, the effect, if any, of Relativity's failure to submit the minimum
number of "Titles" to Netflix under the License Agreement in 2015.  (AA0127-28).
And, as noted above, the Bankruptcy Court found that the motion at issue on this
appeal called upon the Bankruptcy Court to enforce the findings the Court made in
confirming the Plan and to enforce the distributions of property set forth in the

Plan. Those well-supported findings preclude any *Stern* objection here, even assuming Netflix had not waived the argument.

## II. THE BANKRUPTCY COURT PROPERLY DENIED NETFLIX'S MOTION TO COMPEL ARBITRATION

One of bankruptcy's main purposes is to "centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990). Consistent with this overarching purpose, courts routinely decline to give effect to forum selection clauses in core bankruptcy disputes when doing otherwise would "violate the public's interest in centralizing bankruptcy proceedings in the bankruptcy court." *E.g.*, *In re Iridium Operating LLC*, 285 B.R. 822, 837 (S.D.N.Y. 2002) (collecting cases).

Because "an arbitration clause is merely a specialized type of forum selection clause," *Roby v. Corp of Lloyd's*, 996 F.2d 1353, 1362 n.2 (2d Cir. 1993), the Second Circuit has applied this same rationale to arbitration clauses in core bankruptcy proceedings. *In re U.S. Lines*, 197 F.3d at 640. Specifically, a bankruptcy court has discretion to override an arbitration clause in core proceedings when it "finds that the proceedings are based on provisions of the Bankruptcy Code that 'inherently conflict' with the Arbitration Act or that arbitration of the claim would 'necessarily jeopardize' the objectives of the

33

Bankruptcy Code." *Hill*, 436 F.3d at 108 (quoting *In re U.S. Lines*, 197 F.3d at 640).   The Second Circuit has provided guidance that a court should consider whether the claim would "jeopardize the important purposes that the automatic stay serves: providing debtors with a fresh start, protecting the assets of the estate, and allowing the bankruptcy court to centralize disputes concerning the estate." *Id.* at 109.   Likewise, courts may also consider whether the "proceedings are integral to the bankruptcy court's ability to preserve and distribute" a reorganized debtor's assets, and whether the proceeding in question presents a "complex factual scenario, involving multiple claims" and multiple parties.   *In re U.S. Lines*, 197 F.3d at 641.   "Where the bankruptcy court has properly considered the conflicting policies [between the Bankruptcy Code and the Federal Arbitration Act] in accordance with law," this Court is to "acknowledge [the bankruptcy court's] exercise of discretion and show due deference to its determination that arbitration will seriously jeopardize a particular core bankruptcy proceeding." *Id.*

The Bankruptcy Court did not abuse its discretion here.   As an initial matter, Netflix has *conceded* the Bankruptcy Court's authority to address whether Netflix should be estopped from asserting it has rights to stream the Films prior to their theatrical releases.   On the first day of proceedings, before a single witness took the stand, counsel for Netflix plainly stated: "Certainly with respect to the judicial estoppel issue, your Honor, I concede the Court's ability to resolve that issue."

(AA0451).   The Bankruptcy Court then properly relied upon this concession, noting that "Netflix conceded at the outset of this hearing that these points [regarding judicial estoppel] should be decided by me, not by arbitrators." (AA1050).  Netflix does not challenge this finding on appeal, or even mention it.[6] The failure to address this finding alone precludes Netflix's attempt to reverse the Bankruptcy Court's denial of its motion to compel arbitration.

In any event, the Bankruptcy Court properly exercised its discretion in determining that allowing Netflix to arbitrate the issues raised by Relativity's motion to enforce the Plan would permit an impermissible "collateral attack on the factual findings and distributions of property that were essential to this plan." (AA1052).  There is, at the outset, no legal issue here as to whether the Bankruptcy Court applied the correct framework.  Specifically, Netflix takes no issue—nor could it—with the Bankruptcy Court's adherence to *In re U.S. Lines* and *Hill* in deciding this issue or the Bankruptcy Court's statement that those cases called upon it "to consider if deferring to arbitration would be inconsistent with important bankruptcy policies and provisions."   (AA1050).   The Bankruptcy Court then

---

[6] While the Bankruptcy Court noted that "Netflix's counsel appeared to try to walk back from this prior concession at closing argument," these efforts were, at best, "not clear," and Netflix's counsel "still conceded that at least in some respects judicial estoppel and res judicata were matters that should be decided by me."  (AA1051).

proceeded to "weigh the competing bankruptcy interests and arbitration interests," as guided by the Second Circuit.  (AA1052).

After engaging in that balancing, the Bankruptcy Court made a finding that "[t]his issue [Relativity's ability to release the Subject Films in theaters prior to streaming on Netflix] is key to the confirmation of the plan, as it was in the *U.S. Lines* case.  The entire thing collapses otherwise."  (AA1052).  Thus, unlike in *Hill*, the Bankruptcy Court made clear that this was not an instance where "arbitration would not interfere with or affect the distribution of the estate."  To the contrary, the Bankruptcy Court found that the "issues actually affect the entire case and the entire confirmation process that was conducted before me, and therefore affect all creditors."  (AA1051).  In other words, just as the claim in *U.S. Lines* could potentially jeopardize the Trust's ability to compensate claimants, the Bankruptcy Court exercised its discretion in finding that arbitration here would jeopardize its ability to "ensure that the plan [it] confirmed is carried out."  (AA1052).

That is especially so here, as the Bankruptcy Court found, because Netflix withdrew its feasibility objection to the Plan and so the Bankruptcy Court was not required to enter a detailed explanation of its findings or to write an opinion setting forth the basis for its determinations to confirm the Plan.  (RA323).  As a result, Judge Wiles observed, "I am the only one who knows exactly what I previously decided and why, and what points were important to my prior decisions.  No

arbitrator could read my mind and provide an accurate answer to that question."
(AA1051).   This is the precise type of determination that the Bankruptcy Court is
afforded the discretion to make under *U.S. Lines*.[7]

Netflix does not even engage in an argument that the Bankruptcy Court has
abused its discretion here.   Rather, Netflix largely reiterates its meritless argument,
addressed above, that Relativity's motion to enforce the Plan presents a non-core
dispute.   Equally unavailing is Netflix's bald statement that the Bankruptcy Court
erred here even if this dispute is core because "[n]o showing has been made here to
satisfy a finding that arbitration of the claim would 'necessarily jeopardize' the
objectives of the Bankruptcy Code or that the dispute involves provisions of the
Bankruptcy Code that 'inherently conflict' with the Arbitration Act."   App. Br. at
40.   Not only does Netflix ignore the Bankruptcy Court's express, detailed findings
to the contrary, but Netflix is also wrong as a matter of law.   It is *Netflix*'s burden
on appeal to show that the Bankruptcy Court's determination was in clear error.
*E.g.*, *In re Kollel Mateh Efraim, LLC*, 456 B.R. at 191.   And Netflix has failed to
cite to *any* evidence to carry its burden, let alone evidence that demonstrates error

---

[7] The Bankruptcy Court further found that, if the parties had intended for disputes concerning the License Agreement to be arbitrated "they should have so said in the arbitration provision" in the NOAs.   (AA1062).   Although Netflix contended it had the right to stream these films under the NOAs, the legal issues in the dispute were focused on interpretation of the *License Agreement*. And, as the Bankruptcy Court properly noted, the License Agreement does not contain an agreement to arbitrate.   (AA1062).   In light of that consideration, as well, the Bankruptcy Court did not abuse its discretion in finding, upon weighing the *U.S. Lines* factors, that arbitration of the issues presented by Relativity's Plan Enforcement Motion would be inappropriate.

with the requisite "force of a five-week-old unrefrigerated dead fish." *Id.* (internal quotation marks omitted).

## III.   THE BANKRUPTCY COURT'S ORDER SHOULD BE AFFIRMED ON THE MERITS

On the merits, the Bankruptcy Court properly determined that Netflix is barred and precluded from asserting that it has a contractual right under the NOAs to stream the Films before their theatrical releases.

This dispute arose as a result of Netflix's about face as to its alleged rights under the License Agreement.   In connection with Netflix's objection to the feasibility of the Plan and to Relativity's assumption of the License Agreement, Netflix clearly represented that it could stream these films only after their theatrical releases—indeed, that this was a "material requirement" in the Agreement. Specifically, with respect to *Masterminds* and *The Disappointments Room*, Netflix's witness testified that "it remains unclear" whether Netflix would acquire rights to those films because, in Netflix's view, there was doubt that they would be theatrically released in 2016 according to the schedule in the Plan.  (RA548).

After confirmation of the Plan, however, Netflix suddenly changed its position and contended that, under the NOAs themselves, Netflix had the putative right to stream the films in June 2016, notwithstanding their scheduled release dates in September and December 2016, as disclosed in the Plan.  The Bankruptcy Court properly held that Netflix was precluded from undermining the integrity of

the judicial process and severely prejudicing Relativity and its creditors in this manner.  Specifically, the Bankruptcy Court determined that Netflix was barred and precluded from changing positions under the doctrines of *res judicata* and judicial estoppel.  The Bankruptcy Court made extensive, well-reasoned findings in support of its application of these doctrines, and its ruling should be affirmed.[8] In any event, the Bankruptcy Court properly determined that the License Agreement precludes Netflix's new position as well.

### A.   The Bankruptcy Court Did Not Clearly Err in Finding That Netflix Is Judicially Estopped From Asserting Its New Position

"Because judicial estoppel is an equitable doctrine applied in a court's discretion, this Court will not overturn the bankruptcy court's discretion absent an abuse of discretion."  *In re Residential Capital, LLC*, 519 B.R. 606, 610 (S.D.N.Y. 2014).  The Bankruptcy Court did not abuse its discretion in applying this equitable doctrine.

Judicial estoppel "is not reducible to any general formulation of principle or exact criteria."  *In re AMR Corp.*, 508 B.R. 296, 327 (Bankr. S.D.N.Y. 2014). Instead, the doctrine is a flexible one, as the "[t]he exact criteria for invoking

---

[8] Netflix argues that the Bankruptcy Court's Order permitted Relativity to modify portions of an assumed contract in violation of 11 U.S.C. § 365.  Section 365, which governs the debtor's rights to accept or reject contracts prior to plan confirmation, has nothing to do with this dispute.  Here, Relativity assumed in full the License Agreement.  When Netflix threatened to take action in violation of the License Agreement, Relativity filed its Plan Enforcement Motion pursuant to 11 U.S.C. § 1142(b).  Nothing in the Order and Injunction permits Relativity to accept or reject only in part a contract, and therefore § 365 is not implicated here.

judicial estoppel will vary based on 'specific factual contexts.'" *In re Residential Capital*, 519 B.R. at 610 (citing *New Hampshire*, 532 U.S. at 749).  The doctrine "typically is appropriate[] when a party's position is clearly inconsistent with an earlier litigation position, the party persuaded a court to accept the earlier position, and the party will obtain a benefit from the new position." *In re Residential Capital*, 519 B.R. at 610 (citing *New Hampshire*, 532 U.S. at 750-51).  As to this second factor, "an express adoption of the prior inconsistent position is not required." *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011).  Rather, "[a]doption can include adjudication by the court or reliance by another party, the court, or both." *In re 300 Washington St. LLC*, 528 B.R. 534, 546 (Bankr. E.D.N.Y. 2015).

At bottom, as the Bankruptcy Court properly observed, judicial estoppel exists to "protect the integrity of the judicial process" by "prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire*, 532 U.S. at 749-50 (internal quotation marks omitted).  Accordingly, a court acts within its discretion in applying the doctrine when there is an impact on judicial integrity due to a risk of inconsistent results. *See Adelphia Recovery Trust v. Goldman, Sachs & Co.*, 748 F.3d 110, 116-17 (2d Cir. 2014).  In the bankruptcy context, courts in the Second Circuit have held that such risks arise when parties take inconsistent positions regarding their interests in assets that are crucial to a

reorganization plan.  In *Adelphia Recovery Trust*, for example, the Second Circuit affirmed a determination that a debtor was estopped from asserting an ownership interest in certain assets that "were claimed by other parties during the bankruptcy proceeding without objection," because "a debtor's subsequent claim to those assets in a different proceeding must be seen as inconsistent."  *Id.* at 118-19.  The Second Circuit emphasized that it is "crucial, both for the sake of finality and the needs of debtors and creditors, that claims to ownership of various assets be determined in the bankruptcy proceedings" in order to facilitate the reorganization process.  *Id.* at 118.  "A different ruling would threaten the integrity of the bankruptcy process by encouraging parties to alter their positions as to ownership of assets as they deem their litigation needs to change, leaving courts to unravel previously closed proceedings."  *Id.* at 119.  The court reached the same conclusion in *In re Residential Capital* when a debtor failed to list all of her claims in connection with the petition and then sought to file an inconsistent proof of claim later.  *See* 519 B.R. at 610-11.  Because this claim staked out a "litigation position inconsistent with a previously filed asset schedule," the district court agreed that the bankruptcy court did not abuse its discretion when it concluded that the later-submitted proof of claim was barred by judicial estoppel.

*Adelphia Recovery* and *In re Residential Capital* provide ample support for the Bankruptcy Court's exercise of its discretion in this case.  Netflix objected to

the proposed Plan on the grounds that it was not feasible and that, specifically, *Masterminds* and *The Disappointments Room*, among other films, could not be properly designated to Netflix for streaming under the License Agreement until *after* they were theatrically released and that there was doubt whether they would be released in 2016 according to the Plan.   (AA0128).   Like the debtors in *Adelphia Recovery* and *In re Residential Capital*, Netflix "never once contended before [the Bankruptcy Court] that if its agreements were assumed and if the plan were confirmed, that Netflix would have any rights to distribute the movies on any dates prior to those specified in the license agreement itself." (AA1056).   And the Bankruptcy Court "relied on that in making [its] decision and finding that the plan was feasible and in granting property rights to other parties under the plan." (AA1056).

When Netflix suddenly changed course after the Plan was confirmed and claimed it had a right to stream these films prior to their theatrical release, the Bankruptcy Court correctly found that Netflix had taken an "utterly inconsistent" position which threatened the integrity of the bankruptcy proceeding.   Indeed, even putting to one side "the contentions that Netflix actually made at the confirmation hearing," the Bankruptcy Court found that Netflix's silence as to whether it had putative rights to stream the films in June 2016 was "enough to bar [these] contentions." (AA1058).   The Bankruptcy Court found that if Netflix "had thought

it had rights to do what it now contends, it should have raised it when, as Netflix itself suggested, the feasibility determinations were made and the debtors' legal rights to exploit these movies were on the table.  These issues were relevant under Netflix's own descriptions of the issues that I had to decide."  (AA1058).  There is no clear error in either of these factual findings.

Second, the Bankruptcy Court did not clearly err in finding that the "judicial adoption" factor had been met here.  The Bankruptcy Court found that it not only "accepted Netflix's position that theatrical release was required" before Netflix would have a right to stream any of Relativity's films; it also "accepted [Netflix's] position that the benefits under the Netflix contract that would be triggered by that theatrical release were important to feasibility, and I required proof by the debtors that these things could be accomplished."  (AA1058).   Indeed, Judge Wiles explained:   "In fact, I went out of my way to satisfy myself as to the reasonableness of the projected revenues and expenses and the debtors' ability to do what they proposed to do."  (AA1058-59).

Finally, the Court found it was "very clear" that Netflix sought an unfair advantage by sandbagging Relativity as it did.  (AA1059).  The Court did "not believe Netflix is asserting the alleged contractual rights in good faith" because "Netflix waited until very late in the process to spring this new issue on the debtors

in the hopes that it could gain leverage to force a contract change or maybe even a contract cancellation." (AA1059).

In sum, the Bankruptcy Court applied judicial estoppel here for the precise reason the doctrine exists: to protect the "integrity of the bankruptcy process." *Adelphia Recovery*, 748 F.3d at 119.  As the Bankruptcy Court properly found: "This is exactly what judicial estoppel was meant to prevent.  Allowing Netflix to pursue these different rights would threaten the integrity of the bankruptcy process, allow parties to play fast and loose with the relevant issues, and inject an unacceptable level of uncertainty into the results of the confirmation hearing, with devastating consequences to all of the parties who are now bound by the confirmed plan and who now depend on the release of these movies, in the projected manner and schedule and sequence, for the payment of their claims . . . ." (AA1059).

The Bankruptcy Court's Order and Injunction should be affirmed on this ground alone.  Netflix's lone argument specific to judicial estoppel is that it purportedly "does not apply here" because Netflix "did not make any assertions about its own rights at all."  App. Br. at 35.  That is contradicted by both the Bankruptcy Court's express findings and Second Circuit precedent.  First, Netflix did, in fact, make an assertion regarding its rights when it objected to the feasibility of the Plan.  Specifically, Netflix's own witness testified in support of its objection that per the terms of the License Agreement, "there is a material requirement that

the films provided *must be first run, theatrically released films*."   (RA547) (emphasis added).   In any event, even assuming Netflix had not made any such representation, the Bankruptcy Court correctly noted that Second Circuit precedent is clear that "Netflix's silence is enough to bar its contentions now."   (AA1058); *Adelphia Recovery*, 748 F.3d at 118-19 (concluding that because "a debtor's subsequent claim to . . . assets in a different proceeding must be seen as inconsistent with its prior silence," judicial estoppel applied); *see also In re Osyka Corp.*, 426 B.R. 653, 661-62 (Bankr. S.D. Tex. 2010) (same).

The only other argument Netflix makes is that no preclusion or estoppel principles can *ever* apply here because these doctrines are available only to "shield a defendant who is the subject of a legal claim."   App. Br. at 25-26.   That is completely without merit.   Indeed, not only is the argument waived, because Netflix is raising it for the first time on appeal, but Netflix's own description of the issue belies its notion.   Netflix repeatedly refers to "asserting its rights" under the License Agreement, by which it means expressly *claiming* in interactions with Relativity that it has the right to stream these films before they are released.   That is, in context, tantamount to asserting a claim against Relativity.   *See In re Residential Capital*, 519 B.R. at 610-11.   Relativity's hands are not tied as suggested by Netflix merely because, faced with Netflix's out-of-court threat,

Relativity had to seek protection by making a motion in the Bankruptcy Court to enforce the Plan and estop Netflix's bad-faith assertion of its putative "rights."

In any event, Netflix tellingly fails to cite a *single case* in support of this contrived and hyper-technical notion.  Nor could it, as the Supreme Court long ago held that courts have "broad discretion" to determine when it is appropriate to invoke preclusion doctrines to estop a defendant from asserting a position in proceedings.  *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329, 331 (1979) (the "preferable approach . . . is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied"); *see also, e.g.*, *Coffaro v. Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010) (agreeing with a plaintiff that judicial estoppel barred the defendant from taking a position that was "clearly inconsistent with the position he took earlier in his bankruptcy proceeding").

### B.    The Bankruptcy Court Did Not Clearly Err in Finding That The Doctrine of *Res Judicata* Also Precludes Netflix's Position

An independent ground for affirming is that the Bankruptcy Court did not err in applying the doctrine of *res judicata*.

As the Supreme Court has long recognized, *res judicata* provides that a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  Of particular

importance here, this doctrine "bars re-litigation not just of those claims which were brought in a prior proceeding, but of 'any other admissible matter which could have been brought, but wasn't.'"  *Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (quoting *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591, 597 (1948)).

In applying the doctrine, courts "consider whether (1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 87-88 (2d Cir. 1997).  "In the bankruptcy context," this last inquiry also requires a court to consider "whether an independent judgment in a separate proceeding would impair, destroy, challenge, or invalidate the enforceability or effectiveness of the reorganization plan."  *Id.* (internal quotation marks omitted).

The two proceedings at issue here are the confirmation proceedings before the Bankruptcy Court and Relativity's Plan Enforcement Motion.  There is no dispute that the same parties were involved in each of these proceedings or that the Bankruptcy Court had jurisdiction in confirming the Plan and ruling on Netflix's objections to it.  It is also beyond dispute, as the Supreme Court recently re-affirmed, that plan confirmation orders constitute final judgments.  *See Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1692 (2015).

Netflix challenges on appeal only whether the issues raised in these two proceedings constitute the same "causes of action" for purposes of applying *res judicata*. The Bankruptcy Court correctly determined that they are the same.

"To satisfy the fourth prong of the *Corbett* test for res judicata . . . the second action must involve the same 'claim' or 'nucleus of operative fact' as the first." *In re Layo*, 460 F.3d 289, 292 (2d Cir. 2006). When making this determination, courts "examine whether the same transaction, evidence, and factual issues are involved in both cases." *Corbett*, 124 F.3d at 89. For example, in *In re Layo*, the court concluded that a confirmation proceeding and a subsequent adversary proceeding involved identical causes of action when both actions analyzed the "asserted invalidity of [a] mortgage lien listed in the confirmed Chapter 13 plan." 460 F.3d at 292. There, the court concluded that a trustee was precluded from challenging the validity of the lien in a subsequent proceeding because it raised no such argument at the confirmation hearing, despite multiple clear opportunities to do so. *Id.* Thus, because the "Trustee had both a motive and opportunity to confirm the status of real estate liens affecting the debtor's estate at or before the time that the plan was confirmed," the court concluded that the two proceedings were identical for the purposes of *res judicata*. *Id.*; *see also Sure Snap*, 948 F.2d at 874-77 (party was precluded from raising a claim in a

subsequent action because the confirmation proceeding "comprised all matters that Sure-Snap or any creditors might have raised to advance their interest").

The Bankruptcy Court correctly found that the confirmation proceeding with respect to Netflix's objections involved the same cause of action at issue here because, at bottom, both proceedings address the same issue: whether "the debtors had the legal rights and factual ability to release the movies in the manner projected." (AA1044). Central to the Bankruptcy Court's Confirmation Order and its ruling on Netflix's objections was the Bankruptcy Court's determination that Relativity had the factual ability and legal right to release as first-run theatrical films the titles on its proposed slate, including *Masterminds* and *The Disappointments Room*; indeed, "[t]he entire thing collapses otherwise." (AA1052). Netflix was not only aware of the importance of this aspect of the Plan, but filed an objection to the Plan on the grounds that it did not think Relativity would be able to theatrically release the films in a timely manner in 2016, and therefore fulfill all of its obligations to Netflix. (AA00127-28).

The dispute on Relativity's Plan Enforcement Motion involves this exact issue: whether Relativity had the legal right to "exploit these movies and distribute them . . . in the sequence projected" during the confirmation proceedings. (AA1055). As the testimony at the trial reflected, if the films are streamed on the Netflix service prior to theatrical release, as Netflix now contends it had the right

to do, the impact on the films' value would be devastating. (AA0698). Furthermore, the Bankruptcy Court noted that streaming the Films on Netflix prior to theatrical release would lead to the nonsensical conclusion that Netflix could receive the Films for free, as the License Agreement requires Relativity to refund Netflix based upon box office calculations, which would necessarily equal zero here. (RA393).

As in *In re Layo*, not only did the confirmation process underscore the importance of a prior theatrical release of these films as contemplated by the Plan, but Netflix had ample opportunities to notify the Court that it believed it had a contractual right to stream these films prior to their theatrical releases. Indeed, as the Bankruptcy Court found, it would "not have confirmed the plan except based on the finding that the debtors had the legal rights and factual ability to release the movies in the manner projected." (AA1055). Clearly, that was the time for Netflix to assert its purported rights to stream the Films in June 2016, prior to their theatrical releases. There was, on the basis of this record, no clear error in the Bankruptcy Court's finding that the confirmation proceedings and Relativity's motion to enforce the Plan involved the same causes of action for purposes of applying *res judicata*.

Netflix argues that the confirmation proceedings and the present action necessarily involved different questions because Netflix's rights had not yet arisen

as of the date of the Bankruptcy Court's Confirmation Order.  App. Br. at 29.  But this position frames the issue too narrowly.  As Netflix's own objections to the Plan reflect, all parties involved knew that the scheduled theatrical release dates would not occur until middle to late 2016.  (AA0127-28).  And yet, for that entire time, Netflix sat silent about its purported rights to stream the Films in June 2016, before their scheduled theatrical release dates.  Accordingly, as in *In re Layo*, "the facts that form the basis for [Netflix's] challenge" here were publically available for "anyone to see," and Netflix therefore possessed "both a motive and opportunity to confirm the status" of its rights under the License Agreement "affecting the debtor's estate at or before the time that the plan was confirmed." 460 F.3d at 293.

That these asserted rights would not have "vested" until later, according to Netflix, is therefore irrelevant.[9]  The pertinent point is that the same set of factual and legal issues were before the Bankruptcy Court in connection with both the confirmation proceedings and Relativity's Plan Enforcement Motion:  whether

---

[9]  Contrary to Netflix's suggestion that its putative rights to stream these films prior to their theatrical release did not "come into effect" or "vest" as of the confirmation hearing, App. Br. at 29, there was never at any pertinent time any question that Relativity would be able to timely deliver the Films to Netflix, assuming that Netflix had the "right" to stream them in June 2016. By mid-December 2015, two months before the confirmation hearing in February, it was a matter of public record in the bankruptcy proceedings that the films had been completed and were ready to be delivered.  (RA004 ("Disappointments Room and Masterminds have been completed but not released" (filed December 11, 2015)), RA540-41 ("But the film, and particularly 'Masterminds,' 'Disappointments Room' . . . those films exist, those films are done." (December 16, 2015))).

under the License Agreement, the Films were subject to streaming on Netflix's service prior to their scheduled theatrical releases.   In the confirmation proceedings, Netflix took the position that a prior theatrical release was *required* by the License Agreement and that there was doubt as to whether these specific films would be available to Netflix to stream in 2016 in light of this material requirement.   (AA0127-28).   But, on Relativity's Plan Enforcement Motion, Netflix took the contrary position that it has the right to stream the films in June 2016 regardless of when they are theatrically released.   The Bankruptcy Court properly ruled, on this independent ground, that *res judicata* precludes Netflix from proceeding in this manner.

### C.      The Order and Injunction May Also Be Affirmed Under the License Agreement

The Bankruptcy Court also correctly ruled, in the alternative, that the License Agreement precludes Netflix's position.  (AA1061).  Under California law, a "contract must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of the contracting."   Cal. Civ. Code § 1636. Applying this basic principle, the Bankruptcy Court correctly determined, on the basis of well-supported findings, that the License Agreement requires Netflix to execute the Date Extension Amendments and precludes it from streaming the subject films prior to their theatrical release.  (AA1061).

First, Section 5.6 of the License Agreement *requires* Netflix to "enter into all agreements reasonably requested by Relativity or any financial institution or other party (each a 'Lender')" so long as such amendments do not "change Netflix's rights under the License Agreement itself." (AA0015, AA1061).  As the Bankruptcy Court found, the Date Extension Amendments here fall within this provision:  they are customary and, not only is there nothing in these amendments "that would be inconsistent with the license itself," but, to the contrary, "Netflix's refusal to sign the amendments would create rights that would be inconsistent with the [L]icense [A]greement." (AA1061-62).

The Bankruptcy Court also correctly found that Netflix's position "is not consistent with the evidence that both parties offered at trial." (AA1063).  The License Agreement defines "Titles" as "any and all first run, theatrically released feature films." (AA0032, AA1063).  Relativity's expert confirmed, consistently with this requirement in the License Agreement, that release of the films on Netflix's service "prior to their theatrical release" would be "completely contrary to the 'standard release model,' a well-established industry custom.  (AA0406; *see also* AA0610; AA0700; RA223).[10]  Indeed, the contemporaneous record belies

---

[10]  While Netflix claims this testimony was inadmissible parol evidence, App. Br. at 45, "[p]arol evidence is admissible to establish the trade usage" in the film industry under California law, even if "the words are in their ordinary or legal meaning entirely unambiguous."  *Ermolieff v. R.K.O. Radio Pictures*, 122 P.2d 3, 6 (Cal. 1942).  In any event, Section 5.6 of the License Agreement expressly incorporates custom and practice in providing for what agreements Netflix

*(cont'd)*

Netflix's position.  When Netflix was negotiating the License Agreement in 2010, its internal counsel, Bryony Gagan, stated in a contemporaneous email:  "[W]e do need the film to have been theatrically released – that is what we contracted with Relativity for."  (AA1064-65, RA552).

Meanwhile, during Ms. Gagan's testimony at trial, the Bankruptcy Court expressly informed Netflix's counsel that his questions failed to reach the "real issue here":  whether the NOAs were intended to grant to "Netflix [an] option or [were] just an accommodation to the lenders."   (AA0852-53).   In response, Netflix's counsel "pointedly didn't ask her" whether Netflix had bargained for the right to stream films prior to theatrical release, from which the Bankruptcy Court properly found it could "only presume the answer would not have been favorable." (AA0853, AA0962-63).

The Bankruptcy Court's finding on the basis of all of this and other evidence in the record that it is "absurd" for Netflix to now contend that this theatrical release requirement was "just a way of describing the quality of the films that had to be distributed or provided to Netflix" is well-supported and should not be disturbed on deferential clear-error review.  (AA1064).

---

*(cont'd from previous page)*
is required to execute, making this evidence directly operative here.  The Bankruptcy Court did not abuse its discretion to admit this and other evidence of industry custom at the bench trial.

## IV.   THE ORDER AND INJUNCTION DO NOT IMPAIR NETFLIX'S FIRST AMENDMENT RIGHTS

Netflix makes an argument in its appeal brief that it never made to the Bankruptcy Court:   that the Order and Injunction violates Netflix's First Amendment rights.   The Order does not.   Rather, it memorializes the Bankruptcy Court's *res judicata* and judicial estoppel rulings and confirms that, because it was found to have acted in bad faith, Netflix is not to engage in any further collateral attacks on the Confirmation Order.   (AA1052).

As an initial matter, Netflix has waived this argument.   As the Second Circuit has explained, "a federal appellate court refrains from passing on issues not raised below."   *Adelphia Business Solutions, Inc. v. Abnos*, 482 F.3d 602, 607 (2d Cir. 2007).   As Netflix confessed in this Court, it did not raise the First Amendment issue in the Bankruptcy Court, either in briefing or at the hearing or in any post-trial motion.   (RA574-76).

The issue was also not one that first came to Netflix's attention when the Bankruptcy Court issued its Order and Injunction, as Netflix has suggested.   In the Bankruptcy Court, Relativity sought an order that Netflix is precluded and barred from "asserting that it may stream the films" in June 2016,[11] and second, "Netflix

---

[11] RA478 ("Judicial estoppel bars Netflix from asserting that it may stream the films next month"); *see also* RA481 ("Claim preclusion also prohibits Netflix from asserting that it may stream the Films in June 2016 under the NOAs").

should be (i) ordered to dismiss its demand for arbitration and (ii) precluded from filing any further demands in connection with this dispute," (RA486-87). Paragraph 3 of the Order and Injunction tracks these points, preventing Netflix from asserting ("contending") in any litigation, including arbitration, that it has the right to stream the films pre-theatrical release.  (AA1117).

Netflix recognized and responded to Relativity's arguments that Netflix should be precluded from asserting it has a right to stream pre-theatrical release. *See* (RA527) ("Relativity devotes considerable space to an argument that res judicata, or claim preclusion, somehow bars Netflix from asserting its contractual rights under the assumed contracts.").  Yet, Netflix limited its response to arguing that *res judicata* and estoppel *do not apply* in these circumstances:  "the principles of res judicata are so far from being applicable that a full response is barely warranted."  *Id*. at 26-29 (discussing *res judicata*, judicial, and equitable estoppel). That was Netflix's response at the closing argument in the Bankruptcy Court as well.  (AA0956-59).  But at no point below did Netflix raise any First Amendment concerns.

In any event, there is no First Amendment issue here.  As the Bankruptcy Court's decision makes clear throughout, *res judicata* and judicial estoppel are the basis for preventing Netflix from changing its position and now contending that it has the right to stream pre-theatrical release.  *See, e.g.*, AA1060; *see also* AA1063,

AA1068.  Netflix was also found to be in bad faith in asserting the position it did, and the Bankruptcy Court ordered, as courts routinely do in such circumstances, that Netflix is barred from re-asserting this bad-faith position.  (AA1068, AA1069). Thus, this Injunction is about protecting the Plan and the integrity of the judicial process, as the Bankruptcy Court has the power to do.[12]

None of the cases Netflix cites address bars on taking a particular position in the context of an estoppel or preclusion ruling.  Rather, those cases cited by Netflix address classic prior restraints, such as a ban on media publishing during the pendency of the trial of jurors' names disclosed in open court.  *See, e.g.*, *United States v. Quattrone*, 402 F.3d 304 (2d Cir. 2005).  In contrast, Netflix conveniently fails to cite a case where the Supreme Court has held in a context where First Amendment protections are at their zenith—publication by the media—that the application of promissory estoppel against a press outlet does not violate the First Amendment.  *Cohen v. Cowles Media Co*., 501 U.S. 663, 669-70 (1991).  Such an argument is controlled by "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news. . . .  There can be little doubt that the [] doctrine of promissory

---

[12] *See In re Petrie Retail, Inc.*, 304 F.3d at 230; *In re Riverside Nursing Home*, 137 B.R. 134, 138 (Bankr. S.D.N.Y.), *aff'd*, 977 F.2d 78 (2d Cir. 1992).

estoppel is a law of general applicability.  It does not target or single out the press.
Rather, insofar as we are advised, the doctrine is generally applicable to the daily
transactions of all [] citizens . . . .   The First Amendment does not forbid its
application to the press." *Id*.

Finally, constitutional avoidance principles counsel in favor of not reading
the Order and Injunction so broadly as to implicate First Amendment concerns.[13]
As noted, the Order and Injunction is reasonably read to implement the Bankruptcy
Court's *res judicata*, judicial estoppel, and bad faith rulings.   Netflix's stated
concern in making the First Amendment argument on its stay motion in this Court
was that the Bankruptcy Court's Order and Injunction would be interpreted to
preclude it from making arguments in its appeal brief.  (RA571).  Netflix has of
course done so with no consequence, underscoring that this is a non-issue.

---

[13]  *See, e.g.*, *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 808 (2d Cir. 2015); *United States v. Brennan*, 650 F.3d 65, 135 (2d Cir. 2011).

**CONCLUSION**

The Bankruptcy Court's Order and Injunction should be affirmed.

Dated:       New York, New York
             July 11, 2016

                          Respectfully submitted,


                           / s / Richard L. Wynne
                          Richard L. Wynne
                          Todd R. Geremia
                          JONES DAY
                          250 Vesey Street
                          New York, New York  10281-1047

                          Bennett L. Spiegel
                          Monika S. Wiener (*pro hac pending*)
                          JONES DAY
                          555 South Flower Street,
                          Fiftieth Floor
                          Los Angeles, California  90071

                          *Attorneys for the Appellees-Reorganized*
                          *Debtors, Relativity Fashion, LLC et al.*

                          -and-


                          Van C. Durrer, II
                          SKADDEN, ARPS, SLATE, MEAGHER &
                          FLOM LLP
                          Four Times Square
                          New York, New York  10036-6522

                          *Attorneys for Appellee-Plan Proponent,*
                          *Ryan Kavanaugh*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation in Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i).  It contains 13,971 words as counted by the word-processing system used to prepare the brief, exclusive of the parts of the brief exempted from the type-volume limitation by Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(ii).

Dated:       July 11, 2016

_____
Todd R. Geremia

**APPENDIX**

Netflix's brief on appeal repeatedly mischaracterizes the record and makes assertions that are not true, are contradicted by the record, or have no support in the record. This appendix sets out several of those statements in Netflix's brief and contrasts Netflix's misstatements with the actual record evidence showing that Netflix has mischaracterized the record.

| Netflix's Incomplete or Incorrect Assertion | Actual Record Evidence |
|---|---|
| In just the last two months, [Relativity] has lost the rights to one of the films on its "projected" release schedule, failed to deliver another, and has no prospect of releasing a third film as scheduled. And the lenders' Ponzi scheme lawsuit against the Relativity insiders continues in the New York state court. (RJN Ex. A.) [Page 4]. | Netflix cites no record support for these statements, and there is none. Netflix also completely mischaracterizes the pending litigation commenced by RKA Film Financing, LLC ("RKA") by repeating a spurious allegation in RKA's state court complaint that is currently subject to a motion to dismiss. Among Relativity's lenders, only RKA sued certain of Relativity's officers and directors, in an action commenced just before Relativity's Chapter 11 case (against Relativity's CEO and unnamed John Does, but not against Relativity) after RKA was aware that Relativity would likely file for Chapter 11 protection. All of RKA's actual claims against Relativity were resolved pursuant to the Chapter 11 Plan, and with the issuance of replacement notes. No other lenders to Relativity have sued Relativity or its officers and directors. On April 22, 2016, counsel for Relativity's CEO Ryan Kavanaugh filed a motion to dismiss in New York County Supreme Court [Index No. 652592/2015; NYSCEF Doc. No. 77], explaining that RKA's lawsuit against Mr. Kavanaugh should be dismissed because it is a breach of contract claim against Relativity masquerading as a fraud claim against Mr. Kavanaugh. **RKA appears to have filed the lawsuit against Relativity's CEO and other officers or directors of Relativity in a transparent effort to avoid the automatic stay that applied to any lawsuit against Relativity and its affiliates upon commencing their Chapter 11 proceedings.** |
| The License Agreement also contains a provision requiring Netflix to execute documents reasonably requested by Relativity's *lenders* when they are "of a nature which are customarily entered into in connection with comparable credit facilities." (*Id.* §5.6.) However, this provision also | **Netflix selectively misquotes the applicable documents in order to distort their meaning. The License Agreement, AA015, provides in full (emphasis added):** "Netflix shall, promptly upon the request of Relativity, enter into all agreements **reasonably requested by Relativity or any financial institution or other party (each a "Lender")** which extends or is willing to extend credit to Relativity against the License Fees payable to Relativity hereunder but in no event shall Netflix be required to enter into such agreements that cover unpaid License Fees for more than |

| | |
|---|---|
| includes language, on which Netflix insisted during negotiations (AA0825-26), limiting the scope of documents that Netflix can be required to sign. This language states that Netflix "shall not [be required to sign documents that] result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this Agreement ..." (AA0015, §5.6.) [Page 9]. | twenty five (25) Titles at any one time hereunder; provided such agreements are of a nature which are customarily entered into in connection with comparable credit facilities and shall not result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this Agreement other than the waiver, for the benefit of any such Lender, of any and all defenses (other than delivery of the Title Source Material in accordance with the terms, including delivery and timing provisions, hereof), if any, that Netflix may be entitled to assert against, or any and all rights, if any, which Netflix may have to offset against or otherwise withhold from amounts due and owing to Relativity hereunder. **Netflix acknowledges that this provision and Netflix's performance of its obligations under this Section 5.6 is essential to Relativity and its willingness to enter into this Agreement.**" |
| CIT Bank requested these terms to ensure that the license fees would be paid before the loans matured, regardless of unexpected events such as delays to planned theatrical release of the Subject Films. [Page 10]. | **CIT Bank set the Outside Dates in the NOAs so as to allow for streaming on Netflix's service only after the theatrical release of the films.**<br><br>**AA0627 [Testimony of Daisy Stall, CIT Representative]**<br>Q. In your experience, in dealing with notices of assignment that involved CIT Bank, Netflix, and Relativity, is the outside date always set so as to allow for streaming by Netflix only after a theatrical release by Relativity?<br>A. Yes.<br>MR. MICK: Foundation, for personal knowledge, Your Honor.<br>THE COURT: Okay, overruled.<br>Q. And why is that?<br>**A. Because the underlying intent as well as our understanding and part of our credit document -- credit approval documentation reflected initial theatrical release first and streaming after.**<br>Q. Does the sequence of release factor into CIT Bank's underwriting process in any manner?<br>A. Yes, it's -- it's part of our credit approval. Specifically for these two titles, our credit approval referenced target theatrical release dates and then also had estimated Netflix payment dates after that, approximately eight to twelve months after, with a hard date, that outside-payment date.<br>Q. So when these two notices of assignment were entered into in 2014, do you have an understanding of what the anticipated theatrical release dates were for |

| | |
|---|---|
| [Relativity] apparently intends to assume, and then perform all of its distribution agreements, for all territories and Netflix; however, the Plan does not cure the prospective defaults on the outside dates; and *does not propose to amend or extend those outside dates*; as such the September 30 release of *Masterminds* may cause wholesale breaches of the various distribution agreements. (AA0111, n.3, emphasis added.) [Page 13]. | "Masterminds" and "Disappointments Room"?<br>A. Yes. They were both set for 2015 release dates.<br>Q. And those release dates factored into the setting of the outside dates for both of these notices of assignment. Is that correct?<br>A. Yes.<br>Q. In your experience, having been involved with, I think you said, a ballpark of 700 or more notices of assignment, is an outside date in a notice of assignment ever set to be before a first-run domestic theatrical release date?<br>A. I've never seen that.<br>Q. Why is that, in your experience?<br>A. I think the presumption is the sequence of theatrical release first before any other windows.<br><br>**Netflix seeks to confuse by conflating the Notices of Assignment, financing documents entered into (i) for the benefit of Relativity's lenders and (ii) pursuant to the requirements of Section 5.6 of the License Agreement, with the License Agreement itself. Here, Netflix is speculating as to irrelevant provisions of other license agreements with other parties – such documents were not at issue at the trial and were not introduced into evidence at the trial. However, relevant trial testimony includes the following:**<br><br>AA0503 [Testimony of Linda Benjamin, Former Relativity Employee (emphasis added)]<br>Q. Do you see those two dates?<br>A. I do.<br>Q. Is June 17th, 2016 the outside payment date in this notice of assignment?<br>A. So long as delivery has been made, yes, June 17th, 2016 is the outside payment date.<br>**Q. While you were at Relativity, were outside payment dates extended on a regular basis in connection with NOAs?**<br>**A. NOA dates were extended frequently.**<br>Q. Why would an outside payment date be extended?<br>A. There are a number of reasons. Outside payment dates could be extended because the delivery date is being extended or because a theatrical release date is being extended or because the loan is being extended. Those are the primary reasons. |

Q. Primary reasons? And can you estimate as to how many of the Relativity films, when you were at Relativity, outside payment dates were extended in connection with NOAs?

A. Vis-a-vis Netflix?

Q. Vis-a-vis any distributor, any NOA.

A. Outside dates were being extended on virtually every picture.

Q. On virtually every picture with --

A. At least with respect to some of the distributors.

**AA0504 [Testimony of Linda Benjamin, Former Relativity Employee (emphasis added)]**

Q. When you were at Relativity, were outside payment dates extended with respect to films that Relativity had licensed to Netflix?

A. Yes.

**AA0511 [Testimony of Linda Benjamin, Former Relativity Employee (emphasis added)]**

THE COURT: Do you recall any instance when Netflix refused to execute a proposed amendment to a notice of assignment?

THE WITNESS: No.

MR. WYNNE: Thank you, Your Honor.

Q. Do you recall any instances where any other distributors refused to execute a notice of amendment extension -- excuse me -- a notice of assignment amendment or extension agreement?

A. No.

Q. So it was a fairly common business practice, in your experience?

A. It was a very common business practice.

**AA0984 [5/23/16 Trial Transcript]**

JUDGE WILES:

Well, I can think of at least one different inference [for why the Reorganized Debtors didn't raise the issue of Date Extension Amendments at Confirmation], which is that everybody assumed that this was not a substantial and material

-4-

| | |
|---|---|
| Relativity never addressed the Start Dates dates [sic] for the Subject Films during the confirmation process, so Netflix was taken by surprise when it received a letter from Relativity shortly after the Subject Films were delivered, demanding that Netflix execute amendments to the assumed NOA Contracts. [Page 16]. | **issue, yourself [Mr. McNutt] included. And that so long as the lenders were willing to agree to different dates, it would just be a simple matter of issuing an amendment to the outside release date that would be a matter of no consequence.** |
| | **This is a false statement. Netflix's Robert Roy testified about conversations with Relativity concerning Relativity's date extension amendments, and in evidence are emails from CIT's counsel confirming conversations that she had with Netflix's counsel concerning the requested date extensions, all prior to the receipt by Netflix of the letter from Relativity.** |
| | AA0752-54 [Testimony of Robert Roy, Netflix Employee] |
| | Q. You're aware that Netflix did refuse to sign NOA extensions for those two films recently, correct? |
| | A. Yes. |
| | Q. Okay. And that occurred in April of this year, correct? |
| | A. I don't recall the specific date. |
| | Q. Who made the decision to refuse to execute those extensions? |
| | A. A com -- a combination of people within the office: myself, Ted Sarandos. |
| | Q. Yourself and who? I'm sorry. |
| | A. Ted Sarandos. |
| | Q. Do you remember communications that you had with Mr. Spiegelman regarding the extensions? |
| | A. I do. |
| | Q. Do you remember telling Mr. Spiegelman that Netflix refused to enter the extensions because Netflix wanted to get out of this contract? |
| | A. I don't remember saying that, no. |
| | Q. Do you remember what you did say? |
| | A. I do. |
| | Q. What did you say? |
| | A. I spoke to him on two occasions. The first time he called, he asked -- there was some confusion about whether to deliver the titles. I told him we planned to abide by the letter of the law in the NOA and that they should deliver. He hung up and called me back. He called me back on Friday  morning, the day before they delivered the films, had a similar question, asked to clarify we're okay shifting the dates out. I told |

-5-

him we were not okay shifting the dates out, that we planned to follow the letter of the law in the NOAs. The only thing we would entertain, if we were to make a chan - - if we were going to make a change to the deal, we would agree to allow these two titles to come in, and then we would look to have these be the last two titles in the deal.

**Q. So you -- in exchange for executing the NOA extensions for these two films, you requested that the deal otherwise be terminated between Netflix and Relativity?**

A. In exchange for making a material business term change, yes.

**AA0767-68 [Testimony of Robert Roy, Netflix Employee]**

THE COURT: Now who did you -- who was it you identified that you spoke to at Netflix about the request to execute the amendments to the notices of assignments?

THE WITNESS: Ted Sarandos.

THE COURT: Okay. And who is that?

MR. WYNNE: No.

THE WITNESS: I'm sorry.

THE COURT: Who is that?

THE WITNESS: My boss, chief content officer.

THE COURT: Okay. When did you have discussions with him about this issue?

MR. WYNNE: Your Honor, I'm sorry. I was confused. Were you asking him who he spoke to at Relativity or who he spoke with at Netflix?

THE COURT: At Netflix.

MR. WYNNE: Sorry.

THE WITNESS: I can't recall the specific date. It was prior to them delivering the films.

THE COURT: Okay. And what did you -- tell me what that conversation was?

THE WITNESS: His conversation with me is, "We have agreed that we are going to follow the letter of the contract. I don't want to make any changes to the contract. We made a contract and we're going to live by it. If we want to make a material term change to the deal, these are the conditions under which I would consider making a material term change to the deal."

-6-

| | |
|---|---|
| **AA0358-59 [Email Exhibit E to Dkt. No. 1859 Dated 4/11/16]**<br>"[A]s I understand it, Netflix wants a 4-way agreement (with Debtors, CIT and Unifi) extending the delivery date."<br><br>**AA0360-64 [Email Exhibit F to Dkt. No. 1859 Dated 4/12/16]**<br>"I just got off the phone with Netflix's counsel. He has sent the docs on to Netflix but **doesn't anticipate any problem with Netflix agreeing to the extension as we outlined in the two amendments.**"<br><br>**AA0984 [5/23/16 Trial Transcript]**<br>JUDGE WILES:<br>Well, I can think of at least one different inference [for why the Reorganized Debtors didn't raise the issue of Date Extension Amendments at Confirmation], which is that everybody assumed that this was not a substantial and material issue, yourself [Mr. McNutt] included. And that so long as the lenders were willing to agree to different dates, it would just be a simple matter of issuing an amendment to the outside release date that would be a matter of no consequence.<br><br>**AA0493 [Testimony of Linda Benjamin, Former Relativity Employee]**<br>"[N]etflix's desire to have theatrically released pictures in the pay TV window; and that was the impetus for this agreement, not that it was simply acquiring more library products . . ." | This characterization of Relativity's motion is without support in the record. As the Bankruptcy Court itself acknowledged, "there was no prior testimony at confirmation as to any specific new outside date that would be requested from Netflix," nor could it recall "seeing any such provision in the plan documents or in the notes that were issued to CIT [Bank] and other parties." (AA1066.) [Page 26].<br><br>Had there been any doubt in Relativity's mind regarding its ability to honor the terms of the contracts it assumed, it was up to Relativity to reject the contracts during the chapter 11 proceeding. [Page 31].<br><br>Having assumed contracts it had reason to know could prove onerous, Relativity is now obliged to honor them. [Page 31].<br><br>Specifically, the Bankruptcy Court stated at several junctures that the issue in dispute had already been adjudicated, because the parties had agreed during the bankruptcy proceeding |

| | |
|---|---|
| that Relativity had promised to provide Netflix with films that had been theatrically released. (AA1047-49, 1058, 1063-65.) [Page 32].<br><br>Relativity agreed under the assumed contracts to provide films of proven theatrical quality. [Page 33]. | **AA0496 [Testimony of Linda Benjamin, Former Relativity Employee]**<br>"That provision was requested by Netflix, because at the time, Relativity had started acquiring pictures that were being theatrically released by third parties and not by Relativity itself. I recall that there was no screen count commitment, that it had to be theatrical -- a picture would have to be theatrically released to be a title, but that Netflix, at the time, said something to the effect that we don't trust necessarily that a third party is going to release the picture with the same quality of marketing and the quality of release, and that for Netflix, the theatrical release was imperative, obviously, to them, that they didn't -- they hadn't licensed things that were not going to be theatrically released." |
| In sum, Netflix's objection to assumption of the License Agreement was directed at showing that Relativity could not deliver the goods as promised. Netflix was not suggesting that its own rights should be compromised as a result. [Page 34].<br><br>Furthermore, Netflix's position in the present dispute is not at odds with its previous position, as the Bankruptcy Court mistakenly believed. (AA1058.) Netflix did not contend during the confirmation proceeding that its own rights were conditioned on Relativity's meeting its obligation to deliver films that were already theatrically released. It did not make assertions about its own rights at all; it simply objected to the assumption of contracts that Relativity would likely prove unable to perform. [Page 35-36].<br><br>It is undisputed, however, that the Subject Films delivered to Netflix at the end of April | **AA0128 [Netflix Plan Objection Dkt. No. 1352]**<br>That there are substantial doubts regarding the ability of Relativity to release enough films theatrically to meet its 2016 minimum, regardless of whether its proposed reorganization is successful, is underscored by Relativity's own projections. The Disclosure Statement includes a projected film release schedule. *See* Disclosure Statement, Exhibit B, p. 5 (the "Film Release Schedule"). This Film Release Schedule indicates that Relativity expects to release only seven films in 2016, including the four films that were originally intended for 2015. . . . Relativity projects releasing seven films again in 2017 . . .<br><br>**RA547 at ¶21 [Declaration of Robert Roy]**<br>The License Agreements contain substantive obligations regarding the films that can be submitted to Netflix. **In addition to technical requirements, there is a material requirement that the films provided must be first run, theatrically released films.** Further, each film under the U.S. License Agreement must generally be theatrically released on a minimum number of screens simultaneously.<br><br>**RA548 at ¶27 [Declaration of Robert Roy]**<br>It appears that Relativity has now announced new release dates in 2016 for *The Masterminds, The Disappointments Room, Solace* and *Before I Wake.* Given that Relativity canceled and rescheduled the release dates for these films multiple times in 2015, it remains unclear whether these films will actually be released on the proposed |

-8-

| | |
|---|---|
| need not have been theatrically released, although Relativity has represented to all, and contractually promised its lenders, that it will theatrically release these films before the end of the year. [Page 43]. | schedule.<br><br>**RA550 at ¶34 [Declaration of Robert Roy]**<br>There is an open question whether Relativity will even be able to release the films projected on its Film Release Schedule. Releasing even the seven films projected for 2016 is not a trivial matter. **Under the terms of the U.S. License Agreement, these films generally need to be released to a minimum of either 400 or 600 simultaneous screens, depending on the type of film.** Accomplishing this would require negotiating a distribution agreement for each film with one of the small number of major theater chains in the United States. That in turn would require that Relativity be able to commit a substantial print and advertising budget for each film. For certain films, the print and advertising budget is as much as or more than the production cost. Under the circumstances, it is unclear that Relativity can do this.<br><br>**RA552 [Email from Bryony Gagan on 9/2/10 (emphasis added)]**<br>"I am okay with the proposed modifications except that **we do need the film to have been theatrically released – that is what we contracted with Relativity for.**"<br><br>**RA552 [Email from Bryony Gagan on 8/26/10]**<br>"[N]etflix has to be sure it's getting a film that <u>was</u> theatrically released and the version of the film that was theatrically released."<br><br>**RA555 [Netflix and Relativity Press Release]**<br>[Netflix] and Relativity Media, LLC today announced a long term agreement through which major theatrically released films owned by Relativity will be licensed directly and exclusively to Netflix for streaming to its subscribers during the "pay TV window." |
| The Bankruptcy Court based its decision primarily on extrinsic evidence of "custom," which would not have been admissible under state contract law. [Page 44]. | **This is a gross misstatement of the complete evidentiary record and the Bankruptcy Court's detailed findings, which were not primarily based on evidence of custom. For example, as shown in the excerpt below, Judge Wiles explained that the License Agreement bases Netflix's payment to Relativity solely upon the results of theatrical release, i.e., domestic box office ("DBO"). If** |

**there is no DBO, then Netflix does not pay any fee to Relativity for streaming the films on its service.**

**AA1049 [5/27/16 Decision Transcript]**

JUDGE WILES:

The license agreement says that Netflix will pay a license fee that is based on the domestic box office receipts. These are expected to be very big movies. The Debtors made that clear and their witnesses made that clear at the confirmation hearing. If they are released in the sequence expected, there will be a large domestic box office and a large Netflix license fee that will be proportionate to that. Under **Netflix's proposal in its current interpretation of the contract, Netflix would temporarily pay a fee of 3.7 million dollars for each movie to the lenders, but then would immediately have the right to recapture that fee because there wouldn't have been a domestic box office release, and therefore no license fee under the calculation of the license agreement;** and there would never be a license fee that would actually be payable from Netflix to Relativity unless and until some theatrical release could be accomplished after a distribution by Netflix.   And the Debtors testified credibly, that could never happen.

**AA1061-62 [5/27/16 Decision Transcript]**

JUDGE WILES:

As to section 5.6 of the license agreement: Netflix is obligated to comply and to cooperate so long as the terms of the document it is asked to sign does not change Netflix's rights under the license agreement itself.  **There is nothing about the new amended Notices of Assignment that the Debtors and lenders have requested that would be inconsistent with the license agreement itself.**   To the contrary, Netflix's refusal to sign the amendments would create rights that would be inconsistent with the license agreement.   What Netflix really is saying is that it doesn't want to sign an amended notice of assignment that would be inconsistent with a prior notice of assignment.   But there's nothing in Section 5.6 of the license agreement that says that Netflix can refuse to cooperate on that ground.  **So long as the agreements requested by the debtors and the lenders are consistent with the license agreement itself, Section 5.6 requires Netflix to cooperate.**   In fact, it requires all agreements reasonably requested to accommodate the Debtors and

lenders in that regard. Reference to all agreements includes amendments, cancellations and replacements of prior agreements just as much as it covers the initial agreements themselves. And I note that there is no arbitration clause in Section 5.6 or in the license agreement itself. Netflix argues that the agreement being amended has an arbitration clause, but that does not stop the application of Section 5.6 or make Section 5.6 itself subject to arbitration. If the parties had so intended, they should have said so in the arbitration provision, but the notice of assignment noticeably stops short of saying that it applies to disputes under Section 5.6 of the license agreement itself.

**AA1062-64 [5/27/16 Decision Transcript]**
JUDGE WILES:

The first problem is that [Netflix's] position is just not consistent with other terms of the parties' agreements. **The license agreement makes clear that a prior theatrical release is a requirement. You can't even calculate a license fee without it, and no distribution rights are granted in the absence of a movie meeting that condition.** Netflix does not have distribution rights unless a film is a "Title," and it cannot be a Title unless it is theatrically released at a minimum number of theatres. In fact, a film can never be a first-run theatrically released film, as required by the license agreement, if it has been previously released on Netflix itself. The testimony by Ms. Benjamin on that issue was credible. The testimony by Mr. Roy, to the contrary, was not. **Furthermore, the release of the movies by Netflix before a theatrical release would actually destroy the ability to meet the theatrical release requirement. It would create the absurd situation in which Netflix would have displayed a film only to find out later that it had no legal right to do so.** The second problem is that the Notices of Assignment do not say what Netflix contends. **They say explicitly that they are for the benefit of the lenders only. They also say that they take priority over the distribution agreement only as to the lenders and the agent. They do not say that the definition of Title is altered or that these movies qualify as Titles even if they are not yet theatrically released.** The third problem is that Netflix's current interpretation is not consistent with the evidence that both parties offered at trial. At trial, Mr. Roy took the position that a theatrical release could happen after the distribution of a movie by Netflix. That testimony was not credible

| | |
|---|---|
| Although Hohauser correctly stated that the express terms of the NOA Contracts give Netflix the right to release the films on the Start Date, he opined that these rights are "completely contrary to the 'standard release model', a well-established industry custom." (AA0406, ¶10.). [Page 45]. | and it also was not consistent with his prior statements. **It is absurd for Mr. Roy to contend that the material requirement of a theatrical release could be satisfied after the fact. It is the prior theatrical release that generates the popular interest in the movie on which Netflix relied, and that was clearly the point that Netflix was making to me at the confirmation hearing.** The requirement of a theatrical release is also incorporated into the very definition of a Title under the license agreement. Netflix argued, in this proceeding, that the reference to a theatrical release was just a way of describing the quality of the films that had to be distributed or provided to Netflix. That contention is absurd. If quality was the issue, the parties would have said so. Netflix itself said, in its prior papers, that theatrical release was a material requirement and that what Netflix was entitled to was films that already had been widely released. Ms. Gagan testified that Netflix allegedly bargained, in the Notices of Assignment, for a set date, for its own benefit, that would give Netflix an immediate distribution right. But that's belied by the credible testimony of the Debtors' witnesses, which was to the effect that the designation of an outside payment date and a waiver of defenses to payment at that time was customary and was for the benefit of the lenders. It was not something that Netflix separately bargained to do for its own benefit; it was simply something that it was required and expected to do under section 5.6.<br><br>**This mistates Mr. Hohauser's testimony, which is that Netflix refusing to change the dates as requested would result in a situation completely contrary to not only industry custom, but the actual contractual relationship between the parties.**<br><br>**AA0405-06 [Declaration of Ronald Hohauser Dkt. No 1861]** Immediately before the occurrence of the Effective Date, Netflix was provided routine documentation prepared by the Senior Secured Lender, in the form of proposed amendments to the Subject Films NOAs, which have since been modified, and the current versions of which are attached to the Motion as Exhibit D (the "Date Extension Amendments"), in order to adjust the release dates to conform to the schedule presented in Court as well as defer Netflix's own payment obligations correspondingly. To date, Netflix has not signed the Date Extension Amendments.... By not signing the Date Extension Amendments, Netflix would be |

| | | |
|---|---|---|
| able to release the Subject Films prior to their theatrical release which is completely contrary to the "standard release model," a well-established industry custom. **As described in the Motion, and in the Roy Declaration itself, pursuant to the standard release model, films are first scheduled for a theatrical release, followed by staggered releases over time to the various other mediums available to viewers.** Customarily, only after a film is released theatrically for a period of time would it then be released to downstream media such as video on demand, home video DVD's, streaming media services, pay TV and Free TV.<br><br>*See also* AA0687-88. | **This misstates the Bankruptcy Court's conclusion and the testimony of the witnesses at trial that the Bankruptcy Court found credible.**<br><br>**AA0483 [Testimony of Linda Benjamin, Former Relativity Employee]**<br>A. 5.6 obligates Netflix to execute customary financing documents in favor of the lender and completion guarantor, because without that obligation, then Relativity couldn't use the contractual obligation -- Netflix's contractual obligation to pay as collateral for a production loan. So this provision was entered so that Netflix understood what the customary financing documents were and how -- and understood that we needed -- excuse me -- needed to be able to rely on Netflix's agreement to enter into those or we wouldn't be able to finance the pictures.<br><br>**AA0485-86 [Testimony of Linda Benjamin, Former Relativity Employee]**<br>Q. When 5.6 talks about "Netflix shall enter into all agreements," does that refer to license agreements? Do you understand that to refer to license amendments?<br>**A. No, this has to do with things requested as part of the financing of a particular picture or pictures or some other credit situation. But it doesn't require them to amend the distribution agreement. The distribution agreement stays the same.**<br>Q. And in fact, in the middle of 5.6 it talks about -- let me try to -- those are "provided such agreements of the nature which are customarily entered into in connection with comparable credit facilities," those are the types of agreements -- little a -- agreements that you were discussing: NOAs, base rate title designations? | In the final version, Section 5.6 has a single purpose and effect: it binds Netflix to a limited form acknowledgement with the lending bank directing Netflix to pay the bank without offset. Beyond that, Section 5.6 explicitly states that no other term or obligation of Netflix is or can be modified by this provision. The Bankruptcy Court erred in finding that Section 5.6 should be construed as creating an open-ended obligation on Netflix's part to modify the contracts in any way that Relativity desires. [Page 47]. |

-13-

A. Yes.

Q. Correct? And it goes on to say: "and shall not result in any additional material obligations on Netflix's part or otherwise adjust any term or provision of this" -- capital A -- "Agreement." Do you see that?

A. I do.

**AA1060-61 [5/27/16 Decision Transcript]**
JUDGE WILES:

The Debtors' witnesses -- Ms. Benjamin, Ms. Stall, and Mr. Hohauser -- testified credibly that the standard practice in the industry is for the distributor to agree to assign payment to the lenders and also to include an outside date for payment to the lenders in order to ensure that the lenders receive money before the loans come due. These witnesses further testified credibly that it is a standard and customary practice for the distributors to waive defenses to such payments. The distributors do so because the lenders are helping to finance the films that the distributors one day hope to distribute. We now have revised financing terms under the plan, and through the issuance of replacement notes to CIT. The lenders have requested a revised Notice of Assignment. It is customary to provide one; the testimony makes that clear. **Netflix's refusal to cooperate seeks to turn the customs on their head. Netflix wants to seize the rights to release these movies first, but Netflix itself has submitted declarations to me saying that prior theatrical releases are the customary practice, not only the customary practice, were essential preconditions to Netflix's own rights.**

**AA1061-62 [5/27/16 Decision Transcript] (Quoted in full above; see pages 10-11)**

**AA1062-64 [5/27/16 Decision Transcript] (Quoted in full above; see pages 11-12)**

-14-

**CERTIFICATE OF SERVICE**

I, Todd R. Geremia, certify that on July 11, 2016, a true and correct copy of the foregoing APPELLEES' BRIEF was served upon counsel of record for all parties to this appeal through the Court's CM/ECF system.

Dated:  July 11, 2016             */s/ Todd R. Geremia*
       New York, New York    _____
                                                Todd R. Geremia